**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| **GROUP ASSETS, LLC**<br>**5207 Washington Boulevard**<br>**Tampa, Florida 33619,**<br><br>**and**<br><br>**DR. GLENN W. CHERRY**<br>**5207 Washington Boulevard**<br>**Tampa, Florida 33619**<br><br>**and**<br><br>**CHARLES W. CHERRY, II, ESQ.**<br>**5207 Washington Boulevard**<br>**Tampa, Florida 33619,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**FORTRESS INVESTMENT GROUP**<br>**1345 Avenue of the Americas, 46th FL**<br>**New York, NY 10151**<br><br>**and**<br><br>**RL TRANSITION CORPORATION**<br>**745 Fifth Avenue, 18th Floor**<br>**New York, NY 10151**<br><br>**and**<br><br>**ROCKLYNN RADIO, LLC**<br>**GROWTH PARTNERS, L.P.**<br>**745 Fifth Avenue, 18th Floor**<br>**New York, NY 10151**<br><br>**and**<br><br>**D.B. ZWIRN SPECIAL**<br>**OPPORTUNITIES FUND, L.P.**<br>**745 Fifth Avenue, 18th Floor** | : | **Case No. 8:09-cv-1530**<br><br>**Judge Covington**<br><br>**AMENDED COMPLAINT AND JURY DEMAND** |

**New York, NY 10151** :

**and** :

**D.B. ZWIRN** :
**745 Fifth Avenue, 18th Floor** :
**New York, NY 10151** :

**Defendants.** :

Plaintiffs Dr. Glenn W. Cherry, Charles W. Cherry II, Esq. and Group Assets, LLC, hereby allege for their Amended Complaint as follows:

## INTRODUCTION

1. This action is related to United States District Court for the Middle District of Florida, Case No. 8:09-cv-33-T33-EAJ, Dr. Glenn W. Cherry, et al. v. D.B. Zwirn Special Opportunities Fund, L.P., (hereinafter the "Class Action"). It is also related to Middle District of Florida, Case No. 3:08-cv-222-J-33TEM filed on February 4, 2008, and removed to federal court on March 3, 2008. See **Exhibit A** for notice of pendency of related actions filed on March 17, 2009. Under M.D. Florida local procedures, this action and 8:09-cv-33 should have been consolidated with 3:08-cv-222.

2. Plaintiffs Dr. Glenn W. Cherry, Charles W. Cherry II, and Group Assets, LLC are unsecured creditors and representatives of a putative class of Plaintiffs, who on March 17, 2009, filed an Amended Complaint with derivative and class allegations ("The Class Action") against D.B. Zwirn Special Opportunities Fund, L.P. ("DBZ"), Daniel B. Zwirn, personally and others, (collectively, the "Zwirn Defendants") for an amount not less than $250,000,000 for unlawful and predatory lending and collection practices, violation of 15, U.S.C. §1691, et seq., the Equal Credit Opportunity Act, 42 U.S.C. §1981 for racial

discrimination, violation of Section 10(b) of the Securities Act of 1934, and Rule 10b-5, and Article 9 of the Uniform Commercial Code, among other claims. A motion to certify Plaintiffs' class was filed on April 30, 2009, and is still pending. Also pending is Case No. 3:08-cv-222 with claims against DBZ filed by Cherry Group, LLC. An Amended Complaint is due to be filed in Case No. 3:08-cv-222 that will also include class and potentially derivative allegations against DBZ.

3. Notwithstanding the pendency of the above-described actions against the Zwirn Defendants, upon information and belief, on June 1, 2009, DBZ, with full knowledge of the existence of the serious state and federal claims against it, transferred control over substantially all of its assets to Fortress Investment Group ("Fortress"), and affiliated entity or entities, or both, for substantially less than fair value.

4. DBZ and Zwirn made the transfers in control referred to above with the actual intent to hinder, delay or defraud creditors or future creditors, including Plaintiffs' putative class. DBZ and Zwirn did not receive reasonably equivalent value in exchange for the transfer or obligation. DBZ and Zwirn both believed or reasonably should have believed that either or both incur claims and judgments beyond their abilities, either jointly or severally, to pay as they became due.

## I. JURISDICTION AND VENUE

5. This Court has jurisdiction over all causes of action asserted herein under 28 U.S.C. §1332. Plaintiffs are citizens of Florida and Defendants are citizens of the States of Delaware and New York, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

Venue is properly laid in the Middle District of Florida under 28 U.S.C. §1391(a)(2). A substantial part of the acts and omissions giving rise to these claims occurred in the Middle District of Florida.

## II. PARTIES

6. Plaintiff Dr. Glenn W. Cherry, an African-American and a Florida native, is the former president/CEO of Tama Broadcasting, Inc. ("Tama"), a current member of Tama's Board of Directors, and a Tama shareholder. He started in advertising media sales in 1978, when he sold advertising for the family-owned and operated newspaper, the Daytona Times.

7. The Cherry Family, led by the late family patriarch, Charles W. Cherry, Sr., former president of the Florida State Conference of NAACP Branches, acquired its first radio station, WPUL-AM 1590 in Daytona Beach, FL in 1989, followed by WTMP-AM in Tampa, FL in 1997 from Broadcast Capital, Inc. Dr. Cherry moved to Tampa as GM of WTMP and raised the station's revenue from $500,000 to $2 million and cash flow from a loss of $150,000 to over $500,000 profit in 4 years. WTMP-AM has served Tampa's Black community for more than 50 years.

8. In 2002, Tama acquired WTMP-FM in Tampa and expanded into the Jacksonville, FL market with WHJX- FM. In 2003, Tama became a cluster in Jacksonville by acquiring WSJF-FM, WJSJ-FM and WOKF- FM. Tama continued its regional growth in 2004 with acquisitions in the Savannah, GA market of WSSJ- FM, WMZD-FM and WSGA-FM. These acquisitions, along with two family-owned newspapers, made Tama the largest African-American-owned media company in the

Florida, with 11 owned or affiliated radio stations. Currently, Dr. Cherry serves on the national board of directors of the Radio Advertising Bureau.

9. Dr. Cherry served on active duty in the U.S. Air Force at the rank of captain from 1984-1988 and was honorably discharged from reserve duty in November 1991. He received a B.S. degree in Biology from Morehouse College in 1980 and a Doctor of Veterinary Medicine (DVM) degree from Tuskegee University in 1984. From 1993-1997, he served as a political appointee in the Clinton Administration at the United States Department of Agriculture and worked a six-month assignment in the East Wing of White House.

10. Dr. Cherry held several significant positions in veterinary medicine from 1988-1997 including Confidential Assistant to the Administrator of APHIS at the Department of Agriculture. He was one of five State Veterinarians for the Maryland Racing Commission, Supervisory Veterinarian at the National Institutes of Health (NIH), Institute of Mental Health, and Biologist at the U.S. Consumer Product Safety Commission.

11. Charles W. Cherry II is a member of the Tama Board of Directors and is its former Vice President/General Counsel and is a Tama shareholder. He has more than 25 years of media management experience when he began as the publisher of the Cherry family-owned weekly newspaper, the Daytona Times. C. Cherry has served as the General Manager of WPUL-AM since 2000.

12. Charles W. Cherry II is publisher of the Florida Courier, the most widely circulated weekly newspaper with statewide distribution in Florida. He earned his undergraduate degree in Journalism from Morehouse College in 1978, and the Master of

Business Administration and Juris Doctor degrees from the University of Florida in 1982. He has served as an Assistant State Attorney for Broward County, FL, and also as Fort Lauderdale's City Prosecutor before opening a private practice. He is also author of *Excellence Without Excuse: The Black Student's Guide to Academic Excellence.*

13. Group Assets, LLC is the Cherry Brothers' company that owns the land/towers and/or studio buildings in the vicinity of Tampa, FL and Savannah, GA from which three of Tama's nine stations broadcast. Dr. Glenn W. Cherry, Charles W. Cherry II and Group Assets, LLC are citizens of Florida, and all are Tama's unsecured creditors.

14. D. B. Zwirn & Co., L.P. ("DBZ") is a privately owned hedge fund with between $7 billion and $8 billion under management in 2006. Internet research indicates DBZ took in $100 million in management fees in 2006. It was founded in 2001 and is based in New York City.

15. Zwirn has investments worldwide, in the U.S., Germany, and India, among other places. It is a large player in the unregulated hedge fund world. Upon information and belief, Zwirn has a substantial amount of undisclosed foreign investment. Zwirn was Tama's senior secured creditor.

16. Daniel Bernard Zwirn is the founder and former Chief Executive Officer, and Managing Partner at DBZ. He founded the firm in October 2001. Prior to attending business school, he served as an analyst in media and communications mergers and

private equity investments at Lazard Frères & Co. and Madison Dearborn Partners, respectively. Zwirn's hedge fund is under investigation by the Securities & Exchange Commission for allegedly overvaluating its assets.

17. Defendants Zwirn, DBZ and Fortress are citizens of New York or Delaware. RL Transition Corporation and Rocklynn Radio, LLC also citizen of New York or Delaware, are entities 100% controlled by Zwirn and along with Zwirn and DBZ are referred to hereinafter as the "Zwirn Defendants." At the time of the June 1, 2009 transfer of control, Zwirn was in a position to, and in fact did, control and dominate DBZ.

18. In 2004, DBZ embarked upon a specific campaign to market loans to distressed entities. Among other things, DBZ sent representatives and brokers to industry conferences to advertise the availability of financing to small and minority-owned companies such as Tama, regardless of credit history or financial condition. DBZ specifically targeted industries where prospective borrowers possessed assets that were capable of being liquidated in fewer than 90 days.

19. Once DBZ undertook to provide financing, it did so in an atmosphere where it had far superior bargaining power over its borrowers as a consequence of the enormous collection of unregulated capital that its fund constituted, imposed adhesive contractual provisions which it was unwilling to negotiate, injected its own representatives into the day-to -day operations of the borrowers under the pretext of providing technical assistance, interfered with relationships between the borrowers and third parties in order

to claim an entitlement to direct access to revenue, made misrepresentations concerning day-to-day control of federally regulated assets such as radio and television broadcast licenses, and misrepresented to investors and federal agencies such as the Federal Communications Commission and bankruptcy courts, its degree of foreign ownership by reason of accounting fraud and comingling of offshore assets with onshore assets.

20. DBZ's lending strategy was actually a "loan to own" strategy calculated to deprive the borrowers and unsecured creditors of any equity in their collateral and to obtain title to the collateral at a depressed price, only to later attempt to bundle the collateral with like kinds of assets and to sell or flip those bundled assets on the market at an enormous return for DBZ, a hedge fund.

21. In March 2004, Tama received a $20 million loan from Zwirn to purchase the Savannah cluster of three stations and to refinance existing debt. The loan included advance payment of 18 months of interest (approximately $4 million) to Zwirn.

22. Tama's due diligence efforts did not reveal that Zwirn was a predatory lender whose aim was to intentionally loan to distressed or growing companies with the goal of owning them. At the time, Zwirn had not yet begun to 'harvest' distressed assets.

23. In September 2004, Zwirn issued Tama a notice of default for missing budget projections in 3rd quarter 2004. During this period, four separate hurricanes hit Florida during a six-week period and some of Tama's stations were off the air due to power

outages and damage to facilities. Nevertheless, Tama's interest rate was raised from 13% fixed to a default rate of about 22%, which ate through the 18-month interest reserve quickly.

24. From December 2004 to June 2005, Tama was advanced is $1.5 million to pay the default fee as well as the anniversary fee due in March 2005. Total proceeds Tama ended up being approximately $679,203, but the Licensee incurred an additional liability of $1.5 million plus interest. The loan was amended and restated in June 2005 to an adjustable rate, which continued to rise every subsequent quarter.

25. In September 2006, Tam**a's** preferred equity shareholder, Black Enterprise/Greenwich St. Fund (BE/GS) and Zwirn begin secret meetings regarding a Zwirn takeover of Tama. The Cherry Brothers were unaware of such meetings. BE/GS was not authorized by Tama's board to negotiate on behalf of Tama. The Cherry Brothers were still in control of the company at that time. Tama's assets were valued at approximately $28 million at the time.

26. According to published reports, both Daniel B. Zwirn and DBZ have been under investigation for fraud by the SEC since spring 2007 for accounting irregularities including, among other things, illegal transferring of assets between their foreign and domestic subsidiaries and falsifying performance numbers. Upon Plaintiffs' knowledge and belief, the SEC investigation for fraud is ongoing.

27. As a result of the SEC investigation, the actions that triggered the investigation, a delayed audit by PriceWaterhouseCooper and the retraction of the "clean bill of health" status that the auditors gave Zwirn for its 2006 audit, the foreign and domestic partners demanded more than $2.1 billion dollars in redemptions from Zwirn as of the last available report Plaintiffs were able to obtain.

28. In January 2009, Plaintiffs commenced a class action against DBZ and Zwirn as stated above. Cherry Group, LLC, an entity wholly owned by Plaintiffs Glenn and Charles Cherry had filed Case No. 3:8-cv-222 against DBZ in February 2008.

29. Subsequent to the filing of the Class Action, the Zwirn Defendants transferred control over substantially all of DBZ's assets for less than fair value to Fortress. The entire scheme is laid out in Proxy Statement dated as of May 5, 2009 (the "Proxy Statement") and attached herein as **Exhibit B.**

30. The relevant provisions of the Proxy Statement and the fraudulent conveyance scheme is summarized at pages 1 and 2. Essentially, the Zwirn Defendants, which formerly owned, managed, or have secured interests in some $7 billion in assets – including Tama's assets formerly valued at $28 million – conveyed control of the those assets to a Fortress-affiliated company for a total of $51 million, including a $15 million cash fund in attorneys' fees for the Zwirn Defendants to defend themselves, as well as $17.2 million of compensation divved up among the Zwirn Defendants.

31. The $51 million was paid to the Zwirn Defendants not from Fortress' assets, but from the assets owned by Zwirn and now controlled by Fortress.

32. Defendants are paying Fortress to take assets off of Zwirn's corporate hands, as if Tama's assets have no value.

33. As a result of DBZ's transfer of control in the event that Plaintiffs prevail on their claims against Zwirn and DBZ, DBZ will have no assets to satisfy Plaintiffs' claims.

34. The Zwirn Defendants knowingly and intentionally transferred control over DBZ's assets to hinder, delay or otherwise interfere with creditors or future creditors.

35. Plaintiffs have no adequate legal remedy and will be irreparably harmed unless immediate judicial intervention occurs.

36. The fact that the transfer of control complained of here may constitute a fraudulent conveyance was specifically admitted in Proxy Statement on pages 22-26 as follows:

> Certain Risk Factors If the Transactions Are Consummated…DBZCO may become subject to bankruptcy or similar proceedings following the consummation of the Transactions. In the event DBZCO becomes subject to bankruptcy or similarly proceedings, a creditor could potentially assert that one or more of the transactions constitute a fraudulent transfer on the basis that DBZCO did not receive fair consideration or reasonably equivalent value for the transferred assets. In addition, if DBZCO becomes subject to such proceedings, its ability to perform its obligations under the Transaction agreements to which it is a party may be materially

> impaired. In such an event, the Transactions could be challenged and a bankruptcy court would have broad authority to determine remedies. (Emphasis added).

## **II. CLAIMS FOR RELIEF**

### **COUNT I**

### **ACTUAL FRAUDULENT TRANSFER**

37. Plaintiffs reallege that which has been stated in Paragraphs 1 through 36 above as though fully restated herein.

38. Through the fraudulent scheme, as detailed above, Zwirn and DBZ transferred control over valuable assets from DBZ and its affiliates and predecessors worth more than $7 billion to Fortress for "a song," according to published reports in the Wall Street Journal and trade publications, and according to Zwirn's own Proxy Statement.

39. The transfer of control was made to or for the benefit of the Zwirn Defendants and Fortress.

40. At the time the transfer of control was undertaken Zwirn was in a position to, and in fact did control and dominate DBZ.

41. Zwirn and DBZ made the transfers of control with the actual intent to hinder, delay, or defraud the creditors or future creditors, including Plaintiffs' claim, and were illegal under Article 10, Section 270 of the laws of New York, as well as Sections 725.105 and 726.106, Florida Statutes (2008).

42. As a result of the transfers of control, Plaintiffs have been harmed.

### **COUNT II**

### **CONSTRUCTIVE FRAUDULENT TRANSFER**

43. Plaintiffs reallege that which has been stated in Paragraphs 1 through 42 above as though fully restated herein.

44. DBZ did not receive reasonably equivalent value from Fortress in exchange for the June 1, 2009 transfers of control.

45. The transfers of control were made to or for the benefit of Fortress.

46. At the time the transfers of control in question Zwirn was in a position to, and in fact did, control and dominate DBZ.

47. Under Article 10 Section 270 of the laws of New York, as well as Sections 725.105 and 726.106, Florida Statutes (2008), Plaintiffs are entitled to avoid the transfers of control to recover the property or value of the property over which control was transferred to Fortress, their affiliates, or third parties for the benefit of Fortress together with interest.

48. The Zwirn Defendants' conduct set forth herein was fraudulent, wanton, malicious or willful in complete disregard of Plaintiffs' rights. Accordingly, Plaintiffs seek relief in the form of compensatory exemplary or punitive damages in an amount to be determined at trial.

**COUNT III**

**CIVIL CONSPIRACY**

49. Plaintiffs reallege that which has been stated in Paragraphs 1 through 48 above as though fully restated herein.

50. On information and belief, Defendants were aware of Plaintiffs' claims when it was agreed that Fortress would take control of DBZ's assets.

51. On information and belief, Defendants conspired to effectuate the fraudulent conveyance by agreeing to assume control of DBZ assets despite Plaintiffs' claims. DBZ intentionally furthered the conspiracy by providing Fortress with a monetary incentive, an

unusually deep discount, to complete the transfer of control thereby harming Plaintiffs. Defendants benefited from the fraudulent conveyance and/or exercised dominion and control over the fraudulently conveyed assets.

52. Defendants conduct set forth herein was fraudulent, wanton, malicious or willful and in complete disregard of Plaintiffs' rights. Accordingly, Plaintiffs seek relief in the form of compensatory and exemplary or punitive damages in an amount to be determined at trial.

**COUNT IV**

**AIDING AND ABETTING FRAUDULENT CONVEYANCE**

53. Plaintiffs reallege that which has been stated in Paragraphs 1 through 52 above as though fully restated herein.

54. On information and belief, Defendants agreed prior to the completion of the sale that Fortress would purchase control over DBZ's assets notwithstanding the pending Class Action.

55. On information and belief, Fortress knowingly provided substantial assistance to Zwirn and DBZ in the fraudulent conveyance of the transfer of control by, among other things, agreeing to purchase DBZ for far less than fair value harming Plaintiffs.

56. DBZ and Zwirn benefited from the fraudulent conveyance and/or exercised dominion and control over the fraudulently conveyed assets.

57. Plaintiffs seek compensatory damages against Defendants for all damages sustained as a result of its wrongdoing, in an amount to be proven at trial, including interest thereon.

58. Defendants' conduct set forth herein was fraudulent, wanton, malicious or willful in complete disregard of Plaintiffs' rights. Accordingly, Plaintiffs seek relief in the form of exemplary or punitive damages in an amount to be determined at trail.

**COUNT V**

**UNJUST ENRICHMENT**

59. Plaintiffs reallege that which has been stated in Paragraphs 1 through 58 above as though fully restated herein.

60. Defendants were unjustly enriched at Plaintiffs' expense.

61. Through fraudulent scheme, and as detailed above, Defendants caused the transfers of control described above. Defendants benefited directly from the transfers of control by placing control over the disposition of assets beyond the reach of unsecured creditors.

62. Defendants' retention of the above-mentioned benefits would violate fundamental principles of justice, equity and good conscience.

63. As a result of Defendants unjust enrichment, equity, and good conscience requires appropriate restitution to Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A. Awarding compensatory damages in favor of Plaintiff against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proved at trial, including interest thereon;

B. Awarding appropriate restitution to Plaintiff from Defendants for Defendants' unjust enrichment or setting aside and annulling the transfer of control;

C. Awarding Plaintiffs punitive and/or exemplary damages where such damages are available;

D. Appointment of a Receiver to take control of the Zwirn assets and of all assets over which control was transferred from DBZ, Zwirn, or both, to Fortress

E. Avoidance of the transfer of control or obligation from DBZ, Zwirn, or both, to the extent necessary to satisfy Plaintiffs' claims;

F. Attachment or other provisional remedy against the assets over which control was transferred or other property of the transferee in accordance with applicable law;

G. An injunction against further disposition by Zwirn, DBZ, or Fortress of the assets transferred or of other property over which control was transferred.

H. Awarding Plaintiffs reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

J. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff requests a jury by the maximum number allowable at law.

_s/Percy Squire, Esq._______________
PERCY SQUIRE (0022010)
PERCY SQUIRE CO., LLC
514 S. High Street
Columbus, Ohio 43215
Telephone: (614) 224-6525
Facsimile: (614) 224-6529
psquire@sp-lawfirm.com
Counsel for Plaintiffs

*s/Charles W. Cherry II, Esq.*
Charles W. Cherry II, Esq.
5200 SW 18th St.
Plantation, FL 33317
Facsimile: (954) 583-9667
CCherry2@aol.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing was served on the parties on the attached service list as indicated by electronic mail via the Court's Electronic Document Filing System, U.S. Postal Service or facsimile, January 6, 2010:

FORTRESS INVESTMENT GROUP
1345 Avenue of the Americas, 46th FL
New York, NY 10151

RL TRANSITION CORPORATION
745 Fifth Avenue, 18th Floor
New York, NY 10151

ROCKLYNN RADIO, LLC
GROWTH PARTNERS, L.P.
745 Fifth Avenue, 18th Floor
New York, NY 10151

D.B. ZWIRN SPECIAL
OPPORTUNITIES FUND, L.P.
745 Fifth Avenue, 18th Floor

New York, NY 10151

D.B. ZWIRN
745 Fifth Avenue, 18th Floor
New York, NY 10151

_*s/Percy Squire, Esq.*_______________
PERCY SQUIRE (0022010)