# D.B. ZWIRN
# SPECIAL OPPORTUNITIES FUND, LTD.

### SHAREHOLDER ACTION REQUIRED

May 5, 2009

To the Shareholders (the "Shareholders") of
D.B. Zwirn Special Opportunities Fund, Ltd. (the "Fund", the "Offshore Fund", "us" or "we")

The purpose of these materials (this "letter" or this "Proxy Statement") is to invite you to attend an Extraordinary General Meeting of the Shareholders to be held on May 26, 2009 at 10:00 a.m. (Cayman Islands time) at the following address:

> Maples and Calder
> Ugland House
> South Church Street
> George Town
> Grand Cayman KY1-1104
> Cayman Islands

In connection with this meeting, we are soliciting your vote in favor of a series of transactions described in this Proxy Statement (the "Transactions") that would result in an affiliate of Fortress Investment Group LLC ("Fortress") replacing D.B. Zwirn & Co., L.P. ("DBZCO") as investment manager to the Fund. If approved and if the other conditions to closing the Transactions are satisfied, we expect that the transition to the new manager will take place in early June or shortly thereafter. While the Proxy Statement elaborates on the background and terms of the Transactions, we wish to provide you with the following context for the Transactions.

On February 21, 2008, by letter to the Shareholders of the Offshore Fund, DBZCO announced the orderly disposition of the Fund's portfolio. At the same time, DBZCO announced the orderly disposition of the portfolio of the D.B. Zwirn Special Opportunities Fund. L.P. (the "Onshore Fund"), another fund for which DBZCO serves as investment manager. Shortly thereafter, DBZCO determined to wind down the D.B. Zwirn Asia/Pacific Special Opportunities Fund, L.P. (the "Asia/Pacific Fund"). The orderly disposition of the portfolio of a fourth fund to which DBZCO serves as investment manager, the D.B. Zwirn Special Opportunities Fund (TE), L.P. (the "TE Fund"), had been in progress since October 2006 for reasons unrelated to the wind-down of the Offshore Fund, the Onshore Fund and the Asia/Pacific Fund. The Onshore Fund, TE Fund and Asia/Pacific Fund are referred to herein collectively as the "Domestic Funds", and the Domestic Funds and the Offshore Fund are referred to herein collectively as the "Funds".

Throughout 2008, DBZCO focused on cost reductions by seeking to mitigate potential shortfalls between projected fee revenues and operating costs. By late 2008, DBZCO became

concerned that, in light of the very difficult market environment and unanticipated audit adjustments and consequential dramatic reduction in the value of its assets under management, DBZCO might not be viable. Without significantly increasing DBZCO's fees from the Funds, DBZCO was concerned with its projected ability to retain necessary employees over the time period required to wind down the Funds and the managed accounts to which DBZCO provides investment advisory services (the "Managed Accounts") and to satisfy contingent and other liabilities. Concurrently, certain of the major investors in the Funds expressed the desire to explore changing the investment manager for the Funds. DBZCO's concerns and the statements from these investors were communicated to the Offshore Fund's Board of Directors during the course of the year.

Despite the belief of the independent directors of the Offshore Fund and of D.B. Zwirn Partners, LLC ("DBZGP"), which is the general partner of the Domestic Funds, that DBZCO was best qualified to manage the wind-down of the Funds, Berenson & Company, LLC ("Berenson") was engaged by the Offshore Fund and the Onshore Fund to explore and evaluate strategic alternatives, including transitioning the manager duties to a third party. DBZCO and Berenson then undertook a broad effort to identify and solicit qualified parties to replace DBZCO and DBZGP. As a result of this effort, and in light of the decline in assets under management and its impact on DBZCO's financial stability, on May 1, 2009, the Board and DBZGP unanimously approved the Transactions, and DBZCO and DBZGP entered into various agreements with affiliates of Fortress that contemplate, among other things, the replacement of DBZCO as the investment manager of the Funds and the discontinuation of DBZGP as the general partner of the Domestic Funds. The Transactions are subject to various conditions, including, but not limited to, requisite approval by the Shareholders of the Offshore Fund and the limited partners of the Onshore Fund. In arriving at their determination to approve these transactions, the Board and DBZGP considered Berenson's presentation, including advice, rendered on May 1, 2009, to the Board and DBZGP that, as of that date and subject to the assumptions, qualifications and facts set forth in Berenson's presentation to the Board and DBZGP, in Berenson's judgment, the new manager transaction proposal from Fortress represented a superior proposal for the Funds as compared to other alternatives available to the Funds as of May 1, 2009 (see the section "Berenson's Presentation to the Board and DBZGP").

It is a condition to the consummation of the Transactions (the "Closing") that (i) a majority of the voting rights attached to the issued and outstanding voting shares of the Offshore Fund in attendance at the Extraordinary General Meeting (assuming the presence of a quorum), in person or by proxy, are voted in favor of certain matters relating to the Transactions which are set forth on Appendix A (the "Offshore Consent Matters") and (ii) a majority in interest of the limited partners of the Onshore Fund consent to certain matters relating to the Transactions which are set forth on Appendix B (the "Domestic Consent Matters"). The Domestic Funds that obtain the requisite consent of their respective limited partners to the Domestic Consent Matters are referred to herein as the "Consenting Domestic Funds". The Offshore Fund, if it obtains the requisite consent of its Shareholders to the Offshore Consent Matters, and the Consenting Domestic Funds are referred to herein as the "Consenting Funds". We refer to the date on which the Closing actually occurs as the "Closing Date".

This letter and its attachments include details concerning the Transactions and related agreements, Fortress, the investor approval being sought, as well as the background of the Transactions and various risk factors to be considered by investors in determining whether to approve the Transactions. You are urged to read this letter and the attachments to it in their entirety and to carefully consider all of the contents herein and therein, including the risk factors described herein and therein, in determining whether to approve the Transactions.

If you have any questions about any of the Transactions, we encourage you to call or e-mail DBZCO to answer questions in its capacity as the Fund's investment manager. The contact person is Elise Hubsher, who can be reached at (646) 720-9343 or elise.hubsher@dbzco.com.

We appreciate your continued support and, as always, are interested in the views of our Shareholders.

**Enclosed on <u>Appendix A</u> are (i) a Notice of Extraordinary General Meeting to be held on May 26, 2009 and (ii) a form of Shareholder Proxy and Vote. To evidence your approval of the Transactions, please complete, sign and return the attached form of Shareholder Proxy and Vote (<u>Appendix A</u>) to be received no later than 10:00 a.m. (New York time) on May 22, 2009 at:**

> D.B. Zwirn Special Opportunities Fund, Ltd.
> c/o GlobeOp Financial Services (Cayman) Limited
> 45 Market Street, Suite 3205, 2nd floor
> Gardenia Court, Camana Bay
> Grand Cayman KY1-9003
> Cayman Islands
> Attention: Investor Relations: Adam Weisberg
> Via Fax: (345) 946-7652
> Via Email: Investors@GlobeOp.com
>
> with a separate copy to:
>
> D.B. Zwirn & Co., L.P.
> Via Fax: (646) 720-9226
> Via Email: investor.relations@dbzco.com

If the original form is deposited at the offices of GlobeOp Financial Services (Cayman) Limited, then please also send a copy of the form by facsimile or email to GlobeOp Financial Services (Cayman) Limited.

iii

Financial information contained herein is unaudited and subject to change and is provided for informational purposes only. It has not been examined by any independent third party, including any independent accounting firm. The unaudited data is based on information available to the Fund, estimates and certain assumptions that DBZCO or the Fund deems appropriate, and may be revised as additional information becomes available. In preparing the financial information herein, every effort has been made to offer the most current, correct, and clearly expressed information possible. Nevertheless, inadvertent errors may occur. None of DBZCO, the Board, the Fund or Berenson makes any warranties or representations whatsoever regarding the quality, content, completeness, suitability, adequacy, sequence, accuracy, or timeliness of such information and data. Certain financial information provided herein is based on third-party sources, which information, although believed to be accurate, has not been independently verified.

This document and the materials enclosed herein include certain forward-looking statements relating to, among other things, the future financial performance and objectives of the Fund; plans and expectations regarding the operation of the Fund, DBZCO and their affiliates; and estimates or expectations regarding fees, costs and expenses. These forward-looking statements are typically identified by terminology such as "may," "will," "should," "expects," "anticipates," "plans," "intends," "believes," "estimates," "projects," "predicts," "seeks," "potential," "continue" or other similar terminology. Similar forward-looking statements may be contained in other documents that may accompany, or be delivered prior to, this proxy upon a prospective investor's request.

The Fund has based these forward-looking statements on DBZCO's current expectations, assumptions, estimates and projections about future events. These forward-looking statements are subject to a number of risks, uncertainties, assumptions and other factors that may cause actual results, performance or achievements to differ, and these differences could be material. Some important factors that could cause actual results to differ materially from those expressed in any forward-looking statement include changes in general economic conditions; the performance of financial and other markets; political, legal and regulatory uncertainties; and the allocation of the Fund's assets and the timing thereof relative to that which was assumed, among others.

None of DBZCO, the Fund, any of their respective affiliates, the Board or Berenson has any obligation to update or otherwise revise any estimates, projections or other forward-looking statements, including any revisions that might reflect changes in economic conditions or other circumstances arising after the date hereof or the occurrence of unanticipated events, even if the underlying assumptions are not borne out.

Each of DBZCO, the Fund, their respective affiliates and the Board expressly disclaim any responsibility or liability for the accuracy, reliability or completeness of any of the information and statements provided in Annex B and the New Manager Projected First-Year Operating Budget.

Fortress and its affiliates expressly disclaim any responsibility or liability for the accuracy, reliability or completeness of any of the information and statements provided in the Proxy Statement (except for Annex B).

Table of Contents

Page

The Transactions................................................................................................................1
    Key Elements...............................................................................................................1
    Transaction Costs.......................................................................................................3
    New Manager Projected First-Year Operating Budget.........................................5
    Documentation...........................................................................................................6
    The IMTA....................................................................................................................6
    The APA......................................................................................................................8
    The TSA......................................................................................................................8
    The ITA.......................................................................................................................9
    The New IMA...........................................................................................................10
    The Fund LLC Agreement.....................................................................................10
    The Buyer LLC Agreement....................................................................................12
    The ISA.....................................................................................................................13
    Domestic Fund Interest Assignment and Assumption Agreement....................13
    DBZCO's Management Arrangements..................................................................13
Investor Approval...........................................................................................................17
Certain Risk Factors.......................................................................................................18
    Certain Risk Factors Related to the Transactions...............................................18
    Certain Risk Factors If the Transactions Are Consummated.............................20
    Certain Risk Factors If the Transactions Are Not Approved or Consummated....26
Background of the Transactions.....................................................................................32
Advisory Council.............................................................................................................38
Berenson's Presentation to the Board and DBZGP......................................................39
    Review of New Manager Transaction Process.....................................................42
    Comparison of Principal Economic Terms of Final New Manager Transaction Proposals....42
    Comparison of Projected Year-1 Total Operating Budgets................................43
    Comparison of Five-Year Forecasts of Total Operating Expenses....................43
    Total Operating Costs and Net Investor Recovery Sensitivity Analysis...........44
    Qualitative Considerations.....................................................................................45
    Review of Other Alternatives.................................................................................46
Board Considerations......................................................................................................48
Notice Regarding Information Provided To Investors..................................................50

Annex A – Summary of the Transactions Documents
Annex B – Fortress Disclosure
Annex C – Form of New IMA
Annex D – Memorandum, Dated October 20, 2008, from DBZCO to the Shareholders
Annex E – Memorandum, Dated March 26, 2007, from DBZCO to Investors
Appendix A – Notice of the Meeting of the Shareholders of the Fund and Proxy Card

The summaries that follow in this section regarding the Transactions and related matters are qualified in their entirety by the more detailed information set forth in the Annexes hereto and by the terms and conditions of the documents referenced herein. These summaries should be read in conjunction with the information set forth in the Annexes. The summary of the New IMA is qualified in its entirety by the terms and conditions of such agreement, the form of which is attached hereto as Annex C. **In deciding whether to vote in favor of the matters set forth in Appendix A, all shareholders are urged to read and carefully consider the following summaries as well as the more detailed descriptions set forth in the Annexes.**

*The Transactions*

*Key Elements*

In essence, the key elements of the Transactions provide that:

(i)     a Fortress affiliate will enter into new investment management agreements with the Consenting Funds and, following conversion of the Consenting Domestic Funds into limited liability companies, another Fortress affiliate will become the Managing Member of each Consenting Domestic Fund;

(ii)     substantially all of the assets of DBZCO that an investment manager would need to manage the Funds will be either (a) transferred to an entity owned by the Consenting Funds and made available to the Fortress affiliate that will be managing the Funds or (b) retained by DBZCO but made available directly to the Fortress entity that will be managing the Funds, in each case for the purpose of such management;

(iii)     as described in the following sections "Transaction Costs" and "Projected Summary Budget Pursuant to the TSA", the Consenting Funds will directly or indirectly, make a total cash outlay in excess of $60 million (a) to cover the initial and ongoing costs of the Transactions, including (1) the purchase price for such assets of DBZCO, (2) the provision by DBZCO and certain of its affiliates of certain transition services, (3) the wind-down of DBZCO and its affiliates and, (4) certain Transaction expenses of the parties and (b) to fund an indemnity trust to cover potential legal, accounting and indemnification expenses of DBZCO and its affiliates and certain of their respective current and former partners and employees; and

(iv)     the current investment management fee structure will be replaced by one in which each Consenting Fund will (a) reimburse its investment manager for all costs and expenses relating to the Fund, including overhead and internal expenses allocated by the Fortress affiliate that will be managing the Funds, (b) pay a monthly management fee equal to 1% of any gross amounts collected by such Consenting Fund and (c) pay its investment manager an incentive fee equal to 5% of any amounts distributed to investors (gross of such incentive fee) after the return to investors of proceeds equal to the net asset value of their interest in such Consenting Fund (as determined by DBZCO in good faith and in accordance with applicable law) as of the Measurement Date (as defined below in the Section "The Transactions -- The IMTA"). As described in the section "New Manager Projected First-Year Operating Budget", the estimated projected first-year operating budget for the New Manager, excluding any management fees or incentive fees, is projected to total approximately $61 million.

1

Upon the Closing, the Consenting Funds will be managed by Fortress VRF Advisors I LLC (the "New Manager"), an indirect subsidiary of Fortress. Fortress is a global alternative investment and asset management firm founded in 1998 and listed on the New York Stock Exchange (NYSE: FIG). Fortress is headquartered in New York and has affiliates with offices in Chicago, Dallas, Frankfurt, London, Los Angeles, Munich, New Canaan, Rome, San Francisco, Shanghai, Sydney, Tokyo and Toronto. Fortress raises, invests and manages private equity funds and hedge funds.

Fortress has been an active investor in the credit markets, through a number of its funds. In liquidating the assets of the Funds, the New Manager will draw upon Fortress's expertise in investing, managing and realizing assets that are in many cases like those held by the Funds The Fortress Hybrid Funds team will be primarily responsible for managing the Funds. The team is composed of over 200 people who manage highly diversified, value-oriented investments in assets, opportunistic lending situations and securities throughout the capital structure.

For additional information about Fortress, including various risk factors relating to such parties, please refer to <u>Annex B</u>, which has been prepared by Fortress.

*Transaction Costs*

The cost of the Transactions on behalf of the Consenting Funds, Fortress, DBZCO and its principals, the DBZCO estimated wind-down expenses and the amount to be set aside for legal, accounting and indemnification expenses will be borne by the Consenting Funds, pro rata in accordance with their relative net asset value as of March 31, 2009, and will be trued-up within 90 days after the Closing to reflect relative net asset value as of the Measurement Date.

The following table sets forth DBZCO's estimated use of proceeds upon the Closing (capitalized terms used in this section have the definitions assigned to such terms elsewhere in this Proxy Statement):

**Estimated Use of Proceeds at Closing**
Dollars in Millions

| | |
|---|---|
| Unpaid 2008 compensation for over 120 DBZCO employees | $17.2[1] |
| Obligations owed to former sub-advisors | 2.0[2] |
| Other DBZCO accounts payable | 2.8[3] |
| Total DBZCO liabilities at Closing | 22.0 |
| | |
| Indemnity Trust deposit pursuant to the Indemnity Trust Agreement | 15.0 |
| Transaction fees and expenses | 14.0[4] |
| Payments at Closing | $51.0 |

---

[1] Includes amounts payable to senior management, as described further in the section "DBZCO's Management Arrangement".

[2] Represents payments in connection with settlement and release with JCK Partners LLC and ZM Equity Partners, LLC

[3] Represents aged vendor payables, predominantly legal fees not related to the Transactions.

[4] Represents $5.6 million fee payable to Berenson and $8.4 million for estimated legal fees and other expenses related to the Transactions.

In order to facilitate the transition of the management of the Consenting Funds and certain of the Managed Accounts and use of the assets acquired by the Buyer pursuant to the APA, and to facilitate the wind-down of the operations of DBZCO and certain of its affiliates, contemporaneous with the Closing, DBZCO, the New Manager and the Buyer will enter into a Transition Services Agreement, the form of which has been agreed upon (the "TSA"). The initial term of the TSA is 12 months. The following table sets forth DBZCO's estimated budget for the initial term of the TSA (the "TSA Budget"), based on a variety of estimates and assumptions about the costs that may be incurred by DBZCO in winding down the operations of DBZCO and certain of its affiliates and in providing services under the TSA. DBZCO and Fortress do not make, and none of their respective representatives has been authorized to make, any representation to any person regarding the TSA Budget and none of them intends to update or otherwise revise the TSA Budget to reflect information about costs that becomes available after the date hereof.

## DBZCO Projected Summary Budget Pursuant to the TSA[5]
### Dollars in Millions

| | |
|---|---|
| Compensation and benefits, net of reimbursement by Buyer under the TSA | $6.8[6] |
| Selected contractual obligations and termination costs | 8.0[7] |
| Accounting, legal and data storage for DBZCO wind-down | 3.5[8] |
| Other overhead and wind-down expenses, net of reimbursement by Buyer under the TSA | 3.6[9] |
| Potential contingencies | 5.0[10] |
| DBZCO projected budget | 27.0 |
| | |
| Projected DBZCO cash at Closing | (5.9)[11] |
| Projected amounts due to DBZCO for accrued and unpaid management fees prior to Closing | (8.1)[12] |
| Remaining amounts due to DBZCO pursuant to the 2004 fee deferral | (1.4)[13] |
| **DBZCO projected budget, net of cash and fees** | **$11.6** |
| | |
| Domestic Fund Interests Assignment Agreement | (2.3)[14] |
| DBZCO projected budget, net of cash, fees and purchased interests | $9.2 |

[5] The TSA Budget was prepared by DBZCO based on projections of related expenses, fees and costs, none of which have been verified by Fortress. These estimates and assumptions are inherently uncertain and are subject to numerous business, industry, market, regulatory, and financial risks which are outside of DBZCO's and Fortress's control and beyond DBZCO's and Fortress's ability to accurately predict. Accordingly, there can be no assurance that the assumptions made in connection with preparing the TSA Budget will prove accurate, and DBZCO's actual expenses, fees and costs associated with winding down the operations of it and certain of its affiliates and performing services under the TSA may be significantly higher than the TSA Budget, on a line item or on an aggregate basis (although the Buyer agrees to pay such actual expenses, fees and costs for the initial term up to an aggregate of $500,000 (unless additional amounts are agreed to by the Buyer).

[6] Consists of total compensation and benefits of $20.3 million less compensation reimbursement by Buyer for services provided to the New Manager based on percentages and compensation assumptions on a named person-by-person basis of $13.5 million.

[7] Consists of the following: (i) rent and related data expenses of $3.4 million, (ii) telecommunications costs of $2.0 million; (iii) hardware leases of $1.9 million, and (iii) market data services/software licenses of $0.8 million.

[8] Consists of the following: (i) accounting, audit and tax of $1.8 million, (ii) legal and data storage of $1.5 million, and (iii) IT currently of $0.2 million.

[9] Consists of the following: (i) contingent payments to former employees of $1.0 million, (ii) severance expense of $0.6 million and (iii) other general and administrative expense of $3.8 million, less reimbursed by Buyer for services provided to the New Manager of (x) IT support for New Manager of $1.3 million and (y) Hong Kong and India office expenses of $0.5 million.

[10] Other contingencies have not been specified. DBZCO's management believes that this amount could be material. By less than the amount shown, Buyer is not obligated to fund more than $0.5 million of these contingencies unless it agrees otherwise.

[11] Includes $0.7 million in restricted cash.

[12] Consists of accrued and unpaid management fees and unreimbursed expenses for April and May 2009.

[13] Consists of the outstanding amount of the 2004 fee deferral not expected to be paid prior to Closing.

[14] While this table shows a reduction of the DBZCO projected summary budget pursuant to the TSA due to the estimated value of the property transferred pursuant to the Domestic Fund Interest Assignment Agreement, there is no expectation that such property will be liquidated or disposed of for cash during the period covered by such budget and there can be no assurance that the cash proceeds ultimately received in respect of such property will equal $2.3 million.

4

*New Manager Projected First-Year Operating Budget*

The following table sets forth the New Manager's estimated operating budget for the first year following the Closing. The New Manager's operating budget represents the estimated expenses of the New Manager and its affiliates that the New Manager expects to allocate to the Funds. Other direct expenses of the Funds, including third-party costs and expenses incurred by or on behalf of the Funds, would be in addition to expenses allocated by the New Manager. The New Manager's estimated first year operating budget (the "New Manager Budget") is based on a range of estimates and assumptions about the costs that may be incurred by Fortress in connection with managing the portfolio of assets (the 'Portfolio') currently managed by DBZCO. Fortress does not make, and none of its representatives has been authorized to make, any representation to any person regarding the New Manager Budget and none of them intends to update or otherwise revise the New Manager Budget to reflect information about costs that becomes available after the date hereof.

### New Manager Projected First-Year Operating Budget[*]
#### Dollars in Millions

| | |
|---|---|
| Compensation and benefits of former DBZCO employees | $17.1[16] |
| DBZCO compensation and benefits allocation pursuant to the TSA | 13.5[17] |
| Compensation and benefits of existing Fortress employees | 12.2[18] |
| Total compensation | 42.8 |
| | |
| Allocation of Fortress overhead | 5.8[19] |
| IT systems, platform and move | 2.0 |
| Telephone and data | 1.7 |
| Temporary employee and consulting services | 1.6 |
| IT equipment | 1.5 |
| Accounting and other professional services | 1.2 |
| Software licenses | 1.0 |
| Market data | 0.6 |
| Rent – international offices | 0.5 |
| Other | 2.3 |
| | |
| Total | $61.1 |

---

[*] The New Manager Budget was prepared based on projections of management-related costs provided to Fortress by DBZCO, none of which has been verified by Fortress, and Fortress's own experience with managing investment portfolios. These estimates and assumptions are inherently uncertain and are subject to numerous business, industry, market, regulatory, and financial risks which are outside of Fortress's control and beyond Fortress's ability to accurately predict. Accordingly, there can be no assurance that the assumptions made in connection with preparing the New Manager Budget will prove accurate. The actual costs associated with managing the Portfolio may be significantly higher than the New Manager Budget, on both a line item and on an aggregate basis.

[16] Consists of estimated allocated compensation and benefits of former DBZCO employees who are expected to join Fortress and to provide services to the Funds.

[17] Consists of estimated allocated compensation and benefits of retained DBZCO employees expected to provide services to the Funds.

[18] Consists of estimated compensation and benefits of existing Fortress employees allocated to the Funds.

[19] Consists of estimated Fortress overhead allocated to the Funds. Assumes approximately 100 DBZCO employees join Fortress' New York office.

*Documentation*

DBZCO DBZGP and Fortress-affiliates have entered into various agreements relating to the replacement of DBZCO by a Fortress affiliate as the investment manager of the Consenting Funds, subject to various conditions (including, but not limited to, the requisite approval by Ordinary Resolution (as defined below) of the Shareholders of the Offshore Fund and by consent of the limited partners of the Onshore Fund). Also, a newly-formed entity, VRF I Assets LLC, a Delaware limited liability company (the "Buyer"), that will be wholly-owned, directly or indirectly, by the Consenting Funds, will acquire various assets from DBZCO (a portion of which has been internally developed) that are used by DBZCO to manage the Funds and the Managed Accounts. Such assets will be made available to the New Manager, which will serve as the new manager of the Consenting Funds. The New Manager will be owned and controlled by FIG LLC ("FIG"), an investment adviser registered with the Securities and Exchange Commission (the "SEC") that is an affiliate of Fortress. Therefore, following the Closing, the New Manager will manage the Consenting Domestic Funds subject to the Investment Advisers Act of 1940. DBZCO will provide transitional services, and make certain other assets available, to the New Manager. Fortress VRF I LLC, an entity newly-formed by Fortress (the "New MM"), will be appointed the managing member of each of the Consenting Domestic Funds, each of which will be converted into a limited liability company at the Closing. Upon the Closing, DBZCO will no longer maintain a substantial staff or infrastructure. Rather, DBZCO intends to maintain for a period of time only such staff and resources as are necessary for it to wind down its and certain of its affiliates' operations, complete the Fund's audited financial statements and tax returns for the period during which it was manager to the Funds and to fulfill its obligations during a transition period. A basic summary of these and certain additional terms of the Transactions are provided below, and more detailed summaries are provided on Annex A.

*The IMTA*

DBZCO and DBZGP have entered into an Investment Management Transition Agreement, dated as of May 1, 2009 (the "IMTA"), with the New Manager, the New MM and, with respect to certain matters, FIG, which, among other things, provides that the following will occur at or prior to the Closing:

(i)      DBZGP will separate its general partner interest in each of the Domestic Funds such that its capital account and other economic rights (but not its right to the management, operation and control of such Fund) becomes a limited partner interest in such Domestic Fund. DBZGP will, upon the Closing, transfer such limited partner interests as well as its previously purchased limited partner interest in the Onshore Fund (the "Domestic Fund Interests") and grant an option to purchase its interests in ZM Private Equity Fund I GP, LLC (the "ZM Interest") to the Buyer in exchange for a total amount equal to $2.25 million (see the section "Domestic Fund Interest Assignment and Assumption Agreement").

(ii)      Each of the Consenting Domestic Funds will be converted (the "Conversion") into a limited liability company under Delaware law to be governed by a limited liability company agreement (the "Fund LLC Agreement") appointing New MM as its managing member.

6

(iii)    Each of the Consenting Funds (or, as appropriate, a newly-formed subsidiary of such Consenting Fund, which will be classified as a corporation for U.S. federal income tax purposes) and the Buyer will enter into a subscription agreement (the "Subscription Agreement") pursuant to which each of the Consenting Funds (or such newly-formed subsidiary) will subscribe for membership interests in the Buyer and make a capital contribution and a capital commitment, in accordance with its relative net asset value as of March 31, 2009 (to be trued-up within 90 days after Closing to reflect relative net asset value as of the Measurement Date) to the Buyer, in exchange for limited liability company interests in the Buyer. Following the effectiveness of the Subscription Agreement, the Consenting Funds will constitute, directly or indirectly, all of the members of the Buyer pursuant to a limited liability company agreement of the Buyer to be entered into upon the Closing (the "Buyer LLC Agreement"). The aggregate contributions to be made pursuant to the Subscription Agreement at or following the Closing will be equal to the aggregate amount that the Buyer is obligated to pay or to fund, as contemplated under the transaction documents described in this Proxy Statement. The initial contribution payable by the Buyer at the Closing is estimated to be $51 million plus the amount necessary to pay the first month's estimated expenses payable to DBZCO under the TSA. Under the Subscription Agreement and the Buyer LLC Agreement, the Consenting Funds will, directly or indirectly, guaranty, and be obligated to contribute additional capital to the Buyer to fund, certain post-Closing obligations of the Buyer in the Transactions. The "Measurement Date" means (a) if the Closing Date is the last business day of a calendar month, the last calendar day of such calendar month, and (b) if the Closing Date is not the last business day of a calendar month, the last calendar day of the calendar month most recently ended prior to the Closing Date.

(iv)    DBZCO will terminate the current Management Agreement between each Consenting Fund and DBZCO (the "Existing IMA") except with respect to pre-Closing indemnity, exculpation, accrued expense and fee provisions which survive such termination in accordance with their terms. A new investment management agreement, between each Consenting Fund and the New Manager, will be executed, pursuant to which the New Manager will provide investment advisory services to such Fund (the "New IMA") commencing on the Closing. The New IMA is discussed in greater detail below; a comparison between the Existing IMA and the New IMA is contained in Annex A; and the form of the New IMA is attached in its entirety as Annex C.

(v)     If any Managed Account agrees with New Manager to have New Manager manage such account, DBZCO will terminate its existing management agreement with that Managed Account and New Manager will enter into a new management agreement with that Managed Account.

Under the IMTA, FIG, a registered investment adviser with the SEC, has agreed to cause the New Manager and the New MM and their permitted assigns to consummate the Transactions. The Funds are third-party beneficiaries of certain provisions of the IMTA.

For a detailed summary of the terms and conditions of the IMIA, please refer to Annex A.

*The APA*

Contemporaneously with the signing of the IMTA, DBZCO entered into an Asset Purchase Agreement (the "APA") with the Buyer which among other things provides that the following will occur at or prior to Closing:

(i)     DBZCO will sell to Buyer substantially all of its assets currently used by DBZCO and certain of its affiliates in providing investment advisory services to the Funds and the Managed Accounts.

(ii)     The Buyer will assume certain specified liabilities and obligations of DBZCO from and after the Closing.

(iii)     The Buyer will (a) pay to DBZCO a purchase price for the assets being acquired under the APA in an amount equal to $19.75 million, (b) deposit $15 million into a trust, to be administered pursuant to the ITA (described below and in Annex A), (c) pay the expenses of DBZCO and the Buyer incurred in connection with the Transactions and (d) pay transfer taxes incurred in connection with the Transactions.

For a detailed summary of the terms and conditions of the APA, please refer to Annex A.

*The TSA*

As noted above, in order to facilitate transition of the management of the Consenting Funds and certain of the Managed Accounts and use of the assets acquired pursuant to the APA, and to facilitate the wind-down of the operations of DBZCO and certain of its affiliates, contemporaneously with the Closing, DBZCO, the New Manager and the Buyer will enter into the TSA. The initial term of the TSA is 12 months. Among other things the TSA provides that:

(i)     DBZCO will provide certain transitional services to the New Manager and/or the Buyer, including IT access and support, data access, segregation and transfer of data, consultation regarding the integration of acquired data and the installation of acquired computer software, financial and tax services, financial analysis and risk management analysis.

(ii)     DBZCO will (a) prepare, or cause to be prepared, tax returns of the Consenting Funds for the 2008 tax year, (b) prepare and sign, or cause to be prepared and signed, audited consolidated financial statements for the Consenting Funds for 2008, (c) prepare, or cause to be prepared, unaudited statements of net asset value for each of the Consenting Funds for the months commencing on January 1, 2009 and ending on the Closing Date, (d) in connection with the audited financial statements of the Consenting Funds for 2009, sign management representation letters for the period from January 1 2009 to the Closing Date, and (e) prepare, or cause to be prepared, audited financial statements and tax returns for periods through December 31, 2008 for certain affiliates of DBZCO for which it or its affiliates has the responsibility of preparing audits and/or tax returns.

(iii)     The New Manager will provide certain services to DBZCO to assist in the wind-down of the operations of DBZCO and its affiliates and in the provision of services by DBZCO and its affiliates to the New Manager and/or the Buyer, including providing access to

8

certain personnel, office space and office services to certain individuals who remain full-time employees of DBZCO, and access to the accounting journal file that records changes to the books and records of the Funds for the pre-Closing period.

(iv)     The Buyer will pay to DBZCO, DBZCO's expenses, fees, and costs (based on the TSA Budget) in winding down its operations and providing the services to be provided by DBZCO under the TSA (and certain other amounts). For more detailed information concerning the TSA Budget, see the section "DBZCO Projected Summary Budget Pursuant to the TSA". The Buyer will pay such fees monthly in advance and will pay any shortfall if the advance is less than the actual expenses, fees and costs incurred for that month, provided that the aggregate amount paid to DBZCO for the wind down and services provided by DBZCO under the TSA Budget (excluding certain other fees payable under the TSA) shall not exceed the budgeted amount by more than $500,000 for the initial term of the TSA without the approval of the Buyer.

For a detailed summary of the terms and conditions of the TSA, please refer to <u>Annex A</u>.

*The ITA*

Upon the Closing, the Buyer will establish, and deposit $15 million into, a trust (the 'Trust"), pursuant to an Indemnity Trust Agreement (the 'ITA"), in order to facilitate advancement of, and indemnification for, any costs and expenses (including, without limitation legal fees and disbursements) and indemnification obligations whether contingent, known or unknown, that are sustained or incurred by DBZCO or certain of its affiliates or certain of their respective current or former principals, members, officers, directors, partners, employees or agents or any of their representatives (except for certain excluded persons), by reason of or resulting from or arising out of (a) any proceeding relating to the business of DBZCO (but limited to professional fees and expenses), including the pending SEC investigation of DBZCO, (b) indemnification obligations by DBZCO or its affiliates to certain current or former principals members, officers, directors, partners, employees, agents or representatives (excluding partners former partners and former employees of DBZCO with respect to (i) fines or penalties and (ii) indemnification obligations prohibited by law or federal regulatory policy, in each case arising out of any proceeding by the SEC) and (c) professional fees and expenses incurred in connection with the wind-down of DBZCO and certain of its affiliates. Any such advancement will be subject to an undertaking by the recipient thereof that such advancement will be reimbursed to the Trust if the recipient is ultimately not entitled to such payment. To date, DBZCO has provided advances to, and received undertakings from, over 30 current and former principals and employees. An administrator to be designated will oversee the distribution of the funds in the Trust to make advancements and pay indemnification claims and expenses of the Trust. The advancement and indemnification pursuant to the ITA will not limit or modify the rights of any person to indemnification from DBZCO, the Funds or any other person under any other contract or agreement or right to receive insurance proceeds. Upon the termination of the Trust after seven years from the Closing, any funds remaining in the Trust will be refunded to the Buyer. For a detailed summary of the terms and conditions of the ITA, please refer to <u>Annex A</u>.

*The New IMA*

As indicated above, the IMTA provides for, upon the Closing, each Consenting Fund's termination of its Existing IMA with DBZCO and simultaneous entry into a New IMA with the New Manager. Under the New IMA the New Manager shall perform all services incident to the wind-down of the Consenting Fund's portfolio. In addition, under the New IMA, FIG will agree to make available to the New Manager personnel and other resources as reasonably necessary for the New Manager to perform its obligations under the New IMA. For each Consenting Fund, the New IMA additionally provides for the following new compensation structure:

(i)     Such Consenting Fund will pay the New Manager a monthly management fee equal to 1% of any gross amounts collected by such Consenting Fund, payable monthly.

(ii)    From and after the distribution to investors in such Consenting Fund of an amount equal to the net asset value of such Consenting Fund (as determined by DBZCO in good faith and consistent with the operative document and applicable law) as of the Measurement Date, such Consenting Fund shall pay to the New Manager an incentive fee equal to 5% of all amounts distributed to investors (gross of such incentive fee) in such Consenting Fund in excess of such amount, payable monthly.

(iii)   Such Consenting Fund will pay or reimburse the New Manager for its allocable share of the New Manager's costs and expenses payable quarterly in advance whether incurred prior to or after the Closing. If certain expenses to be borne by such Consenting Fund pursuant to the New IMA are paid by the New Manager or its affiliates (including any such overhead expenses) then such Consenting Fund will reimburse such parties for such expenses.

(iv)    Such Consenting Fund will bear its pro rata portion of all expenses incurred by the New Manager and its affiliates in connection with the Transactions or relating to DBZCO and its affiliates.

(v)     The New IMA provides for indemnification and exculpation of (a) the New Manager and its affiliates or their respective officers, directors, managing members, members, shareholders, partners, controlling persons, employees, agents, consultants and legal representatives, and (b) DBZCO, its affiliates or their respective officers, directors, managing members, members, shareholders, partners, controlling persons, employees, agents  consultants and legal representatives in connection with services rendered under the TSA.

A comparison between the Existing IMA and New IMA is provided in <u>Annex A</u>; and the form of the New IMA is attached in its entirety on <u>Annex C</u>.

*The Fund LLC Agreement*

The provisions of the Fund LLC Agreements do *not* apply to the Offshore Fund, but are being provided to inform Shareholders of the Offshore Fund of certain provisions of such agreement that could impact the Offshore Fund. As a condition to the obligations of the Fortress affiliates to complete the Transactions, each Consenting Domestic Fund will be converted from a limited partnership into a limited liability company. The Fund LLC Agreements will require several changes from the existing limited partnership agreements of the Consenting Domestic

Funds. These changes are necessary by reason of the nature of limited liability companies and to conform the agreements to the terms of the Transactions. Additionally, the following modifications will be made:

(i)     Special Tax Member. DBZGP will be admitted to the Consenting Domestic Funds as a 'Special Tax Member' for the sole purposes of filing the 2008 tax return for each Consenting Domestic Fund, and to serve as Tax Matters Member with respect to the years that it was the general partner of each Consenting Domestic Fund.

(ii)     Advisory Board. Provisions for an Advisory Board to the Consenting Domestic Fund to be established, the members of which will be selected in the discretion of the New MM, will be included in the converted agreements. The role of the Advisory Boards will generally be to approve or disapprove any conflicts of interest, including between the New MM and the Consenting Domestic Funds that the New MM presents to them. While the decisions of the Advisory Boards will not be binding, if the New MM acts in accordance with such decisions, it will not be liable to any claims by the members as a result of approved actions. Members of the Advisory Boards will be exculpated from liability related to their service on the Advisory Boards for acts and omissions not in bad faith and will be indemnified by the Consenting Domestic Funds to the extent that their losses or expenses are not the result of actions taken in bad faith. Investors with representatives on the Advisory Boards may have objectives that differ from other investors without such representatives.

The Transactions do not contemplate the establishment at this time of an Advisory Board for the Offshore Fund. The Board will be independent of Fortress and will continue to provide independent oversight and approve or disapprove of transactions involving conflicts of interest. In doing so, the Board may engage the services of independent experts and may delegate as it sees fit.

(iii)     Indemnification of DBZGP. DBZGP will continue to be indemnified for actions taken while serving as the general partner of the Domestic Funds. This arrangement existed in the partnership agreements and does not represent any change in or expansion of the rights of the DBZGP.

(iv)     Managing Member Contribution. The New MM will agree to make a capital contribution to each Consenting Domestic Fund in the amount of $1,000. Apart from this capital contribution, neither the New Manager, the New MM nor Fortress, nor any Fortress affiliate will have, and in any event will not be required to retain, any direct economic interest in the Consenting Funds unlike DBZGP (with respect to the Domestic Funds) prior to the Transactions.

(v)     Removal of Incentive Allocation and Management Fee Provisions. All provisions and language relating to the incentive allocation that appear in the limited partnership agreements will be deleted in the converted agreements. Additionally, the provisions describing the calculation and payment of the management fee that appear in the existing limited partnership agreements will be replaced by a reference to the New IMA.

11

(vi)   Dissolution Rights.  As described further in Part III of Annex B, each Fund LLC Agreement would permit the members of a Consenting Domestic Fund to vote to liquidate such Consenting Domestic Fund within one year following such vote and, if the liquidation were not substantially completed within such one-year period, to vote to replace the managing member of such Consenting Domestic Fund.  As a result, under the New IMA, the Board of the Offshore Fund and the managing member of the Consenting Domestic Funds will have the right to terminate the New IMA upon 90 days' notice to the New Manager.  If a Consenting Domestic Fund were to vote to liquidate within a one-year period of such vote without the other Funds' liquidating within the same period, there could be an adverse effect on all of the Funds that did not elect to liquidate within the same period.  Similarly, if one Fund were to replace the New Manager without the other Funds' replacing the New Manager at the same time, there could be an adverse effect on one or all of the Funds.

The above list of alterations is intended as a guide to explain the more substantial changes to the agreements of the Consenting Domestic Funds; however, it is not a comprehensive list of all changes to be made.

*The Buyer LLC Agreement*

As noted above, upon the Closing, each of the Consenting Funds or, as the case may be, a newly-formed subsidiary thereof, will constitute all of the members of the Buyer pursuant to the Buyer LLC Agreement.  Although as of the date hereof the parties have not agreed upon the form of the Buyer LLC Agreement, they have agreed on the following general terms:

(i)   Each Consenting Fund, or a wholly owned subsidiary of such Consenting Fund  shall be admitted as a member, and shall constitute all of the members of the Buyer.

(ii)   In order to fund the Buyer, Consenting Funds will make capital contributions and commitments as set forth in the Subscription Agreements.  Each Consenting Fund will have a 'Percentage Interest" from time to time equal to a fraction the numerator of which is the aggregate capital contributions of such member to the Buyer and the denominator of which shall be the aggregate capital contributions of all members to the Buyer.

(iii)   Each of the members, and their respective affiliates, partners, employees, officers, directors, representatives and agents of the members and their affiliates and the officers of the Buyer shall be exculpated and indemnified substantially to the same extent that the New Manager is exculpated and indemnified pursuant to the New IMAs.

(iv)   The affairs of the Buyer shall be governed by the members, with decisions being made by members holding a majority of the Percentage Interests.  Day-to-day management of the Buyer shall be delegated to the officers, who may be removed and replaced by the members.  The initial officers shall be named in the Buyer LLC Agreement.

(v)   Members may assign interests, new members may be admitted and existing members may resign only with the approval, in each case, of members holding a majority of the Percentage Interests.

12

*The ISA*

The parties have agreed that DBZCO will not transfer to the Buyer or the New Manager, at the Closing, files and records of DBZCO that may contain confidential communications between DBZCO and its legal counsel that may be subject to the attorney-client privilege or work product doctrine. The Buyer and the New Manager will enter into an Information Sharing Agreement with DBZCO (the "ISA"), in order to establish certain procedures, for a period of approximately seven years after the Closing, for the delivery of certain such files and records to Buyer or the New Manager upon a determination that privilege does not apply or, as applicable, without waiving privileges or work product protections. Files and records covering certain specified matters will not be made available to the Buyer or the New Manager, to the extent protected by attorney-client privilege or work product doctrine

The ISA provides that upon the request of the Buyer and/or the New Manager, DBZCO legal counsel will review documents responsive to such requests and, on the basis of such review, DBZCO will provide to the Buyer or the New Manager information to the extent that it is either non-privileged material or information that is relevant to the business of managing the Funds and the Managed Accounts and is subject to attorney-client privilege or work product doctrine belonging to DBZCO or its attorneys. The ISA also provides that where certain matters are the subject of current or anticipated legal proceedings, DBZCO, the Buyer and/or the New Manager will enter into a joint defense or common interest agreement so that information can be shared among the parties and their counsel without waiving any privilege applicable to such information. A more detailed summary of the ISA is provided in Annex A.

*Domestic Fund Interest Assignment and Assumption Agreement*

DBZGP will sell its Domestic Fund Interests to the Buyer effective at the Closing and grant to the Buyer an option to purchase for $100 the ZM Interest exercisable on or after Closing, until December 31, 2009, in exchange for a total cash purchase price of $2.25 million, pursuant to an agreement executed on May 1, 2009 (the "Domestic Fund Interest Assignment and Assumption Agreement"). The Domestic Fund Interest Assignment and Assumption Agreement contains customary representations and warranties made by DBZGP (with respect to its limited partner interests) and Buyer and provides that, upon execution, (i) DBZGP will be released from its obligations under the limited partnership agreements of the Domestic Funds with respect to its limited partner interests, (ii) Buyer will assume the obligations of DBZGP with respect to its limited partner interests under, and Buyer will be admitted as a limited partner of each Domestic Fund. The Domestic Fund Interest Assignment and Assumption Agreement will automatically terminate in the event the APA is terminated.

*DBZCO s Management Arrangements*

      (i)    Daniel Zwirn.

As a condition to the Closing, Daniel Zwirn, DBZCO's founder, Managing Partner and Chief Investment Officer ("CIO"), will resign from all offices and directorships with the Funds and their affiliates.

Since the orderly dissolution of the Offshore Fund, Onshore Fund and Asia/Pacific Fund was announced in February 2008, Mr. Zwirn has reduced the Funds' expenses through an array of measures, including reductions in headcount in functional areas across the firm -- particularly investment staff -- and the global reduction of office and overhead expenses.  As described below, DBZCO sought in October 2008, and obtained in November 2008, the consent of the majority of the Shareholders to the acceleration of the payment of deferred fees earned by DBZCO in 2004.  (Please refer to the Memorandum from DBZCO to the Shareholders, dated October 20, 2008, attached hereto as Annex D, in which such consent was sought.)  Based on estimated amounts as of the time of such consent, the accelerated fees would have amounted to approximately $19.5 million, of which approximately $12.6 million would have normally been distributed by DBZCO to Mr. Zwirn.  Based on estimated amounts as of December 31, 2008, the accelerated fees are expected to amount to approximately $14.2 million, of which approximately $9 million would normally have been distributed by DBZCO to Mr. Zwirn.  Mr. Zwirn agreed to forgo the amounts otherwise due to him from the deferred fees (other than any potential tax distributions of which none have been made) and to support DBZCO's operations in carrying out the dissolution process for the benefit of investors.  Concurrent with Mr. Zwirn's agreement to forego any past and future distributions due to him as a partner of DBZCO, the Compensation Committee of DBZCO engaged Alan Johnson & Associates ("Johnson"), a compensation consulting firm specializing in the financial services industry, to assist in establishing a reasonable compensation paradigm for Mr. Zwirn.  Based upon a review of existing facts and circumstances, including Mr. Zwirn's responsibilities, Johnson concluded that these conditions supported a total compensation range (base salary and bonus) in the 75th to 100th percentile of $6.25 million to $10.5 million for 2008.  Johnson concluded that these amounts would be competitive not only for Mr. Zwirn but also for an external candidate being considered for the CIO function.  This excluded possible compensation for his position as Managing Partner; no such compensation has been paid.

Concurrently, Mr. Zwirn entered into an employment agreement in January 2009 with DBZCO under which he agreed to be compensated at below the 25th percentile range, or $2.95 million, providing for base compensation of $1 million per annum, with a 2008 cash bonus of $1.95 million under this revised agreement.  Provision was made for an acceleration of payments of 2009 base compensation upon a termination for good reason or without cause.  At Closing, Mr. Zwirn will receive a 2008 Bonus of $1.95 million at the same time as the receipt by the majority of the other DBZCO employees of their 2008 bonuses.  In addition, Mr. Zwirn has agreed to be paid the balance of his 2009 base compensation over the remainder of 2009.

(ii)   David Lee and Lawrence Cutler.

In order to facilitate the Transactions and provide Fortress with greater assurance that the services of the two most senior officers of DBZCO will be available throughout the transition period, David Lee, the President of DBZCO, and Lawrence Cutler, the Chief Operating Officer and Chief Compliance Officer of DBZCO (together, the "Executives"), will enter into employment agreements with DBZCO (the "Executive Employment Agreements").  Each of the Executive Employment Agreements will have a term commencing on the Closing and ending on May 31, 2010, which is meant to coincide with the end of the transition period under the TSA.

14

The Executive Employment Agreements will each provide for the continuation of the current base salary, a sign-on bonus in lieu of a 2008 bonus (the "Sign-On Bonus") and a retention bonus (the "Retention Bonus"). For each of the Executives, except as provided below, the Sign-On Bonus is payable within two (2) weeks following the Closing and the Retention Bonus is payable on or about May 31, 2010, subject to the Executive's continued employment on each payment date. However, if the employment of either of the Executives is terminated by DBZCO (with the approval of Fortress) without cause, by the Executive for good reason or as a result of the Executive's death or disability, the Executive will be entitled to receive (i) continued base salary until May 31, 2010 and (ii) payment of any unpaid portions of the Sign-On Bonus and the Retention Bonus.

The Executive Employment Agreements will each provide that the Executives will not be employed by, be a member of or otherwise provide services to any hedge fund, private equity fund or similar equity or credit based investment vehicle during their employment with DBZCO through May 31, 2010. The Executive Employment Agreements will also provide that the Executives will not solicit employees of or other service providers to DBZCO or Fortress during their employment with DBZCO and for twelve (12) months thereafter. In addition, the Executive Employment Agreements will include confidentiality provisions and provide that the Executives must give DBZCO at least ninety days' advance written notice upon their voluntary termination of employment.

      (iii)   <u>Other Employees of DBZCO</u>.

In addition, in order to facilitate the Transactions and provide greater assurances that the services of certain other critical DBZCO employees will be available to assist in transitioning the management of the Funds and in winding down DBZCO's and certain of its affiliates' operations during the transition period, DBZCO will enter into employment agreements with those employees (the "Other Employment Agreements"). The Other Employment Agreements will each have a fixed term ending on either (i) May 31, 2010, coinciding with the expiration of the transition period under the TSA, or (ii) December 31, 2009 (for employees whose transition services will not be needed for the entirety of the expected one-year transition period).

The Other Employment Agreements will each provide for the payment of a specified base salary and cash bonus. The bonus for employees whose term of employment ends on May 31, 2010 will be paid on or about May 31, 2010, subject to the employee's continued employment on the payment date. The bonus for employees whose term of employment ends on December 31, 2009 will be paid no later than February 28, 2010, subject to the employee's continued employment through December 31, 2009. However, the continued employment requirements will not apply if the employment of an employee is terminated by DBZCO without cause or by the employee for good reason prior to the payment of the bonus.

The Other Employment Agreements will generally provide that, until either the end of the employee's employment term or the employee's earlier termination without cause or for good reason, the employee will not be employed by, be a member of or otherwise provide services to any hedge fund, private equity fund or similar equity or credit based investment vehicle. The Other Employment Agreements will also generally provide that the employees will not solicit employees of or other service providers to DBZCO or Fortress during their employment with

15

DBZCO and for twelve (12) months thereafter.  In addition, the Other Employment Agreements will include confidentiality provisions.

        (iv)    <u>Guaranties</u>.

        In order to further induce and provide additional assurances to Messrs. Lee and Cutler and other DBZCO employees providing transition services, the Buyer will enter into guaranty agreements with these individuals that guarantee salary, bonus and certain severance payments under the Executive Employment Agreements and Other Employment Agreements.  In addition, these guaranty agreements will provide that in the event of the bankruptcy of DBZCO, the Buyer may either request that the employee continue to perform services for DBZCO on the same terms; request that the employee accept employment with Fortress or its affiliates for the remainder of the transition term; or request that the employee terminate employment, in which case the employee will be entitled to receive certain severance payments from the Buyer.

16

*Investor Approval*

The Board of Directors of the Offshore Fund (including the two independent Directors) (the 'Board') and DBZGP have each separately approved the Transactions. However, under the Transaction documents, approval by Ordinary Resolution (as defined below) of the Shareholders of the Offshore Fund of the Offshore Consent Matters and by the limited partners of the Onshore Fund representing a majority in interest of the Onshore Fund of the Domestic Consent Matters respectively, is a prerequisite to the Closing.

An 'Ordinary Resolution' is a resolution approved by Shareholders holding a majority of the voting rights attached to the issued and outstanding voting shares of the Offshore Fund in attendance at the Extraordinary General Meeting (assuming the presence of a quorum), in person or by proxy. Any ownership interests held by DBZCO or its affiliates and any of their current partners, members, shareholders, officers, principals or employees will be excluded. The quorum for the Extraordinary General Meeting requires that Shareholders representing at least 51% of the voting rights attached to the issued and outstanding shares in the Offshore Fund entitled to vote be present in person or by proxy at the Extraordinary General Meeting.

Based upon the factors and considerations discussed herein, the Board believes that the Transactions are in the best interests of the Shareholders of the Fund.

Specifically, the Shareholders of the Offshore Fund are being asked to approve the matters set forth on <u>Appendix A</u>. In addition, the limited partners of each of the Domestic Funds are being asked to approve the matters set forth on <u>Appendix B</u>. If the requisite approval of the investors of each of the Offshore Fund and Onshore Fund, respectively, are obtained and all other Closing conditions are satisfied, including any required anti-competition regulatory approvals, then the parties to the IMTA and APA currently intend to close the Transactions as soon as reasonably practicable thereafter. As indicated above, we expect that the Transactions will be consummated in early June or shortly thereafter, although there can be no assurance that the Closing will not be delayed to permit the Closing conditions to be satisfied.

In the case of the Domestic Funds, DBZGP is seeking the approval of limited partners of each such Domestic Fund representing a majority in interest of such Domestic Fund both (a) taking into account any ownership interests held by DBZCO or its affiliates and any of their current partners, members, shareholders, officers, principals or employees and (b) without taking into account any such ownership interests.

Shareholders are urged to carefully review this letter, including the Risk Factors contained herein, which describe certain risks associated with the consummation, and failure of the consummation, of the Transactions.

## *Certain Risk Factors*

The following section outlines certain risks that could arise in connection with the consummation of, or the failure to consummate, the Transactions. In addition, Fortress has included in Annex B Risk Factors relating to the New Manager and FIG and its affiliates. The following risk factors and those risk factors set forth in Annex B are collectively, the "Risk Factors".

In considering the Transactions, the Shareholders should take into account the risks associated with providing or not providing their consent to the Transactions. Each Shareholder must perform, in consultation with its own professional advisors, its own due diligence and evaluation of the merits and risks of consenting or not consenting to the matters set forth on Appendix A. Nothing herein, including the Risk Factors or the other materials provided in connection with the Transactions, should be viewed, or relied upon, as legal, tax or any other advice.

*Certain Risk Factors Related to the Transactions.*

- The Transactions involve considerable expense associated primarily with the development and completion of the Transactions, the winding-down of DBZCO and paying amounts reflecting DBZCO's liabilities and obligations, all of which will be borne by the Consenting Funds (on a pro rata basis). Additionally the Offshore Fund has agreed, severally with the Domestic Funds, to reimburse Fortress for all fees and expenses of outside counsel incurred through the Closing (or, if the Closing does not occur, through July 31, 2009), including fees and expenses incurred in evaluating DBZCO and it affiliates (such as due diligence), drafting and negotiating Transaction documents, preparing to complete the Transactions and other tasks related to the Transactions.

- Whether or not the Transactions are consummated, the Fund will nevertheless have incurred substantial transaction costs including certain transaction expenses of Fortress, which the Fund is obligated to pay regardless of whether or not the Transactions are consummated.

- Daniel Zwirn has acted in numerous capacities in connection with the Transactions. He acts as a Director of the Offshore Fund, the controlling person of DBZGP (the general partner of the Domestic Funds), the controlling person of DBZCO, and, following the Closing, will be the beneficiary of certain perpetual licensing arrangements with the Buyer, disclosed in this Proxy Statement. As a result, he would derive benefits from the Transactions and has a variety of conflicts of interest, primarily in that he has an interest in the Transactions while simultaneously having fiduciary duties to the Funds and to DBZCO. The proposal by one of the unsuccessful bidders (for which Mr. Zwirn did not vote) included terms for Mr. Zwirn to be retained by such bidder as a potential senior employee. The foregoing conflicts have been addressed in the following ways, reducing the consequence of Mr. Zwirn's role: (i) an independent financial advisor was retained to advise on the Transactions, (ii) the Offshore Fund

18

independent directors have approved the Transactions on behalf of the Offshore Fund, with the supporting advice of such advisor, and (iii) the Transactions are conditioned upon the approval of the Shareholders of the Offshore Fund and the limited partners of the Onshore Fund. Moreover, because of the overlapping portfolios of the Offshore Fund and the Domestic Funds, regardless of Mr. Zwirn's position as controlling person of DBZGP, it would have been impracticable to effectuate a replacement of DBZCO as manager without the approval of the Board. Nevertheless, these circumstances give rise to the possibility that the terms of the Transactions that were negotiated may be less advantageous to the Funds than if the general partner of the Domestic Funds had been completely independent of DBZCO.

- The terms of the Transaction documents, including the proposed arrangements and payments between DBZCO and its affiliates, on the one hand and the Funds, Fortress and their affiliates on the other hand, have been based on the premises that DBZCO's solvency and assistance are critical both during and after the transition to the New Manager. No valuation of such proposed arrangements or payments, including of the license in favor of Daniel Zwirn has been conducted or prepared.

- Even though the consummation of the Transactions is conditioned upon the approval by Ordinary Resolution of the requisite shareholders of the Offshore Fund and a majority in interest of the limited partners of the Onshore Fund, and has been approved by the two independent directors of the Offshore Fund (see "Investor Approval"), the structure and terms of the Transactions and the related documents were negotiated by senior management of DBZCO and DBZGP on behalf of DBZCO, DBZGP and the Funds. The members of senior management were subject to potential conflicts of interest in negotiating the Transactions including, among other things, (i) their interest in avoiding a bankruptcy of DBZCO and its affiliates, (ii) the continuation of their employment with DBZCO and receipt of related compensation, including the Sign-On Bonuses and the Retention Bonuses, (iii) the prospect that they may be employed by Fortress or its affiliates in the future, (iv) their desire to enable DBZCO to maintain its right to assert its privilege in connection with communications with its attorneys and privileged work product, and (v) their eligibility for potential indemnification under the Fund documents and the Indemnification Trust Agreement.

- In connection with the Transactions, Schulte Roth & Zabel LLP ("Schulte Roth") represents the Funds, Maples and Calder ("Maples") represents the Offshore Fund as to Cayman Islands law only, and Campbells represents the independent directors of the Board. Schulte Roth, Maples and Campbells do not represent any of the Investors in connection with the Transactions. The Shareholders have not been represented by counsel in connection with the Transaction. From time to time, Schulte Roth represents and may, in the future, represent DBZCO and Fortress, and Maples represents and, in the future may represent Fortress, with respect to certain other matters.

19

- Under the terms of the New IMA, the New Manager has the right to terminate the New IMA upon three months' notice. If the New Manager terminates a New IMA prior to the complete wind-down of the portfolio of the Consenting Fund that is the party to such New IMA, then such Consenting Fund may not realize the full value of many of the costs borne by it in connection with the Transactions, and could incur further expenses and reductions in realization values in respect of the actions that may have to be taken as a result of such termination.

- The requisite approval of the Offshore Consent Matters by the Shareholders of the Offshore Fund and of the Domestic Consent Matters by the limited partners of the Onshore Fund is a condition to the consummation of the Transactions. With respect to the Onshore Fund, the approval of a majority of the outstanding interest of the limited partners is required. With respect to the Offshore Fund, a resolution approved by Shareholders holding a majority of the voting rights attached to the issued and outstanding voting shares of the Offshore Fund in attendance at the Extraordinary General Meeting (assuming the presence of a quorum), in person or by proxy is required. The quorum for the Extraordinary General Meeting requires that Shareholders representing at least 51% of the voting rights attached to the issued and outstanding shares in the Offshore Fund entitled to vote be present in person or by proxy at the Extraordinary General Meeting. Therefore, approval by the Offshore Fund may be achieved by as little as slightly more than 25% of such voting rights if only 51% thereof are present in person or by proxy at the Extraordinary General Meeting.

*Certain Risk Factors If the Transactions Are Consummated*

- Although certain employees of DBZCO and certain of its affiliates will have ongoing involvement with the Fund as employees of the New Manager or, under the TSA, as retained employees of DBZCO, after the Closing, the New Manager will involve many of its own employees in the daily operations and business activities of the Fund. Additionally, following the Transactions, Daniel Zwirn, who is currently responsible for the Fund's portfolio, will not be employed by, nor will he provide services to the New Manager. None of DBZCO, the Board or the Fund can provide any assurances that the actions of the New Manager or that the absence of Daniel Zwirn or other DBZCO personnel will not have an adverse effect on the Fund.

- Following the Closing, the New Manager will perform all services incident to the wind-down of the Fund's portfolio. The New Manager will receive fees on collections by the Fund. Therefore the New Manager may have an incentive to liquidate assets before their potential value is realized. As a result, certain longer-term private equity investments may not be held long-term, pending litigation and other claims may be settled and other steps may be taken as the New Manager reasonably deems appropriate to facilitate the reduction to cash and a subsequent liquidation and distribution to Shareholders and dissolution of the Fund. As a result of these steps, Shareholders may ultimately receive an amount of cash that is substantially below the current net asset value of their interest in the Fund.

20

Additionally, none of DBZCO, the Board or the Fund can provide any assurances regarding the outcome of such wind-down activities, including, but not limited to (i) the amount of distributions, if any, that the Shareholders may receive, (ii) the period of time that the wind-down may require, (iii) whether the New Manager elects to distribute assets and the type of distributions that the New Manager may make, and (iv) the likelihood that the amount of distributions may exceed or may be lower than the current net asset value of the Fund.

- The costs under the New IMA, including expenses, internally allocated costs, management fee and the incentive fee, may be higher than another third party advisor may have charged.

- The Board and the investors will not have any inspection rights or other contractual means to verify the calculation of the Offshore Fund's payments of the New Manager's allocable costs and expenses under the New IMA, which are not capped. The contractual verification right that the Board has in this respect is to cause the New Manager to certify that the payment obligations of the Offshore Fund with respect to expenses have been determined in accordance with the New IMA. Such certificate is required to be delivered within 45 days after each quarter and 60 days after each year-end, together with supporting schedules with line item detail to be agreed in good faith by the New Manager and the Board. Upon request, the Chief Financial Officer of Fortress or his designee shall confer with the Board or its designated representatives. As a consequence of these limitations on access to the New Manager's books and records, there can be no assurance that the amounts of the expenses charged to the Offshore Fund will be determined accurately or equitably nor that the Offshore Fund will have sufficient information to challenge the calculation of payments of costs and expenses.

- No assurance can be provided with respect to or is given as to the ability of Fortress or its affiliates to perform their obligations under the Transactions or to achieve the objectives of the Transactions including under the New IMA.

- The Transactions are subject to numerous conditions, including approval by Ordinary Resolution of the Shareholders of the Offshore Fund, approval by limited partners of the Onshore Fund representing a majority in interest of such Funds, and approval (or expiration of applicable waiting periods) with respect to certain anti-competition filings. Even if such approval is obtained, there can be no assurance that the other conditions will be satisfied or waived, or that the Transactions will be completed.

- In recommending the appointment of New Manager as new manager to the Fund, the Board of Directors of the Offshore Fund and DBZGP solicited and considered the views of the Advisory Council. Pursuant to the Charter of the Advisory Council, each member served on the Advisory Council solely on its own behalf as a limited partner of a Domestic Fund and/or Shareholder of the Offshore Fund or a Managed Account client of DBZCO, and not as a representative of any other limited partner or Shareholder in any of the Funds. Such Advisory Council

21

members may have objectives or interests that may differ from or conflict with the objectives and interests of other Shareholders.

- DBZCO currently manages assets held not only by the Funds, but also by the Managed Accounts. As of December 31, 2008, assets held by the Managed Accounts constituted approximately 13% of all of the assets managed by DBZCO. A substantial portion of the investments of the Managed Accounts constitute participations in certain investments of certain Funds. In addition, a substantial portion of the investments of the TE Fund and the Asia/Pacific Fund constitute participations in certain investments of other Funds. There can be no assurance that the Managed Accounts and/or the TE Fund or Asia/Pacific Fund (in each case, if not a Consenting Fund) will agree to modifications in their existing investment advisory agreements to reflect a similar change in compensation structure as is contemplated by the New IMAs or that the Managed Accounts and/or the TE Fund and/or the Asia Pacific Fund (in each case, if not a Consenting Fund) will agree to pay their pro rata share of the costs and expenses incurred as a result of the Transactions. Accordingly, if the Transactions are consummated and (i) the Managed Accounts and the TE Fund and the Asia/Pacific Fund (in each case, if not a Consenting Fund) do not agree to contribute their pro-rata share of the costs and expenses incurred in the Transactions and (ii) new investment advisory agreements are not entered into by the New Manager with the Managed Accounts and the TE Fund and the Asia/Pacific Fund (in each case, if not a Consenting Fund) on terms similar to those set forth in the New IMAs, then the costs of the New Manager associated with the Transactions and in managing the Consenting Funds may be significantly higher as a percentage of assets under management and, as a result, Shareholders will absorb their pro rata portion of such higher costs.

- Although the Existing IMA between DBZCO and the Fund will be terminated upon the Closing, certain provisions in the Existing IMA concerning the Fund's indemnification of DBZCO and certain of its affiliates and current and former principals, partners, officers and employees and the Fund's advancement of certain expenses to them, among other provisions, will, in accordance with the terms of the Existing IMA, survive the termination of the Existing IMA. The New IMA contains similar indemnification of DBZCO and certain of its affiliates and current and former partners, officers and employees with respect to services provided under the TSA. In addition, upon the consummation of the Transactions, the Buyer will deposit $15 million into the Trust under the ITA. Accordingly, notwithstanding the consummation of the Transactions, the Fund, under the provisions that survive the termination of the Existing IMA, and through its indirect ownership of the Buyer and its guaranty of the Buyer's obligations, will continue to bear certain expenses arising out of DBZCO's management of the Fund's assets and arising out of certain liabilities (contingent or otherwise) of DBZCO.

- The New IMA provides that the New Manager shall not be liable for the prior acts of DBZCO. If after the Closing, the Fund has a claim to be brought with respect

22

to the manner in which the Fund was managed prior to the Closing, including investment decisions made by DBZCO, such claims must be brought by the Fund against DBZCO, and not the New Manager. There can be no assurance that DBZCO will have sufficient assets to satisfy any successful claim

- Pursuant to the TSA, the Buyer will pay DBZCO for the fees that DBZCO earns thereunder as it provides transition services to the New Manager. The amount of such fees will be guaranteed severally by the Consenting Funds pro rata based on their relative net asset values as of the Measurement Date. The Managed Accounts and, to the extent it is not a Consenting Fund, the TE Fund and the Asia/Pacific Fund will not contribute to such fees or to the purchase price under the APA. In connection with the Transactions DBZCO prepared in good faith a budget of its and certain of its affiliates' projected wind-down costs. If the actual costs to wind-down DBZCO and certain of its affiliates exceed current projections, then the Buyer may have to pay additional fees, which will require capital contributions by the Funds, pursuant to the Subscription Agreement, in excess of the amounts currently projected.

- In addition to the consent of the Shareholders of the Offshore Fund and the limited partners of the Onshore Fund, the consent of certain third parties (e.g., contractual counterparties of the Funds) to the replacement of DBZCO may be advisable or required but obtaining such consents is not a condition to the Transactions. There can be no assurance that such third parties will consent or that such third parties will not seek to extract onerous concessions. If any required consent is withheld, DBZCO or the Funds may be in default on certain contracts upon the consummation of the Transactions and the Funds may suffer adverse economic consequences as a result of the Transactions.

- The Funds and/or DBZCO or its affiliates may hold investments or related assets that may not be managed by the New Manager as a result of regulatory issues, licenses, permits or other factors which are triggered by a replacement of DBZCO. In such event, DBZCO and New Manager intend to work together to secure such regulatory approval, license, permit or other consent necessary to complete such transfer as soon as practicable. Pending such transfer, it may be necessary for any such assets to remain under the control of DBZCO, if possible. There can be no assurance that any such approval, license, permit or other consent will be obtained or, if not so obtained, that the Funds would not suffer an economic loss as a result.

- Although the terms of the IMTA require the New Manager to offer employment to certain employees of DBZCO, there is no guarantee that all of the employees with requisite knowledge will accept their offers of employment from the New Manager or, if they do, that they will remain employed by the New Manager for any length of time. Accordingly, the New Manager may not retain the same knowledge of the Fund's portfolio positions as DBZCO.

23

- Under the ISA, certain employees will be retained by DBZCO to assist in its and certain of its affiliates' wind-down. In some cases, such retained employees will also be providing services to the New Manager. At certain times, these retained employees may need to prioritize the services they provide to DBZCO in connection with the wind-down over those provided to the New Manager. Therefore, the New Manager, and, indirectly the Fund, may not receive the complete benefit of such employees' time and attention. In addition, DBZCO may not be able to retain any such employees during the transition period and may not be able to find suitable replacements for such employees.

- Daniel Zwirn is the only executive director of the Fund. The other two directors are non-executive directors and are not engaged in the business of the Fund or DBZCO on a full-time basis. Mr. Zwirn had a conflict of interest in negotiating the terms of the Transactions, and the independent directors do not have in-depth and day-to-day knowledge of the Fund's investments. Consequently, the independent directors have relied on the advice, analyses and judgment of the professionals engaged by the Fund, in particular Berenson, in evaluating the Transactions. The directors were not involved in the negotiations of the Transactions on a day-to-day basis; the negotiation of the detailed terms of the Transactions were undertaken by senior DBZCO management and the Fund's legal advisors Schulte Roth.

- DBZCO's investment processes and back-office operations are based on a certain number of people working together with certain allocated responsibilities. While many of DBZCO's employees will be retained by the New Manager, there can be no assurance that these processes, operations and responsibilities will continue in a similar fashion, respectively, at the New Manager. A disruption of these processes, operations and responsibilities could have a negative impact on the ability of the New Manager to effectively transition the assets under management and successfully wind down such assets.

- DBZCO has developed and maintained certain proprietary information technology customized to suit the investment needs of DBZCO and the Fund. The investments of the Fund may suffer if the New Manager fails to properly utilize, maintain and upgrade such information technology.

- As part of the Transactions, certain information, data and books and records that are being sold to the Buyer will nevertheless be retained by DBZCO following the Closing and may be provided to the New Manager only pursuant to the ISA or related arrangements. The ISA sets forth procedures pursuant to which certain of such information, data and books and records will be provided to New Manager or Buyer. There can be no assurance that the New Manager or Buyer will be entitled to all requested information, data and books and records.

- If DBZCO becomes subject to bankruptcy or similar proceedings following the Closing, then the New Manager's access to certain information under the ISA concerning the Fund or the Fund's portfolio could be restricted or curtailed, and

24

DBZCO s ability to provide services required under the IMTA or the TSA could also be severely curtailed or precluded totally, which could have a material adverse impact on the New Manager's ability to effectively manage the Fund s portfolio.

- As a result of the Transactions, the New Manager may not be able to maintain the same employee, financing, joint venture, affiliate, brokerage and counterparty relationships, or the same terms thereof. as have been maintained by DBZCO from time to time. The inability to maintain such relationships or terms could have an adverse effect on the Fund.

- Certain contracts to which the Fund, and/or one or more of its subsidiaries. is a party contain change of control or "key man" provisions that would give rise to a termination or other default right as a result of the Transactions. There can be no assurance that any contractual counterparty will not exercise such rights if available. There also can be no assurance that if such termination or default rights are exercised it will not have a materially negative impact on the net asset value of the Fund.

- Under certain of the ISDA Master Agreements and prime brokerage agreements to which the Fund is a party (collectively, the "Trading Agreements"), an event of default, termination event or similar event has already occurred. However, to date, no counterparty or broker-dealer/counterparty has exercised, nor agreed to waive, its right to terminate the relevant Trading Agreement. Many of these agreements contain "key man" or change of control provisions that will provide an additional basis for a termination and/or default. Therefore, there is a risk that upon learning of the Transactions, a counterparty or broker-dealer/counterparty, as applicable, which has refrained from exercising its right to terminate a Trading Agreement and all transactions under such agreement, may exercise such termination right. There can be no assurance that any counterparty or broker-dealer/counterparty will not exercise such termination rights. There also can be no assurance that if such termination rights are exercised that it will not have a materially negative impact on the net asset value of the Fund.

- In addition, pursuant to such Trading Agreements. the Fund is invested in credit default swaps. A credit default swap is a contract between two parties which transfers the risk of loss if a company fails to pay principal or interest on time or files for bankruptcy. The Fund s notional credit default swap exposure as of April 30, 2009 was in excess of $8 billion. There is a risk that, upon learning of the Transactions. a counterparty or broker-dealer/counterparty, as applicable. which has refrained from exercising its right to terminate a Trading Agreement and all transactions under such agreement, may exercise such termination rights. There also can be no assurance that if such termination rights are exercised that it will not have a significant and material negative impact on the net asset value of the Fund.

25

- As a result of the Transactions (including, without limitation, the payment of the purchase price under the APA, the reimbursement of the parties' transaction expenses, the payment of fees under the TSA, the ongoing costs of the ISA and amounts deposited pursuant to the ITA), the Fund will incur certain upfront and ongoing expenses that will be materially higher as a percentage of the Fund's net asset value than expenses have historically been, resulting in a greater adverse impact on the performance of the Fund during the period in which the Transactions are consummated and in successive periods. In addition, due to the liquidity constraints under which the Fund is operating, the expenses attributable to the Transactions at and following the Closing may increase the risk that the Fund cannot meet its financial obligations when due.

- There may be litigation by third parties and/or regulatory proceedings relating to the Transactions and their consummation. Such litigation or regulatory proceedings, if pending prior to the consummation of the Transactions, could involve an injunction or other remedies that could materially delay or otherwise prevent the Transactions. Alternatively, such litigation or regulatory proceedings, if pending following the consummation of the Transactions, could result in an obligation of the Fund to advance or reimburse DBZCO and/or the New Manager (or their respective affiliates) or their respective employees in connection with their respective defense of such actions. The amount of any such advancement or reimbursement, individually or in the aggregate, may be significant.

- DBZCO may become subject to bankruptcy or similar proceedings following the consummation of the Transactions. In the event DBZCO becomes subject to bankruptcy or similar proceedings, a creditor could potentially assert that one or more of the Transactions constitute a fraudulent transfer on the basis that DBZCO did not receive fair consideration or reasonably equivalent value for the transferred assets. In addition, if DBZCO becomes subject to such proceedings, its ability to perform its obligations under the Transaction agreements to which it is a party may be materially impaired. In such an event, the Transactions could be challenged and a bankruptcy court would have broad authority to determine remedies.

- All investors, including affiliates and current and former employees of DBZCO that do not currently pay fees, will bear the fees and reimbursement of the expenses of the New Manager.

*Certain Risk Factors If the Transactions Are Not Approved or Consummated*

- The approval by the investors of the Offshore Fund and the Onshore Fund, and not the other Funds, are the only investor approvals that are conditions to the Closing. If the investors in the Asia/Pacific Fund or the TE Fund fail to provide their respective requisite approval, then Fortress cannot be engaged to manage such Funds, but the Transactions will nonetheless close if all other conditions to the Closing have been satisfied or waived. DBZCO would, at that time, lack the capabilities to properly manage either the Asia/Pacific Fund or the TE Fund.

26

DBZCO has not yet determined its approach in the event that these Funds do not approve, although two alternatives would be to distribute the assets of such Fund or to have a receiver appointed, either of which is likely to materially adversely affect asset values and recoveries. The failure by the Asia/Pacific Fund or the TE Fund, or for that matter the failure by the Managed Accounts, to agree to the New Manager's management of them could also adversely affect the wind-down of the Consenting Fund's portfolio given the integrated nature of the portfolio currently under DBZCO's management.

- There may be no viable alternatives for DBZCO to implement with respect to the Fund if the Transactions are not consummated. DBZCO, while operating with materially diminished resources, could be required to reduce the entire Fund to cash more quickly than might be optimal. DBZCO could also be required to seek a third party to reduce the Fund's portfolio to cash, which could also require Shareholder consent and could result in increased costs to the Shareholders. Moreover, any such third party may have incentives to reduce the Fund's portfolio to cash in an expeditious manner resulting in increased losses for the Shareholders. And, in the absence of a thorough replacement manager selection process, such as the one conducted by the Board in connection with the Transactions, it is possible that any such third party would have limited expertise with respect to the appropriate disposition of assets of the type held by the Fund which could result in significant losses to the Fund and the Shareholders.

- DBZCO has indicated that it expects that, if the Transactions are not consummated or an alternative plan is not successfully implemented, DBZCO would not be able to meet its liquidity needs at the end of the year 2009.

- DBZCO, through its wholly-owned subsidiary, Bernard Capital Funding, LLC ("Bernard Capital") serves as investment advisor and collateral manager, respectively, to Bernard Global Loan Investors, Ltd. and Bernard National Loan Investors, Ltd., which are, respectively, subsidiaries of the Fund and the Onshore Fund (collectively, the "CLOs"), pursuant, in each case, to an investment advisory or a collateral management agreement (as applicable, the "Advisory Agreements") between Bernard Capital and such CLO. Bernard Capital does not have employees and all of its business and affairs are managed by and through DBZCO, as its sole member and manager. If the Transactions, for any reason, cannot be consummated and DBZCO is otherwise unable to successfully address its liquidity needs, there could be material adverse consequences to the CLOs and, therefore, the value of the equity interest of the Fund and the Onshore Fund, as applicable, in the CLOs. There can be no assurance that any suitable alternative management arrangements can be made for the CLOs. Even if such alternative arrangements could be made, it may be time consuming or otherwise difficult to put such arrangements in place, which may result in a period of time during which there is effectively no investment advisor or collateral manager with respect to the assets of the relevant CLO. It is likely that under such circumstances, an event of default will be declared under the indenture for each CLO, followed by a forced liquidation of the assets of such CLO. Any forced liquidation of the assets of a

27

CLO under current market conditions could substantially reduce, or even eliminate, the value of the equity owned by the Fund and the Onshore Fund in such CLO.

- The CLOs are currently subject to a dispute with MBIA Insurance Corporation (including its affiliates, 'MBIA'), which insures certain of the CLO debt. Subject to the future appointment of an affiliate of Fortress as investment advisor and collateral manager, as applicable, to the CLOs (such affiliate, the "New CLO Manager") and the satisfaction of certain rating agency confirmations (the appointment of the New CLO Manager and receipt of such confirmations, the "CLO Transaction"), the dispute has been resolved to the mutual satisfaction of the parties and, in exchange for the waiver of certain alleged defaults, MBIA, upon the closing of the CLO Transaction, will receive consideration, including agreements as to certain structural changes to the indentures of the CLOs and the appointment of the New CLO Manager. There can be no assurances that the rating agencies will issue the required rating confirmation letters in connection with such appointment. To the extent that the CLO Transaction does not close (whether due to the failure to obtain rating agency confirmations or otherwise), the dispute between the CLOs and MBIA may continue, MBIA may not waive certain alleged defaults, the CLOs may be unable to find a new manager and/or the CLOs may be unable to obtain the required approvals (including approvals required from MBIA) for a new manager. This could result in material adverse consequences to the CLOs and, as a result, the value of the equity interest of the Fund and the Onshore Fund, as applicable, in the CLOs. In particular, an alleged event of default that is not waived by MBIA could result in the acceleration of the applicable CLO's debt by the CLO trustee (either on its own initiative or at the direction of MBIA) and the forced liquidation of the assets of the applicable CLO. As set forth in the preceding paragraph, any forced liquidation of the assets of a CLO under current market conditions could substantially reduce, or even eliminate, the value of the equity owned by the Fund and the Onshore Fund in such CLO. The foregoing risks may also exist if the Transactions are consummated in the event the ratings agencies do not approve the New CLO Manager.

- In the 2007 audited financial statements for the Offshore Fund dated April 14, 2009, the Offshore Fund's auditor, PricewaterhouseCoopers LLP, stated in its opinion that DBZCO and the Offshore Fund's CLO have been negatively impacted by the events and conditions in the financial markets, the broader economy and certain other matters. Accordingly, these events and conditions could have material adverse consequences to the Offshore Fund's business, results of operations and financial position and therefore material adverse consequences to the value of the shareholders' interest in the Offshore Fund. The ability of DBZCO to continue to be an effective investment manager and to efficiently wind-down the Fund assets in an orderly fashion is uncertain.

- In the 2008 audited financial statements for the Offshore Fund's CLO, dated April 30, 2009, the CLO's auditor, PricewaterhouseCoopers LLP, stated in its opinion

28

that the Offshore Fund's CLO and DBZCO have been negatively impacted by the events and conditions in the financial markets, the broader economy and certain other matters. Accordingly, these events and conditions in the financial markets, the broader economy and certain other matters raise substantial doubt about DBZCO's ability to continue as a going concern. The substantial doubt about DBZCO's ability to continue as a going concern, and certain other matters, raises substantial doubt about the Offshore Fund's CLO's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of these uncertainties.

- If the Transactions are not consummated and the Funds do not agree to cover the costs of DBZCO's operations and obligations, then DBZCO will lack the financial wherewithal to continue to operate its business and, as a result, DBZCO could become subject to bankruptcy or similar proceedings, in which event one or more of the following risks may arise:

  - o  DBZCO management may be immediately replaced by an interim trustee appointed by the United States Trustee's Office until a permanent trustee is elected by DBZCO's unsecured creditors. Any such trustee may elect to cease all business operations, or may be appointed by DBZCO's unsecured creditors and charged with maximizing the value to creditors through the disposition of DBZCO's assets.

  - o  DBZCO would be subject to an 'automatic stay' order. The entry of such an order would prevent DBZCO or the Fund from using assets to which they may be entitled and/or taking property, including books and records, without approval from a bankruptcy court.

  - o  DBZCO may be unable to retain employees responsible for the management of the Fund's portfolio. Alternatively, a trustee may terminate such employees. The absence of such employees could materially impair the value of the Fund's portfolio

  - o  Bernard Capital could be removed as investment advisor or collateral manager, as the case may be, under the CLO's Advisory Agreements, which could result in an event of default under the related indenture.

  - o  The trustee's compensation, which is based on distributions to creditors (subject to a maximum of 3% of distributions in excess of $1 million), may incentivize the trustee to act in a manner inconsistent with or contrary to the interests of the Shareholders. In addition, the trustee may not have the reputational concerns or investment capabilities that may inform his or her decisions in how to liquidate the Fund's portfolio, as is typically the case, in contrast to professional investment managers who are likely to be mindful of standard investment manager practices and the interests and concerns of investors.

- o  Multiple trustees could be appointed to manage the separate liquidations of one or more of the various Funds, respectively. For example, it is possible that a Cayman liquidator could be appointed to manage the liquidation of the Fund, while a U.S. trustee could be appointed to manage the liquidation of the Domestic Funds. Under such circumstances, there can be no assurances that such liquidator and trustees would proceed with the respective liquidations of the Funds with any of the coordination or cooperation necessary for any such liquidation to effectively realize the value of the assets held by such Funds, especially with respect to any assets that are held by more than one such Fund.

- o  A trustee or DBZCO (as debtor in possession) may elect to reject the Existing IMA. Alternatively, a trustee or DBZCO may elect to assume the Existing IMA and assign it to a third party. It is also possible that the Existing IMA may be assigned to a third party over the objection of the Fund and, if a trustee is appointed, over the objection of DBZCO.

- o  A bankruptcy or similar proceeding could result in a default by DBZCO, the Funds or Bernard Capital under financing, brokerage, lending or other key relationships or arrangements with counterparties.

- o  Many key decisions that are material to DBZCO's business may be subject to approval by a bankruptcy court, which may result in increased costs, delays and uncertainty. Such decisions could include whether to assume or reject the Existing IMA and other contracts of DBZCO that may be material to the Fund.

- News reports regarding the Transactions have already appeared in major media outlets. Although the executed transaction agreements contain non-disclosure provisions, if the existence of the agreements to implement the Transactions becomes public knowledge and the Transactions are not consummated, then DBZCO's ability to effectively manage the Fund may be materially adversely impacted.

- If the Transactions are not consummated, then employees of DBZCO, including those with important knowledge of the Fund's investments, may become more likely to terminate their employment with DBZCO and, accordingly, the ability of DBZCO to continue to manage the Fund effectively may be substantially impaired.

- If the Transactions are not consummated, then the Fund's financing, brokerage, counterparty and other key relationships may be adversely affected.

- There are outstanding two Interfund Notes (as defined below) that evidence advances from the Offshore Fund and the TE Fund to the Onshore Fund. As of December 31, 2008, the aggregate principal outstanding under the Interfund Note in favor of the Offshore Fund was approximately $98 million, currently bearing

30

interest at 19% per annum (to increase to 20% per annum on May 31, 2009). As of December 31, 2008, the aggregate principal outstanding under the Interfund Note in favor of the TE Fund was approximately $27 million, also currently bearing interest at 19% per annum (to increase to 20% per annum on May 31, 2009), subject in each case to adjustment based upon the 2008 audit. Each of the Interfund Notes is payable on demand. Accordingly, in the event that a liquidator or a bankruptcy trustee was appointed to manage the Fund or the TE Fund, then the Fund or the TE Fund could demand payment of its Interfund Note from the Onshore Fund. If the Onshore Fund was not capable of making such payment in a timely manner, then the Onshore Fund, if not already subject to bankruptcy proceedings, could be forced into such proceedings as a result of such demand. As the Fund participates in a number of investments made through and together with the Onshore Fund, such a bankruptcy proceeding could have a material negative effect on the net asset value of the Fund.

- If the Transactions are not consummated, then the Fund will nevertheless have incurred substantial transaction costs and the Shareholders may have no opportunity to recover some or all of their respective Fund losses to date through the continued operation of the Fund. Such Shareholders' losses to date may be exacerbated by the failure to consummate the Transactions because, among other reasons, DBZCO (or its agents other than the New Manager) intends, and may be required by counterparties, to reduce the Fund's portfolio to cash in a more expeditious manner than is currently intended, despite disadvantageous market conditions.

- Failure to consummate the Transactions may increase the likelihood that distributions to Shareholders are made in-kind.

- If the Transactions are not consummated, then there may be litigation and/or regulatory proceedings relating to the Transactions and the failure of the Transactions to be consummated.

- If the Transactions are not consummated, then the Fund may no longer be able to continue operating in the same manner as it currently operates, and the Board may have no choice but to (i) propose the appointment of a liquidator for the Fund, (ii) amend and restate the Existing IMA to restructure the fees and distributions in order to provide DBZCO and the Board with sufficient resources to continue to manage the operations of the Fund or (iii) attempt to resume discussions with the Alternative Bidder (as defined below) or other interested parties. Each of these options would involve further deliberation, negotiation and cost to the Fund as well as, possibly, further Shareholder approval and resolutions.

- The consummation of the Transactions is conditioned on, among other things, the requisite investor consent of each of the Funds. If any one or more of such conditions are not satisfied, unless such conditions are waived by the parties, the Transactions will not be consummated.

*Background of the Transactions*

In 2006, DBZCO identified certain financial irregularities and accounting issues relating to the Fund. Those matters led to the separation from DBZCO of DBZCO's former Chief Financial Officer, and DBZCO's voluntarily reporting various issues to the SEC and engaging legal counsel to conduct  together with an independent accounting firm and with assistance of forensic accountants, an independent review. (Please refer to the Memorandum from DBZCO to investors, dated March 26, 2007, attached hereto as Annex E, in which these issues are addressed in detail.)  Based on the findings of the independent review, DBZCO made financial reparation to the Funds on all of the issues identified as of such time. The SEC obtained a formal order of investigation with respect to DBZCO  and that investigation is ongoing.

In early 2007, DBZCO devoted even greater resources to strengthen its global infrastructure of operational controls, compliance safeguards and management oversight procedures. Nevertheless, DBZCO experienced significant delays in issuing the audited financial statements for the Funds for the 2006 fiscal year, which continued in 2007 and 2008. These delays were, we believe, primarily responsible for the commencement of significant investor redemptions from the Funds.

In September 2007, DBZCO met with Fortress regarding a possible transaction. The parties were not able to agree on an appropriate transaction structure or valuation of DBZCO and, as a result, the negotiation of such a transaction never materialized.

In November 2007, DBZCO met with certain large investors of the Funds to, among other things, update them on certain strategic alternatives that had been explored over the preceding several months with potential third-party strategic and financial partners. Based on these discussions, DBZCO and those investors explored the potential of merging DBZCO and the Funds into a finance company. However, after several weeks of discussions and analyses, DBZCO and such investors determined that this alternative was not promising and abandoned the concept. Among other things, they concluded that there was limited debt financing available for the proposed finance company based on discussions among DBZCO, several potential lenders and Berenson, which, by separate engagement letters on May 8, 2007, was formally retained as the financial advisor to the Offshore Fund and Onshore Fund and, separately, to affiliates of DBZCO (see section "Berenson's Presentation to the Board and DBZGP").

On February 21, 2008, by letter to the Shareholders of the Fund, DBZCO announced that, as a result of the large number of withdrawal and redemption requests made to the Funds, due primarily, we believe, to the delays in the issuance of the 2006 audited financial statements, DBZCO had concluded that it was in the best interests of the investors in the Offshore Fund that DBZCO engage in the orderly disposition of the Offshore Fund's portfolio. At the same time, DBZCO announced the orderly disposition of the Onshore Fund's portfolio. Shortly thereafter DBZCO determined to wind down the Asia/Pacific Fund. The orderly disposition of the TE Fund had been in progress since October 2006 for reasons unrelated to the wind-down of the Offshore Fund, the Onshore Fund and the Asia/Pacific Fund. As all such portfolios are substantially overlapping with investments that are either illiquid or of limited liquidity, DBZCO concluded that an integrated non-distressed liquidation over several years was the best way to try to maximize proceeds, a view supported by an overwhelming majority of investors in the Funds.

To enhance DBZCO's ability to retain staff essential to the wind-down process, DBZCO entered into compensation agreements with key personnel.  Such agreements were structured to incentivize employees to remain employed at DBZCO throughout 2008, with final payments due to employees in 2009.

By early 2008, as a result of significant redemptions by investors in 2007, an event of default had occurred under two debt facilities, one provided by KBC Financial Products Inc., an affiliate of the Belgian bank ("KBC"), to Woodhaven Drive 1, LLC, a special purpose vehicle controlled by the Onshore Fund ("WHD I"), and one provided by KBC to Woodhaven Drive II, LLC, a special purpose vehicle controlled by the Offshore Fund ("WHD II").  The facility to WHD II was repaid in February 2008.  In March 2008, in light of this event of default as well as the desire to repay amounts owed by the Onshore Fund under the Interfund Notes (described below), Berenson was instructed to explore a third-party debt financing to refinance the KBC debt facility to WHD I and the Interfund Notes.  Given the desire to limit dissemination into the market of any liquidity concerns of the Funds, four potential lenders were discreetly contacted.  Three lenders submitted preliminary proposal letters in late May 2008, of which two were invited to perform further due diligence to provide a commitment letter.  One party issued a commitment letter, subject to the completion of confirmatory due diligence and negotiation of definitive documentation, and the other party concluded that it was not willing to provide the financing under the terms of its preliminary proposal letter.  During the completion of confirmatory due diligence and negotiation of definitive documentation with the remaining lender, WHD I was able to generate sufficient proceeds from asset sales to fully repay the remaining KBC facility.  As a result of the KBC repayment and, due to DBZCO's concerns regarding certain provisions of the definitive documentation with the remaining potential lender in early August 2008, DBZCO, in consultation with the Board, terminated discussions with the remaining lender and began negotiating an extension amendment for the Interfund Notes in lieu of completing a third party refinancing.

The Offshore Fund, the TE Fund and a Managed Account frequently made advances to the Onshore Fund and other managed accounts in order to fund investments.  These interfund transfers were subsequently documented as interest-bearing demand notes in favor of the Offshore Fund, the TE Fund and such Managed Account by the Funds and Managed Accounts that had received the benefit of the use of such capital.

As of the date hereof, two promissory notes (the "Interfund Notes") evidencing advances from the Offshore Fund and the TE Fund to the Onshore Fund remain outstanding.  The original Interfund Notes were issued effective March 26, 2007 and evidenced revolving advances extended by the Offshore Fund and the TE Fund, respectively, to the Onshore Fund as early as January 1, 2004.  The original Interfund Notes were amended and restated on two occasions, once effective December 31, 2007 and again effective September 30, 2008.  These amendments extended the maturity date of the obligations under the Interfund Notes.  For as long as the obligations under the Interfund Notes remain outstanding, the Onshore Fund is prohibited from (i) making any distributions, dividends, or redemption payments to its limited partners and (ii) making any distribution to DBZGP with respect to incentive allocations relating to the 2008 fiscal year and future fiscal years.  As of December 31, 2008, the aggregate principal outstanding under the Interfund Note in favor of the Offshore Fund was approximately $98 million and the accrued and unpaid interest thereon as of such date was approximately $34 million  subject in

33

each case to adjustment based upon the year-end audits for 2008. As of December 31, 2008, the aggregate principal outstanding under the Interfund Note in favor of the TE Fund was approximately $27 million, and the accrued and unpaid interest thereon as of such date was approximately $10 million, subject in each case to adjustment based upon the year-end audits for 2008.

In April 2008, DBZCO again met with representatives from Fortress who expressed an interest in exploring a potential transaction involving DBZCO and Fortress. In the weeks that followed, the senior managements of Fortress and DBZCO conducted several in-person and telephonic discussions concerning a potential transaction. The initial discussions focused on several possible alternative transaction structures, including (i) a participation interest by Fortress in DBZCO, (ii) a buyout of DBZCO, (iii) Fortress's entering into a sub-advisory relationship with the Funds, or (iv) a transaction in which Fortress would assume management of the Funds. As discussions between DBZCO and Fortress continued, the parties focused on a replacement manager transaction as the likely structure. At the time, Fortress indicated that, were it to replace DBZCO as investment manager to the Funds, it would seek to implement a new fee structure in which the Funds would pay to Fortress the overhead cost of managing the Funds, plus 5% of any distributions realized. DBZCO and Fortress determined that they could not come to agreement on certain threshold issues, and the parties determined to cease further discussions at that time regarding a transaction.

In June 2008, following the initial discussions with Fortress described above, DBZCO began discussions with certain individuals and the asset management division of a major international bank with a view toward potentially forming a new management company to raise new funds that would pursue strategies similar to those of the Funds. The proposed structure would have benefited the Funds by generating incremental revenue that would offset DBZCO's expense infrastructure, provide potential new capital to invest in Fund assets and in joint venture partners of the Funds (subject to the approval of a conflicts committee), and mitigate concerns regarding the ability to retain and incentivize employees. Berenson advised DBZCO on this potential transaction as well as on other potential financings and the potential sale of its asset management business. In October 2008, discussions were terminated based on the inability of the bank to receive approval from its internal investment committee.

In the summer of 2008, DBZCO undertook an internal analysis as to whether a modification of its management fee model would be appropriate for the purpose of stabilizing the DBZCO platform. As part of this analysis, DBZCO studied the potential implementation of a new fee structure in which DBZCO would charge the Funds for DBZCO's costs of managing the Funds. Such costs would be monitored by the Fund's independent directors and a committee of investors in the Funds. The Board was advised of the possibility that DBZCO might need to modify its management fee model in August 2008, at which time Constellation Investment Consulting Corp. ("Constellation") was engaged by the Offshore Fund upon the suggestion of the independent directors to, among other matters, assist the Board with assessing and overseeing any modification of DBZCO's management fee model and the realization of the Fund's assets by DBZCO.

Throughout 2008, DBZCO focused on cost reductions seeking to mitigate potential shortfalls between projected fee revenues and operating costs. By late 2008, DBZCO became

concerned that, in light of the very difficult market environment and unanticipated audit adjustments and consequential dramatic reduction in the value of its assets under management, DBZCO might not be viable. Without significantly increasing DBZCO's fees from the Funds, DBZCO was concerned with its projected ability to retain necessary employees over the time period required to wind down the Funds and the Managed Accounts and to satisfy contingent and other liabilities. DBZCO again explored several options to mitigate the imbalance between future revenue and the continuing expense of managing the global dissolution of the Funds' assets. Concurrently, certain of the major investors in the Funds expressed the desire to explore changing the investment manager for the Funds.

DBZCO sought in October 2008, and obtained in November 2008, the consent of the majority of the Shareholders (excluding DBZCO-affiliated shareholders) to accelerate the distribution of the 2004 deferred fees pursuant to the Fee Deferral Agreement between DBZCO and the Offshore Fund, dated as of December 29, 2003. At the time of the Shareholder consent, DBZCO had hoped that the acceleration of the distribution of the 2004 deferred fees, valued at approximately $19.5 million before taxes (based on estimates at that time) would provide DBZCO with sufficient liquidity to allow it to pay its ongoing expenses and sustain itself. However, as a result of audit adjustments and the rapid deterioration of market conditions, the net asset value of the Funds had declined, reducing the amount of cash that the acceleration would provide to approximately $14.2 million before taxes (based on estimated amounts as of December 31, 2008). Such amount will largely be offset by an unanticipated return to the Funds of approximately $12 million of management and incentive fees for 2007 resulting primarily from audit adjustments, which reduced assets under management during that year. DBZCO concluded that projected revenues from all sources, including the accelerated fees would not be sufficient to cover DBZCO's liabilities beginning in December 2009.

Subsequently, in 2008, despite the projected availability of the 2004 deferred fees, the Board and DBZGP, after consulting with certain large investors in the Funds, decided to commence a process to seek formal proposals from investment managers to replace DBZCO as investment manager. The factors informing this decision by the Board and DBZGP, included (i) projected liquidity concerns for DBZCO based on deterioration of market conditions and a material reduction in assets under the management of DBZCO, (ii) concerns regarding DBZCO's ability to retain and incentivize employees (iii) an inability to satisfy future contingent liabilities and (iv) certain substantial investors in the Funds expressing a desire for a change in the manager.

On November 1, 2008, the Offshore Fund and the Onshore Fund expanded Berenson's engagement (as described further in the section "Berenson's Presentation to the Board and DBZGP") to include a replacement of DBZCO as their manager. Under that assignment, Berenson identified a list of potential replacement managers. At a meeting with the Board and DBZGP on November 19, 2008, Berenson reviewed potential interested parties and provided an overview of the transaction process and a timetable for the selection process. Following this meeting, Berenson, with input from senior DBZCO management and various investors, identified and contacted thirty-nine parties. Such parties were furnished with an offering memorandum describing the opportunity to replace DBZCO as investment manager to the Funds. Of this group, seventeen parties requested further information and introductory meetings, and ten of these parties conducted some due diligence. At the conclusion of the exploratory

process, nine bidders submitted written proposals (including general terms and conditions) to act as replacement manager to the Funds or to service the portfolio of existing assets of the Funds.

On February 11, 2009 and February 20, 2009, Berenson updated the Board on the status of proposals received and provided preliminary analyses of such proposals. The Board asked DBZCO and Berenson to continue negotiations with three interested bidders, including Fortress. In addition, for the purposes of comparing the proposals among the bidders, the Board asked DBZCO to prepare, with the assistance of Constellation, an alternative proposal pursuant to which DBZCO's fees would reflect a cost-based structure.

Shortly thereafter, one additional bidder was invited to continue negotiations based on a material revision to its initial proposal and one of the initial three interested parties withdrew from the process. On March 13, 2009, DBZCO and its legal advisors furnished these interested bidders with draft documents, and asked that each of the bidders provide more detailed terms and conditions of a possible transaction involving such party based on such draft documents.

At a meeting held on March 23, 2009, each of the three interested bidders made separate presentations of its proposal to the Board and to an Advisory Council composed of certain Shareholders of the Offshore Fund, limited partners in the Domestic Funds and certain Managed Account clients of DBZCO. See the section "Advisory Council" below for a description of the Advisory Council.

During the days that followed their presentations, each of the three interested bidders provided specific terms and conditions for a possible transaction with such party based on the transaction documents with which they previously had been provided. The Board, with the assistance of Berenson and advice of legal counsel, evaluated these proposed terms and conditions and their relative benefits to the Fund. In response to the submission of one of the three interested bidders, further negotiation with such bidder was discontinued.

From the end of March, DBZCO and the Funds continued negotiations with Fortress and the other remaining interested bidder (the 'Alternative Bidder"), including lengthy negotiations on legal documentation, structure of the transactions and material financial terms. The proposal by the Alternative Bidder contemplated retaining Daniel Zwirn to continue managing the Funds' existing portfolio and, potentially, to manage new, additional assets. On April 7, 2009, at Fortress's insistence and as its condition to continue negotiations toward a transaction, the Board and DBZGP authorized the reimbursement by the Funds, pursuant to a reimbursement agreement (the "Original Reimbursement Agreement"), of attorneys' fees incurred by Fortress after April 3, 2009, capped at $500,000. On April 24, 2009, the parties amended the Original Reimbursement Agreement to increase this cap by an additional $750,000. The Original Reimbursement Agreement has since been superseded by a new reimbursement agreement which provides that all reasonable out of pocket expenses incurred by Fortress from February 13, 2009 through the earlier of the termination of the IMTA (other than as a result of Fortress's breach) or the Closing would be reimbursed by the Funds.

On March 31, 2009, the Existing IMA was amended to provide that the indemnification and advancement provisions therein would survive the termination of the Existing IMA. Thus, upon termination of the Existing IMA at Closing, the indemnification and advancement

provisions of the Existing IMA will survive. The Existing IMA was further amended on April 29, 2009 to conform the advancement of expenses provision therein to the advancement of expenses provision in the New IMA. While the Fund previously had discretion to advance to an indemnified person attorneys' fees and other costs and expenses, under the provision as amended, such advancement will be made upon request of the indemnified person, and not in the Fund's discretion. Such advancement is subject to an undertaking by the indemnified person to repay the advancement upon a determination that such indemnified person was not entitled to it.

At a Board meeting on April 17, 2009, Berenson made a presentation similar to the one described below under the section "Berenson's Presentation to the Board and DBZGP". Based on the considerations of the Board (described in more detail below in the section "Board Considerations"), including such Berenson presentation as well as an update from legal counsel and following discussions with the Advisory Council, the Board unanimously authorized the Fund to engage in exclusive negotiations for a limited period of time with Fortress with the view toward entering into definitive documentation for the Transactions as soon as possible. In addition, in order to retain the ability to continue negotiations with the Alternative Bidder upon any failure of Fortress to finalize definitive documentation in a short timeframe, the Board authorized the entry into a reimbursement agreement with Alternative Bidder to provide for the reimbursement by the Fund (together on a several basis with the Domestic Funds) of the attorneys' fees of the Alternative Bidder from and after April 1, 2009, capped at $500,000, in consideration for the Alternative Bidder's agreement to resume good faith negotiations with DBZCO upon notice to the Alternative Bidder no later than April 25, 2009.

At a meeting of the Board held on May 1, 2009, based on the considerations of the Board (described in more detail below in the section 'Board Considerations"), the Board unanimously approved the Transactions.

*Advisory Council*

In order to provide DBZCO and the Board with investor feedback and perspective concerning the potential replacement of the manager of the Funds and general partner of the Domestic Funds, DBZCO invited several of the investors  including some of the Funds' larger investors, to form a committee (the 'Advisory Council').  The Advisory Council consists of the following nine members:

> Avaya Inc. Master Pension Trust
> BlackRock Financial Management  Inc.
> Coast Asset Management, LLC
> Delphi Capital Management, Inc.
> DB Investment Managers, Inc.
> Private Advisors, LLC
> Schein Family Partners, LLC
> Silver Creek Capital Management LLC
> Union Bancaire Privée Asset Management LLC

Each of the members served on the Advisory Council solely in an advisory capacity and on its own behalf as a limited partner of a Domestic Fund and/or Shareholder of the Offshore Fund or a Managed Account client of DBZCO, and not as a representative of any other limited partner or Shareholder in any of the Funds.

The Advisory Council participated in discussions regarding the process of selecting a replacement manager and provided input on certain terms and conditions for the Transactions. As indicated above, on March 23, 2009, the three then-interested bidders made in-person presentations to the Advisory Council during which the Advisory Council asked questions of the three bidders. Following the presentations, a joint meeting was held among the Advisory Council, the Board, DBZGP and DBZCO, at which the Advisory Council was given the opportunity to deliberate and provide input to the Board, DBZGP and DBZCO with respect to the Advisory Council's evaluation of the three bidders, based on the three bidders' respective in-person presentations, written materials and other considerations relating to the bidders that the Advisory Council deemed to be relevant.

Teleconferences between the Advisory Council and DBZCO were held on April 2, April 15, and April 27, 2009 in order for DBZCO to provide the Advisory Council with updates on DBZCO's progress in its negotiations of the Transactions and information concerning the material terms of the Transactions.  From time to time, DBZCO provided the Advisory Council with various written materials as DBZCO deemed appropriate in order to further enable the Advisory Council to evaluate the interested bidders and the ongoing negotiations with each of them.

During the meeting of the Board and DBZGP on April 17, 2009, the Board and DBZGP invited the Advisory Council to participate in a joint session by teleconference. As indicated below in the section "Board Considerations", the Board solicited the views of the Advisory Council, particularly with respect to whether or not each respective bidder would be viewed favorably by the Advisory Council.

*Berenson's Presentation to the Board and DBZGP*

At a meeting of the Board and DBZGP held on May 1, 2009, Berenson advised the Board and DBZGP that, subject to the assumptions, qualifications and facts set forth in Berenson's presentation to the Board and DBZGP on the same date, which is summarized below, in Berenson's judgment, as of May 1, 2009, the new manager transaction proposal from Fortress represented a superior proposal for the Funds as compared to other alternatives available to the Funds as described in Berenson's presentation, discussed with the Board and DBZGP and summarized below as of such date.

**Berenson provided its advice solely for the information and assistance of the Board and DBZGP in connection with their evaluation of the proposed Transactions. Berenson's advice does not constitute a recommendation to any investor in the Funds as to how such investor should vote with respect to the Transactions or any other matter.**

In connection with providing the advice described above, Berenson reviewed, among other things:

- the proposal dated March 27, 2009 from Fortress (the "Fortress Final Proposal") and the proposal dated March 27, 2009 from the Alternative Bidder (the "Alternative Bidder Final Proposal");

- the financial and economic terms and conditions of (i)(a) a draft dated April 29, 2009 of a form investment management agreement to be entered into among the New Manager, FIG (for certain provisions only) and each of the Funds, respectively, (b) a draft dated April 29, 2009 of an investment management transition agreement to be entered into by affiliates of Fortress and the other parties thereto and (c) a draft dated April 29, 2009 of an asset purchase agreement to be entered into by an entity to be owned by the Consenting Funds and DBZCO (collectively, the "Fortress Drafts") and (ii)(x) a draft dated April 8, 2009 of a form investment management agreement to be entered into between an affiliate of the Alternative Bidder and each of the Funds, respectively, (y) a draft dated April 8, 2009 of an investment management succession agreement to be entered into by affiliates of the Alternative Bidder and the other parties thereto and (z) a draft dated April 8, 2009 of an asset purchase and license agreement to be entered into by an affiliate of the Alternative Bidder and DBZCO (collectively, the "Alternative Bidder Drafts");

- certain publicly available information relating to Fortress and the Alternative Bidder;

- the report of The Atkin Group, dated March 24, 2009, and a letter from Senator Warren B. Rudman, the former Vice Chairman for Governance and Compliance of DBZCO, dated April 1, 2009 to Schulte Roth;

- certain internal financial analyses and forecasts for Fortress and FIG prepared by its management;

39

- certain internal financial analyses and forecasts for DBZCO, the Offshore Fund and the Onshore Fund prepared by DBZCO, including the Cash Flow Summary/Budget Analysis dated April 29, 2009 and the Wind-Down Costs/Transition Services analysis dated April 29, 2009; and

- the notice of default alleged by MBIA dated April 14, 2009 related principally to concerns about the financial condition of Bernard National Loan Investors, Ltd. resulting from the liquidity issues at DBZCO.

Berenson also held discussions with members of (x) DBZCO's management, the Board and DBZGP regarding their assessment of the potential benefits and risks of the Fortress and the Alternative Bidder proposals and other alternatives currently available to the Funds and the past and current business operations, financial condition and future prospects of DBZCO and the Funds, including their views on the risks and uncertainties of achieving DBZCO management s forecasts for DBZCO and the Funds; (y) Fortress's management regarding their assessment of potential benefits and risks of their proposal and their past and current business operations, financial condition and future prospects of Fortress, including their views on the risks and uncertainties of achieving Fortress's management's forecasts for Fortress; and (z) the Alternative Bidder's management regarding their assessment of potential benefits and risks of their proposal. In addition, Berenson (i) took into account the possibility of the appointment of a liquidator to oversee the wind-down of the Funds; (ii) took into account (A) the fact that certain investors have expressed a desire for a change in manager and (B) the views of the Advisory Council, as presented to DBZCO's management, the Board and DBZGP; (iii) took into account the fact that there is little publicly available information on companies with structures and operations that, for purposes of Berenson s advice, are comparable to those of DBZCO and the Funds or for transactions comparable to the proposed new manager transactions; and (iv) performed such other analyses and considered such other information as Berenson deemed appropriate for purposes of its advice.

For purposes of advising the Board and DBZGP, Berenson relied upon and assumed, without assuming any responsibility for independent verification, the completeness and accuracy in all material respects of all information provided to it by or on behalf of DBZCO, the Funds and/or Fortress or other potential transaction participants, from public sources or otherwise reviewed by Berenson. To the extent such information included estimates and forecasts of future financial performance prepared by or reviewed with managements of DBZCO and/or Fortress or other potential transaction participants or obtained from public sources, Berenson assumed that such estimates and forecasts were reasonably prepared on bases reflecting the best currently available estimates and judgments of such managements (or, with respect to estimates and forecasts obtained from public sources, represented reasonable estimates).

In addition, Berenson assumed that the definitive agreements relating to either a transaction with Fortress or a transaction with the Alternative Bidder would be substantially the same as the Fortress Drafts and the Alternative Bidder Drafts, respectively, and that the representations and warranties of DBZCO, the Funds, Fortress, the Alternative Bidder and their respective affiliates in the Fortress Drafts and the Alternative Bidder Drafts are true and complete and that each of the Fortress and Alternative Bidder new manager transaction proposals would be consummated on the terms and conditions described in the Fortress Drafts and the

40

Alternative Bidder Drafts, respectively, without any waiver or modification of any terms or conditions thereof, and that in the course of obtaining necessary consents for the proposed transactions, no delay or restriction would be imposed that would have an adverse effect on DBZCO, the Funds, Fortress, the Alternative Bidder or any of their respective affiliates.

Berenson has not conducted or been provided with any valuation or appraisal of any assets or liabilities of DBZCO, the Funds, Fortress or the Alternative Bidder or any of their respective affiliates (except Berenson was provided with historic valuations of certain assets of the Funds and historic net asset values of the Funds) and Berenson does not express any view as to the solvency or the value of any assets or liabilities of DBZCO, the Funds, Fortress, the Alternative Bidder or any of their respective affiliates, whether or not a new manager transaction is implemented.

**Berenson's advice does not address any legal, regulatory, tax or accounting matters. In addition, Berenson's advice does not constitute an opinion as to the fairness, from a financial point of view or otherwise, of the terms of the Transactions or any other transaction considered by the Board or DBZGP.**

With the consent of the Board and DBZGP, Berenson does not express any view as to, and its advice to the Board and DBZGP did not address:

- any proposed arrangements or payments between DBZCO, its affiliates or its employees, on the one hand, and the Funds, Fortress, the Alternative Bidder or their respective affiliates, on the other hand, including in connection with the purchase of assets from DBZCO, related transition services or the creation or funding of a trust relating to liabilities of DBZCO and related parties;

- the operating capabilities, including an assessment of the technological or systems capabilities, of DBZCO, Fortress or the Alternative Bidder or the ability of DBZCO, Fortress or the Alternative Bidder to realize any particular value for the Funds and their respective investors;

- the ongoing investigation of DBZCO by the SEC; or

- the price at which the Class A shares of Fortress Investment Group LLC or other publicly-traded securities will trade at any time, including subsequent to May 1, 2009, nor the prospective financial condition or operating results of DBZCO, the Funds, Fortress or the Alternative Bidder subsequent to May 1, 2009.

Berenson's views, judgments and observations were necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to Berenson as of May 1, 2009. Subsequent developments may affect Berenson's views, judgments or observations, and Berenson does not have any obligation to update, revise or reaffirm these views, judgments or observations.

The following summarizes the material analyses presented by Berenson to the Board and DBZGP in connection with providing its advice described herein. The following summary,

41

however, does not purport to be a complete description of the analyses performed by Berenson, nor does the order of analyses described represent relative importance or weight given to those analyses by Berenson. Some of the summaries of the analyses include information presented in tabular format. The tables must be read together with the full text of each summary and are alone not a complete description of Berenson's analyses.

*Review of New Manager Transaction Process*

At the meeting of the Board and DBZGP held on May 1, 2009, Berenson reviewed with the Board and DBZGP the new manager transaction process that despite the challenging market environment and the issues surrounding DBZCO, had resulted in the Fortress Final Proposal and the Alternative Bidder Final Proposal. Berenson's overview of the new manager transaction process showed that soliciting competitive proposals from a number of interested parties over several rounds of bidding resulted in a reduction of projected costs and fees to the Funds vis-à-vis indications submitted earlier in the process. See "Background of the Transactions" above for a description of this process.

*Comparison of Principal Economic Terms of Final New Manager Transaction Proposals*

Berenson reviewed with the Board and DBZGP the principal economic terms of the Fortress Final Proposal and the Alternative Bidder Final Proposal:

- Fortress Final Proposal. Under the Fortress Final Proposal, the new manager would receive from each of the Funds an amount equal to such Fund's pro rata share of the costs and expenses of the new manager related to the Funds, including overhead and internal expenses allocated by the New Manager, payable quarterly in advance, plus a management fee in an amount, payable monthly in arrears, equal to 1% of collections by the applicable Fund. In addition, each of the Funds would have to pay an incentive fee equal to 5% of any amounts distributed to investors (gross of such incentive fee) in the applicable Fund which amount would be payable monthly in arrears after the applicable Fund has returned to investors an amount of proceeds equal to the net asset value of such Fund at the Closing.

- Alternative Bidder Final Proposal. Under the Alternative Bidder Final Proposal, each of the Funds would have to pay a fixed management fee equal to its pro rata share of $52.0 million for the first year following the Closing and $45.0 million in the second year following the Closing, respectively, and a fee for any year thereafter, equal to 3% of the net asset value, in each case, payable quarterly in advance. In addition, each of the Funds would have to pay an incentive fee, payable quarterly in arrears, equal to its pro rata share of (x) 2.5% of amounts up to $1.0 billion distributed to investors in the Funds; (y) 3.5% of amounts between $1.0 billion and $1.5 billion distributed to investors in the Funds; and (z) 5% of amounts in excess of $1.5 billion distributed to investors in the Funds. In addition, the Alternative Bidder Final Proposal included a fee payable by the Funds equal to 20% of any reduction in annual audit, legal and other costs below the budget for costs and expenses of the Funds for calendar year 2009 as projected

by the Alternative Bidder. The Alternative Bidder Final Proposal also included certain other economic terms, including (A) a $100 million commitment to invest in existing assets and platforms of the Funds at the sole discretion of the Alternative Bidder which commitment would be subject to a 2% management fee (but no incentive fee) and preemptive rights to existing investors and (B) the distribution of warrants covering 5% of the new manager entity to be formed by the Alternative Bidder to existing investors in the Funds, of which 2.5% would be at a strike price of $0.01 and the other 2.5% would be at a strike price based on a $200 million valuation of the new manager entity.

*Comparison of Projected Year-1 Total Operating Budgets*

In its presentation to the Board and DBZGP, Berenson compared the total operating budgets for the first 12 months following the Closing as projected by Fortress in the Fortress Final Proposal (the "Fortress Budget") and the Alternative Bidder in the Alternative Bidder Final Proposal (the "Alternative Bidder Budget") with the projected 12-month total operating budget ending May 31, 2010 for DBZCO contained in DBZCO's Cash Flow Summary/Budget Analysis dated April 29, 2009 (the "DBZCO Budget"). The DBZCO Budget contemplated that DBZCO would remain the manager of the Funds on the basis of revised fee arrangements between DBZCO and the Funds that would provide for the reimbursement of 100% of DBZCO's costs (the "Stand-Alone Scenario"). Each of the DBZCO Budget, the Fortress Budget and the Alternative Bidder Budget excluded any incremental wind-down costs associated with the wind-down of DBZCO and certain of its affiliates. In addition, the Fortress Budget included certain amounts that, under the draft April 29, 2009 of a transition services agreement among affiliates of Fortress and the other parties thereto, would be funded by the Funds and paid to DBZCO in the form of fees in exchange for services provided by DBZCO to the New Manager. Berenson noted that, as a result, if this draft of the transition services agreement became effective, the amount of such fees would likely no longer be accounted for as expenses of the New Manager and reduce Fortress's 12-month operating budget accordingly.

The total operating budgets proposed by Fortress and the Alternative Bidder were $68.7 million and $56.2 million, respectively. In the Stand-Alone Scenario, the total operating budget was $53.7 million. Berenson noted that the Fortress Budget was $14.9 million higher than the DBZCO Budget, which difference was primarily due to (i) incremental employee compensation costs to retain necessary employees in excess of those budgeted by DBZCO, (ii) allocated costs associated with existing Fortress personnel who, under the Fortress Final Proposal, would play a critical role in managing the assets of the Funds and (iii) other allocated overhead costs associated with the transition of approximately 100 existing DBZCO employees to Fortress. Berenson also noted that the Alternative Bidder Budget assumed the Alternative Bidder would operate within the DBZCO Budget plus $2.5 million, which excess amount was associated with certain incremental costs relating to additional senior management team personnel to be provided by the Alternative Bidder.

*Comparison of Five-Year Forecasts of Total Operating Expenses*

Berenson also calculated and compared the costs to the Funds over a 5-year period starting at the Closing (i) assuming Fortress replaced DBZCO as the new manager (the "Fortress

43

Scenario"), (ii) assuming the Alternative Bidder replaced DBZCO as the new manager (the "Alternative Bidder Scenario") and (iii) the Stand-Alone Scenario. For each scenario, the estimated total costs over the 5-year period are referred to herein as the "Total Operating Costs.

For purposes of this comparison, based on DBZCO management's forecasts, Berenson assumed, following discussions with DBZCO's management, for each of the scenarios that (i) the Funds would distribute to investors, over that 5-year period, 100% of the Funds' estimated net asset value ("NAV") of approximately $2.4 billion, (ii) the Funds would wind down by approximately 30% in the first year, 30% in the second year, 20% in the third year, 10% in the fourth year and 10% in the fifth year and (iii) the variable expenses would decline by approximately 30% each year. For purposes of this comparison, Berenson also assumed an implied growth rate of the Funds' portfolio such that, in the case of the Stand-Alone Scenario, the return to investors in the Funds over the 5-year period would be equal to 100% of the estimated $2.4 billion NAV after giving effect to the Total Operating Costs to the Funds in the Stand-Alone Scenario. For each scenario, Berenson calculated the Total Operating Costs based on the DBZCO Budget, the Fortress Budget and the Alternative Bidder Budget, respectively. In that connection, Berenson assumed that, in the case of the Alternative Bidder, the annual audit, legal and other costs would, in each of the 5 years, be below the budget for costs and expenses of the Funds for calendar year 2009 as projected by the Alternative Bidder and, as a result, the Funds would have to pay a fee equal to 20% of any such reduction amounts as contemplated by the Alternative Bidder Final Proposal. For purposes of the summary of Berenson's analyses, we refer to the Berenson assumptions described above as the 'Reference Case Assumptions.

Based on the Reference Case Assumptions, Berenson calculated the following:

(Dollars in Millions)

|  | Total Costs in Year 1 | Total Costs in Year 2 | Total Costs in Year 3 | Total Costs in Year 4 | Total Costs in Year 5 | Total Costs for 5 Years |
|---|---|---|---|---|---|---|
| Stand-Alone Scenario | $53.7 | $37.3 | $27.5 | $20.5 | $15.5 | $154.6 |
| Fortress Scenario | $76.8 | $54.5 | $37.8 | $25.4 | $18.5 | $212.9 |
| Alternative Bidder Scenario | $67.6 | $66.4 | $46.3 | $26.5 | $19.1 | $226.0 |

Berenson noted that, despite the Alternative Bidder's proposal to place an aggregate cap on the expenses to be borne by the Funds, the Total Operating Costs in the Alternative Bidder Scenario were higher than those calculated for the Fortress Scenario.

*Total Operating Costs and Net Investor Recovery Sensitivity Analysis*

Berenson then performed a total operating costs and net investor recovery sensitivity analysis to provide the Board and DBZGP with an indication of the incremental net investor recovery that would be required in the Fortress Scenario and the Alternative Bidder Scenario to offset the excess of Total Operating Costs in the Fortress Scenario and the Alternative Bidder Scenario over the Total Operating Costs in the Stand-Alone Scenario.

Based on the Reference Case Assumptions, Berenson first calculated the Total Operating Costs for each of the Fortress Scenario, the Alternative Bidder Scenario and the Stand-Alone Scenario in situations where 75%, 100% and 125% of the estimated $2.4 billion NAV would be distributed to investors in the Funds over the 5-year period following the Closing. Berenson again observed that, in each case, the Total Operating Costs in the Fortress Scenario and the Alternative Bidder Scenario exceeded the Total Operating Costs for the Stand-Alone Scenario. Berenson then calculated the amount of incremental net investor recovery that would be required in the Fortress Scenario and the Alternative Bidder Scenario to offset the incremental costs to be incurred by the Funds as compared to the Total Operating Costs in the Stand-Alone Scenario. For purposes of this analysis, Berenson excluded any value that could be attributed to the warrants that the Alternative Bidder proposed to issue to investors in the Funds because that value would likely not be meaningful in the absence of an assumption of a material increase in assets under management by the Alternative Bidder.

The table below sets forth, for each case, (i) the excess of the Total Operating Costs in the Fortress Scenario and the Alternative Bidder Scenario over the Total Operating Costs for the Stand-Alone Scenario and (ii) the incremental net investor recovery (expressed as a percentage of the estimated $2.4 billion NAV) required in each scenario to achieve a return to investors equal to the full amount of the assumed net asset value of the Funds:

| Case | Excess Costs | | Required Incremental Net Investor Recovery | |
| | Fortress | Alternative Bidder | Fortress | Alternative Bidder |
| --- | --- | --- | --- | --- |
| 75% of NAV | $52 million | $43 million | 2.2% | 1.8% |
| 100% of NAV | $58 million | $71 million | 2.4% | 3.0% |
| 125% of NAV | $90 million | $100 million | 3.7% | 4.2% |

*Qualitative Considerations*

The Board, DBZGP and Berenson then discussed that, in all three cases, a new manager transaction with Fortress or the Alternative Bidder would result in incremental costs as compared to the Stand-Alone Scenario, and that a new manager would need to have the ability to generate the applicable incremental net investor recovery amounts so as to provide an equivalent net investor recovery as the Stand-Alone Scenario. In that connection, Berenson highlighted for the Board and DBZGP a number of qualitative factors affecting the potential investor return, including a new manager's ability to (i) maximize recoveries on the portfolio; (ii) manage potential counterparty risks, including within the CDS portfolio and CLO vehicles; and (iii) reduce overall costs to the Funds, including management and incentive fees to the new manager and fund-related audit and other costs. Additional considerations regarding a manager's ability to maximize the value of the Funds' portfolios would include (A) access to personnel and other resources, both through the management company and other advisors on an asset-by-asset basis, (B) the ability to manage complicated negotiations in connection with the disposition of assets, especially in bankruptcy, restructuring and other distressed situations, (C) the ability to determine optimal time horizons for asset realizations, (D) the appropriate use of the Funds' liquidity for additional funding of existing investments in distress and (E) an established and

well-recognized reputation and franchise. The Board, DBZGP and Berenson discussed that, while the Stand-Alone Scenario projected lower costs for the Funds as compared to the Fortress Final Proposal and the Alternative Bidder Final Proposal, due to the issues surrounding DBZCO described under "Background of the Transactions" and the qualitative considerations described above, Fortress and/or the Alternative Bidder could well generate a higher net return for the investors as compared to DBZCO. Although Daniel Zwirn, in his capacity as a director of the Offshore Fund, and DBZGP, as the general partner of the Domestic Funds, voted in favor of the Transactions, Mr. Zwirn indicated that it is not necessarily the case that Fortress or the Alternative Bidder would generate a higher net return for investors as compared to DBZCO, or that Fortress would generate a higher net return for investors as compared to the Alternative Bidder.

The Board, DBZGP and Berenson then discussed whether Fortress or the Alternative Bidder would be better suited to assume management of the Funds. Berenson reviewed with the Board and DBZGP the proposed governance and transition plans under the Fortress Final Proposal and the Alternative Bidder Final Proposal and compared Fortress and the Alternative Bidder based on various qualitative factors, including (i) investment track record (including the amounts of current assets under management) (ii) financial condition, (iii) investment strategies and office locations (iv) potential conflicts with assets held by the Funds, (v) ability to support current investments of the Funds and (vi) potential effects of a new manager transaction with either of them on counterparties, joint ventures and employees.

*Review of Other Alternatives*

Berenson then discussed with the Board and DBZGP other alternatives that were available to the Offshore Fund and the Onshore Fund as of May 1, 2009, including the potential appointment of a liquidator to oversee the wind-down of the Funds. Berenson noted that, while in a liquidation the costs to the Funds would likely be reduced, the liquidation of the Funds under the supervision of a liquidator would likely jeopardize the ability to maximize the value of the portfolio of the Funds.

The preparation of advice of the type given to the Board and DBZGP on May 1, 2009 is a complex process and is not necessarily susceptible to partial analysis or summary description. Selecting portions of the analyses or of the summary set forth above, without considering the analyses as a whole, could create an incomplete view of the processes underlying Berenson's advice. In arriving at its judgment, Berenson considered the results of all of its analyses and did not attribute any particular weight to any factor or analysis considered by it. Rather, Berenson made its determination on the basis of its experience and professional judgment after considering the results of all of its analyses.

Analyses based upon forecasts of future results are not necessarily indicative of actual future results, which may be significantly more or less favorable than suggested by these analyses. Because these analyses are inherently subject to uncertainty, being based upon numerous factors or events beyond the control of the parties or their respective advisors, none of the Funds, DBZCO, Fortress, Berenson or any other person assumes responsibility if future results are materially different from those forecasts. See "Risk Factors" above and the risk factors included in Annex B.

The proposed new manager arrangements were determined through arm's-length negotiations and were approved by the Board and DBZGP. Berenson provided advice to the Funds during these negotiations. Berenson did not, however, recommend to the Funds, the Board or DBZGP any specific fee arrangement with Fortress or any other specific terms of the proposed Transactions.

As described below under 'Board Considerations', Berenson's advice to the Board and DBZGP was one of many factors taken into consideration by the Board and DBZGP in selecting Fortress as replacement manager of the Funds and in approving the Transactions. Berenson's advice does not confer any rights or remedies upon any investor in the Funds, any creditor of the Funds or any other person other than the Board and DBZGP.

Berenson has in the past provided, and may currently or in the future provide, investment banking services to the Funds, DBZCO, Fortress, the Alternative Bidder or their respective affiliates for which services Berenson has received or may receive customary fees. The Offshore Fund, together with the Onshore Fund, engaged Berenson pursuant to a letter agreement dated May 8, 2007 as its financial advisor in connection with the potential sale of all or a majority of the assets or equity interests of the Offshore Fund and the Onshore Fund. This letter agreement was superseded by an engagement letter, dated as of November 1, 2008, pursuant to which the Offshore Fund and the Onshore Fund engaged Berenson as their financial advisor in connection with (i) the potential sale of all or a majority of the assets or equity interests of the Offshore Fund and the Onshore Fund, (ii) the potential replacement of DBZCO as their manager and (iii) the ongoing wind-down process of the Offshore Fund and the Onshore Fund. In connection with its financial advisory services to the Offshore Fund and the Onshore Fund, Berenson has received fees aggregating $3.4 million to date and, contingent upon the consummation of the Transactions, will receive an additional fee of $5.6 million. If the Transactions are not consummated, Berenson will continue to provide financial advisory services to the Offshore Fund and the Onshore Fund in connection with the ongoing wind-down process of the Offshore Fund and the Onshore Fund and will receive additional fees, payable quarterly, equal to 0.25% of amounts distributed to investors, provided that such additional fees will not exceed an aggregate amount of $5.6 million. In addition, Berenson has been engaged by the Offshore Fund and the Onshore Fund to sell or restructure certain investments held by them for which engagement Berenson will receive customary fees whether or not the Transactions are consummated. The Offshore Fund and the Onshore Fund also agreed to reimburse Berenson for its reasonable out-of-pocket expenses, including attorneys' fees and disbursements, and to indemnify Berenson and its affiliates against various liabilities arising out of Berenson's engagement. Berenson was also engaged by affiliates of DBZCO in connection with the potential sale of all or a majority of DBZCO's asset management business, potential financings and certain other potential transactions. Berenson received fees under such engagement aggregating $1.0 million prior to June 2008, and will not receive any payments from such engagement in connection with the Transactions.

*Board Considerations*

At the time that the Fund commenced its wind-down and realization of assets in an orderly fashion, the Board believed that DBZCO, in light of its expertise and its position as the manager that had constructed the Fund's portfolio, was best positioned to achieve the highest realization from the Fund's investments.

However, the market turmoil and dramatic drop in values, along with the freezing of credit markets over the last 12-18 months, indicated clearly that the standard fees generated by DBZCO's assets under management would no longer be sufficient to support DBZCO in the long term. The Board engaged the services of Constellation to analyze whether cost-cutting measures on the part of DBZCO would enable DBZCO to continue. Although Constellation's analysis indicated that savings could be achieved, it became apparent that these savings would not be sufficient to enable DBZCO to continue winding down the operations of the Fund without an increase in the fees charged to the Fund whether directly or by moving to a cost structure.

Therefore, in November 2008 the role of Berenson was expanded to include, among other things, exploring the possibility of engaging an alternative investment manager. By then, certain substantial investors had expressed a desire for changing the manager. In February 2009, the Board was advised by DBZCO that it had concluded that it could not retain key staff needed for the wind-down in the long term. The Board was advised by Constellation and DBZCO that, by December 2009, DBZCO would, in all likelihood, no longer be in a position to satisfy payroll expenses and that DBZCO had determined that it needed to defer the payment of guaranteed bonuses to certain of its staff.

Consequently, the Board and DBZGP initiated a thorough replacement manager selection process managed by Berenson. The factors informing this decision by the Board and DBZGP, included (i) projected liquidity concerns for DBZCO based on deterioration of market conditions and a material reduction in assets under the management of DBZCO, (ii) concerns regarding DBZCO's ability to retain and incentivize employees without a change in fee structure, (iii) an inability to satisfy future contingent liabilities and (iv) certain substantial investors in the Funds expressing a desire for a change in the manager. This process culminated in two preferred candidates, Fortress and the Alternative Bidder, with Fortress being the preferred candidate, based on the factors described below.

In reviewing each of the proposals and in ultimately selecting Fortress, the Board has sought and relied on professional advice from, among others, Berenson, DBZCO, the Fund's legal advisors, Schulte Roth and Maples, and from Campbells, which represents the Fund's independent directors. As noted in the Risk Factors, Daniel Zwirn, as a member of the Board, had a conflict of interest in negotiating the terms of the Transactions, and the independent directors did not have in-depth and day-to-day knowledge of the Fund's investments. Consequently, the independent directors have relied on the advice, analyses and judgment of the professionals engaged by the Fund, in particular Berenson, in evaluating the Transactions. The directors were not involved in the negotiations of the Transactions on a day-to-day basis; the negotiation of the detailed terms of the Transactions was undertaken with the Board's approval, by DBZCO's management and the Funds' legal advisors. Schulte Roth

48

In arriving at its determination to select Fortress and recommend the Transactions, the Board reviewed and considered the following documents, issues and advice, among others:

- Berenson's presentations and advice to the Board from December 2008 to May 1, 2009 and in particular Berenson's presentations, including advice, on April 17 and May 1, 2009, to the Board and DBZGP that, as of such dates and subject to the assumptions, qualifications and facts set forth in Berenson's presentations to the Board and DBZGP, in Berenson's judgment, the new manager transaction proposal from Fortress represented a superior proposal for the Funds as compared to other alternatives available to the Funds as described in such presentations and discussed with the Board and DBZGP as of such dates (see the section "Berenson's Presentation to the Board and DBZGP");

- a financial due diligence memorandum prepared by Berenson on Fortress Investment Group LLC;

- a report provided by the Arkin Group, an international risk, consulting and intelligence firm engaged by counsel to the Funds to provide the Board and DBZGP with background information on the two final bidders and their respective executives and principals; and

- the views and concerns expressed by substantial investors, including those expressed by the Advisory Council.

In evaluating the Transactions, the Board considered, among other factors, that (i) the structure of the Transactions was such that the investment manager for all of the Funds would be replaced by the New Manager, (ii) investors have generally supported the Transactions and (iii) the selection of Fortress as the replacement manager made consummation of the Transactions more likely than the various transactions proposed by certain of the alternative bidders.

In evaluating the proposals, no single factor was considered in isolation, nor was any single factor considered to be determinative in the Board's decision to select Fortress as replacement manager of the Funds.

*Notice Regarding Information Provided To Investors*

In reviewing the agreements that are annexed to this letter, please remember that they are included only to provide you with information about the Transactions. The agreements contain representations and warranties by each of the parties to the applicable agreements. These representations and warranties have been made solely for the benefit of the other parties to the applicable agreement and:

- should not in all instances be treated as categorical statements of fact, but rather as a way of allocating the risk to one of the parties if those statements prove to be inaccurate;

- may have been qualified by disclosures that were made to the other party in connection with the negotiation of the applicable agreement, which disclosures may not be reflected in the agreements;

- may apply standards of materiality in a way that is different from what may be viewed as material to you or other Shareholders; and

- were made only as of the date of the applicable agreement or such other date or dates as may be specified in such agreement and may be subject to more recent developments.

Accordingly, you should not rely on the representations and warranties contained in the agreements as characterizations of the actual state of facts about any of the parties to such agreements, and you should read the information provided elsewhere in this letter for information regarding such parties.

Please review this letter, including the Risk Factors and all annexes hereto carefully with your legal and tax advisers. By indicating that you vote FOR the ordinary resolution on the attached Form of Proxy (Appendix A), you will be approving the Offshore Consent Matters, all as described in this letter.

If you have any questions about this consent, we encourage you to call Elise Hubsher, who can be reached at (646) 720-9343 or elise.hubsher@dbzco.com.

Very truly yours,

D.B. Zwirn Special Opportunities Fund Ltd.

By: _____
Name:  Gary C. Elinford
Title:  Director


By: _____
Name:  Allison B. Nolan
Title:  Director

## ANNEX A

## SUMMARY OF TRANSACTION DOCUMENTS

The following summaries are qualified in their entirety by the terms and conditions of the documents they describe. This summary should be read in conjunction with the matters described elsewhere in the letter to which these summaries are annexed. The summary of the differences between the Existing IMA and the New IMA is qualified in its entirety by the terms and conditions of such agreements. The form of the New IMA is attached hereto as Annex C. **In deciding whether to vote in favor of the matters set forth on Appendix A, all shareholders are urged to read and carefully consider the following summaries.**

The following is a summary of the material terms of the transaction agreements with Fortress:

## 1.   INVESTMENT MANAGEMENT TRANSITION AGREEMENT

*General*

*Parties.* The Investment Management Transition Agreement (the "IMTA") was entered into on May 1, 2009, by DBZCO, DBZGP (collectively, the "Existing Entities"), New Manager New MM (collectively, the "New Entities") and, with respect to certain matters, FIG.

Neither the Buyer nor the Funds are parties to the IMTA. However, the Funds are third-party beneficiaries of certain provisions of the IMTA, including certain representations and warranties of the Existing Entities and the New Entities, and the covenants of, and indemnification by, the Existing Entities and the New Entities. FIG is a party to the IMTA for the sole purpose of causing the New Entities to perform their respective obligations to consummate the Transactions. FIG is a registered investment adviser with the SEC.

*Transactions.* At or prior to the Closing the parties will complete, or cause to be completed the following transactions:

- DBZGP will convert its capital account and other economic rights in each Domestic Fund into a limited partner interest in each such Fund;

- Each of the Consenting Funds will subscribe, directly or indirectly, for interests in the Buyer pursuant to a Subscription Agreement and will contribute and commit to contribute capital, directly or indirectly, in accordance with the Subscription Agreement, which is described in Section 5 below);

- DBZGP will sell to the Buyer the Domestic Fund Interests and an option to purchase the ZM Interest;

- DBZCO will sell to the Buyer the assets to be sold under the APA (as described in Section 2 below);

A-1

- DBZGP will take the necessary steps to convert each of the Consenting Domestic Funds into a Delaware limited liability company to be governed by an LLC agreement appointing New MM as the managing member of each Fund;

- DBZCO will terminate the Existing IMAs (except with respect to pre-Closing indemnity, exculpation, accrued expense and fee provisions which survive termination in accordance with their terms), the New Manager will enter into the New IMAs and each Consenting Fund shall pay the New Manager the initial advance due thereunder

### *Representations and Warranties*

The IMTA contains customary representations and warranties applicable to each of the parties (including representations made by the Existing Entities with respect to the Funds), subject in some cases to customary qualifications. These representations and warranties will survive the Closing for a period of two years.

In addition, the IMTA includes representations and warranties of the Existing Entities regarding the following matters (with respect to themselves and the Funds), subject in some cases to customary qualifications, which will not survive the Closing, but, if untrue in any material respect prior to the Closing, would result in a breach that, if not waived by the New Entities, would give the New Entities the right to not consummate the transactions:

- absence of undisclosed liabilities;

- absence of a material adverse effect with respect to the Existing Entities or a Fund Material Adverse Effect (see below);

- litigation;

- material contracts;

- affiliate arrangements;

- compliance with laws; government regulation;

- information concerning the Funds, fund agreements and operations;

- managed accounts;

- employees and employee benefits;

- fund taxes; and

- information provided to investors in the Funds by or on behalf of DBZCO or the Funds regarding the transactions contemplated by the IMTA and the APA (as defined below).

A-2

Additionally, several of the above representations are subject to a 'not reasonably likely to have a Fund Material Adverse Effect' qualifier. For purposes of the IMTA, a "Fund Material Adverse Effect' generally means (a) since December 31, 2008, a decline in the net asset value of any Fund of more than 50% from such value as of December 31, 2008, (b) any change effect, event, matter, occurrence or state of facts in respect of a Fund, that, individually or the aggregate, has or results in, or would reasonably be expected to have or result in, (i) the failure of such Fund to be solvent, (ii) a material impairment of such Fund's ability to perform its obligations hereunder or under any transaction document, (iii) the incurrence of a material liability by the New Manager or its affiliates that is not expected to be reimbursed by such Fund, or (iv) an adverse effect in any material respect on the business, assets, properties, prospects or condition (financial or otherwise) or results of operations of the New Manager or any of its affiliates.

The IMTA also includes representations and warranties of the New Manager regarding the following matters, subject in some cases to customary qualifications, which will not survive the Closing, but, if untrue in any material respect prior to the Closing, would result in a breach that, if not waived by the Existing Entities, would give the Existing Entities the right to not consummate the transactions:

- FIG balance sheet;

- permits;

- litigation;

- regulatory compliance;

- financial and operational facts relating to the New Manager and its affiliates;

- compliance with laws;

- absence of a material adverse effect; and

- information provided to investors in the Funds by or on behalf of Fortress regarding the transactions contemplated by the IMTA and the APA (as defined below).

*Covenants*

Each of the parties will agree to certain customary covenants covering the period prior to and following the Closing.

- The parties have made the following covenants with respect to public announcement and third-party disclosure:

  o Prior to the Closing, neither party may make a public announcement or public disclosure regarding the Transactions without prior approval, except as required by law;

A-3

    o   Prior to the Closing, if any party determines it is required by law to make any press release or public disclosures regarding the Transactions, the party required to make such disclosure will give notice to the other party enclosing the text of any proposed public announcement and will consider any changes proposed by the other party.

- For a period of seven years following the Closing, each party will provide cooperation and reasonable access to books and records from prior to the Closing and certain personnel necessary to comply with (A) SEC, tax or other reporting or regulatory demands, (B) other requests or demands made by SEC, other governmental authorities or other regulatory or similar obligations, and (C) requests with respect to any litigation. In connection with such access and cooperation, DBZCO has agreed to preserve records referenced above for seven years. The requesting party will bear the costs and expenses associated with providing such access and cooperation, including allocation of overhead to the extent an employee spends more than 10% of his or her time in a fiscal quarter on such requests. The provision of access to information is also subject to the process set forth in the Information Sharing Agreement with respect to any information that would reasonably be expected to be subject to attorney-client or other privilege.

- The Existing Entities will prepare appropriate disclosure materials to be provided to the investors in the Funds, which shall be subject to comments by the New Entities, and the final form of which will be subject to the approval of the New Manager.

- The parties agree that certain employees of FIG or its affiliates will not disparage Daniel Zwirn or DBZCO, DBZGP, D.B. Zwirn Holdings, LLC, Zwirn Holdings, LLC, Bernard Capital and D.B. Zwirn Asia Partners, LLC (the 'Covered Persons") and that the New Manager will instruct all employees of FIG and certain of its affiliates not to disparage the Covered Persons. The parties have agreed to certain procedures in the event there is a claim of disparagement. Daniel Zwirn is a third party beneficiary of these provisions.

- The New Manager will offer employment effective as of Closing to certain specified employees, with the same base salary for such employees as is in effect as of signing and with benefits no less favorable than comparable employees of FIG. The New Manager will offer full-time employment to substantially all individuals retained by DBZCO following the completion of such person's employment with DBZCO.

- Within sixty days after Closing, DBZCO will deliver to the New Manager and the Funds the calculation of the net asset value of the Fund as of the Measurement Date.

- Except as specifically agreed, the Existing Entities will terminate as of the Closing all affiliate arrangements between any Fund, any entity controlled by a

A-4

Fund and/or any person in which the Funds have a material investment or loan on the one hand, and any of DBZCO and its affiliates, their current and former employees, members, directors and senior officers and affiliates and family members of certain key employees, on the other hand.

- The Funds will pay to DBZCO at Closing any fees payable or accrued under the Existing IMAs but not yet paid, including any fees deferred under any existing deferred fee agreement, but excluding 10% of the 2004 incentive fee payable under the terms of the Existing IMAs of the Offshore Fund.

- No later than December 31, 2009, the New Entities will change the legal name of the Consenting Domestic Funds, and will use commercially reasonable efforts to change, subject to any shareholder or other consent required, the legal name of the Offshore Fund, to remove the name "Zwirn," including, if shareholder consent is required, taking such actions as are reasonably required to request such consent in a manner that would permit such Fund to remove the name "Zwirn" from its legal name not later than December 31, 2009.

- DBZCO or DBZGP, as applicable, will:

  o  prepare or cause to be prepared the audited consolidated financial statement of the Consenting Funds for 2008;

  o  with the reasonable cooperation of the New Manager, prepare or cause to be prepared unaudited statements of net asset value of each of the Consenting Funds for each of the months during the period commencing on January 1, 2009 and ending on the Closing Date;

  o  provide management representation letters in respect of the period from January 1, 2009 to the Closing Date in the form reasonably requested by the New Entities after consulting with the Existing Entities regarding the substance of these letters to confirm their accuracy;

  o  prepare and file or cause to be prepared and filed, and sign or cause to be signed, the tax returns of the Consenting Funds for the 2008 tax year; and

  o  prepare or cause to be prepared audited financial statements and tax returns for periods through December 31, 2008 for all entities in which any Fund or Managed Account has a direct or indirect interest and for which the Existing Entities or certain of their affiliates currently have responsibility for the preparation and/or filing of audited financial statements and/or tax returns.

- In each instance in which the agreement contemplates that certain information or documents requested by a party may be subject to the attorney-client privilege, work-product doctrine or any other privilege, the parties have agreed to follow the

A-5

procedures set forth in the Information Sharing Agreement (See Section 7 of this Annex A)

- If any Fund or Managed Account that has not consented to be managed by the New Manager as of the Closing Date subsequently consents to be so managed, the Existing Manager will terminate the Existing IMA or Existing Managed Account IMA, as applicable, other than with respect to provisions that survive such termination, and the New Manager will enter into a New IMA or New Managed Accounts IMA, as applicable. The financial statements and tax returns covenants described above will, after such time, apply to any such Fund that subsequently consents to management by the New Manager.

- The parties agree to use commercially reasonable efforts to take such further actions and do or cause to be done any additional things necessary, proper or advisable to consummate the transactions contemplated by this agreement, including executing and delivering additional instruments or documents and with respect to the Existing Manager, using its reasonable best efforts to continue its legal existence for so long as may be reasonably necessary to satisfy its obligations under the transaction documents, and with respect to the Existing GP, continuing its legal existence until it has directed one or more of its officers to sign the 2008 tax returns for the Domestic Funds as described above.

*Indemnification*

- The Existing Entities will jointly and severally indemnify and hold harmless the New Entities and each of their successors and permitted assigns and their officers, directors, partners, members and employees and their respective affiliates, the Funds and each director of the Offshore Fund from any loss arising out of any inaccuracy or breach of any covenant, agreement, representation or warranty of the Existing Entities contained in the IMTA, other than certain representations of the Existing Entities, which do not survive the Closing.

- The New Entities will jointly and severally indemnify and hold harmless the Existing Entities and each of their successors and permitted assigns and their officers, directors, partners, members and employees and their respective affiliates, the Funds and each director of the Offshore Fund from any loss arising out of any inaccuracy or breach of any covenant, agreement, representation or warranty of the New Entities contained in the IMTA, other than certain representations of the New Entities, which do not survive the Closing.

- No party shall have any liability to the other party for breaches of representations and warranties until the aggregate amount of losses incurred as a result of such breach or breaches exceeds $220,000 and the liability of such party shall be limited only to amounts exceeding $220,000.

A-6

***Conditions to Consummation of the Transactions***

The IMTA provides that the obligations of the parties to consummate the transactions are subject to the satisfaction or waiver of the following conditions (some of which run in favor of only the New Entities or only the Existing Entities):

- the representations and warranties of the parties shall be true and correct in all material respects if not otherwise qualified by materiality or, if qualified as to materiality (with limited exceptions), true and correct, in each case, as of the Closing Date, except that those representations and warranties which address matters only as of a particular date need only be true and correct or true and correct in all material respects, as applicable, as of such date;

- the parties shall have performed and complied in all material respects with each of the terms, conditions, covenants, obligations, agreements and restrictions required by the IMTA and shall have performed the specific transactions outlined in the IMTA in all respects;

- the satisfaction or waiver of all conditions to the Closing of the APA;

- each of the parties shall have obtained specified authorizations and consents, including with respect to any anti-competition filings required to be made under applicable law;

- the absence of injunctions preventing the Closing, or pending litigation, or threatened litigation by a governmental authority seeking to restrain or prohibit the Closing;

- the receipt of certain legal opinions by counsel to the Funds and the New Entities;

- a majority in interest of the investors in each of the Onshore Fund and the Offshore Fund shall have approved the transactions;

- the subscription agreement between the Funds and the Buyer shall be in full force and effect and the capital contributions by the Funds or their subsidiaries shall have been made in accordance with the Subscription Agreement;

- the New Manager and its affiliates shall have been reimbursed for their legal fees relating to the Transactions;

- each of the Domestic Funds shall have converted to a limited liability company;

- DBZCO shall have delivered to New Manager the resignations of certain employees in their capacity as directors and/or officers to be identified by the New Manager;

A-7

- the provision of evidence reasonably satisfactory to the New Manager of certain tax filings; and

- the delivery by the parties of all other required transaction documents.

*Termination*

The IMTA may be terminated:

- by the mutual written consent of the parties at any time prior to the Closing Date;

- by written notice of any party to the other parties if the Closing has not occurred prior to July 31, 2009, unless a breach by the party seeking termination is the sole cause for the Closing not having occurred prior to such date; and

- by any party in the event of an earlier termination of the APA.

## 2.   ASSET PURCHASE AGREEMENT

*General*

*Parties.* The Asset Purchase Agreement (the "APA") was entered into on May 1, 2009, by DBZCO and the Buyer.

*Funding of the Buyer.* Prior to or contemporaneously with the Closing, the Consenting Funds and the Buyer will enter into a separate subscription agreement, pursuant to which each of the Consenting Funds (or one or more newly-formed subsidiaries of such Fund) will make capital contributions in accordance with its relative net asset value, as of March 31, 2009, and trued-up within 90 days after the Closing to reflect the relative net asset values of the Funds as of the Measurement Date, in exchange for limited liability company interests in the Buyer. The capital contributions to be made by the Funds or their subsidiaries at or after the Closing for membership interests in the Buyer will be equal to the amounts Buyer is obligated to pay or to fund under the APA (including the Indemnity Trust), the Transition Services Agreement, certain other transaction documents and certain other documented expenses incurred by the Buyer and DBZCO with respect to Transactions, each as described below. For a description of the Subscription Agreement, see Section 5 below). For descriptions of the Transition Services Agreement and the Indemnity Trust, see Sections 4 and 6 below, respectively.

*Purchased Assets and Assumed Liabilities.* Pursuant to the APA, the Buyer will acquire:

- certain identified equipment, tangible personal property, intellectual property, books and records, memoranda and computer software, and certain information and data relating to DBZCO and certain affiliates, including D.B. Zwirn Asia Partners, LLC, in each case which are used for or relate to the business of providing investment advisory services to the Funds and managed accounts and certain administrative and operational services to certain strategic investments (collectively the "Business");

- all data that is owned by DBZCO or certain of its affiliates relating to the Business other than certain legally privileged materials with respect to DBZCO or data the transfer of which would be prohibited by law;

- equity interests in another investment manager that are held by DBZCO and its affiliates and a related management agreement, to the extent assignment is permitted or consent to assignment is obtained;

- the goodwill of DBZCO and the going-concern value of the Business, in each case other than as associated with any excluded assets;

The Buyer will also assume all obligations to be performed from and after the Closing in respect of the acquired contracts.

*Excluded Assets and Liabilities.*  DBZCO will retain:

- all assets not specifically acquired by the Buyer, including certain computer hardware, intellectual property and data owned or licensed by DBZCO; any trademark rights in the name "Zwim", any fees or deferred fees earned in the time periods prior to the Closing Date, all track records, cash and cash equivalents and all liabilities other than those liabilities assumed by the Buyer.

*Payments at Closing.*  The Buyer will (a) pay to DBZCO a purchase price for the assets being acquired under the APA in an amount equal to $19,750,000, (b) deposit $15,000,000 into a trust, to be administered pursuant to the ITA (described below in Section 6), and (c) pay the expenses of DBZCO and the Buyer incurred in connection with the negotiation and execution of the Transaction agreements and transfer taxes incurred in connection with the Transactions. Pursuant to the Domestic Fund Interest Assignment and Assumption Agreement, the Buyer shall pay to DBZGP an amount equal to $2,250,000 in respect of the Domestic Fund Interests and an option to acquire the ZM Interest for $100.

### Representations and Warranties

The APA contains customary representations and warranties applicable to each of the parties, subject in some cases to customary qualifications.

The APA also contains additional representations and warranties of DBZCO including regarding title to the assets being purchased by the Buyer and that these assets, when combined with the assets to be used by DBZCO to provide services under the TSA (as defined below) and certain other categories of assets Buyer is not purchasing, constitute all of the assets which are in use by DBZCO to conduct the Business.

### Covenants

The APA contains certain customary covenants for the periods prior to and following the Closing. In addition, the APA contains the following:

- The parties have made the following covenants with respect to public announcement and third-party disclosure:

  o Prior to the Closing, neither party may make a public announcement or public disclosure regarding the Transactions without prior approval, except as required by law;

  o Prior to the closing, if any party determines it is required by law to make any press release or public disclosures regarding the Transactions, the party required to make such disclosure will give notice to the other party enclosing the text of any proposed public announcement and will consider any changes proposed by the other party.

- For a period of seven years following the Closing, each party will provide cooperation and reasonable access to books and records from prior to the Closing

A-10

and certain personnel necessary to comply with (A) SEC, tax or other reporting or regulatory demands, (B) other requests or demands made by SEC, other governmental authorities or other regulatory or similar obligations, and (C) requests with respect to any litigation. In connection with such access and cooperation, DBZCO has agreed to preserve records referenced above for seven years. The requesting party will bear the costs and expenses associated with providing such access and cooperation, including allocation of overhead to the extent an employee spends more than 10% of his or her time in any fiscal quarter on such requests. The provision of access to information is also subject to the process set forth in the Information Sharing Agreement.

- DBZCO will conduct the Business prior to the Closing in a manner generally consistent with past practices since April 1, 2008, will use commercially reasonable efforts to preserve its current business organization and relationships, business, operations, assets, rights, franchises, goodwill and relations with the Funds and others with whom it conducts business, in each case to the extent consistent with its current business plan; use commercially reasonable efforts to keep available the services of its employees; and, subject to its fiduciary and contractual duties with respect to the Funds, manage the Funds in accordance with the Existing IMAs in a manner that is cognizant of the transactions contemplated by the transaction documents.

- Prior to the Closing, without the Buyer's consent, DBZCO will not:

*With respect to the Funds:*

   o   amend the Fund's organizational documents or agree to merge the Fund with any other person or acquire any equity or voting interest in any Fund or make any other change to the capital structure of any Fund or liquidate or dissolve any Fund;

   o   issue or sell any equity interest in any Fund;

   o   without prior notice to the Buyer, settle, terminate or discharge any rights with respect to any litigation involving the Funds or involving persons controlled by the Funds where DBZCO has prior knowledge of the settlement, termination or discharge;

   o   make any material accounting change with respect to the Funds other than as required by GAAP or applicable law;

   o   without prior notice to the Buyer, with respect to any Fund, make any material tax election or settle or compromise any material tax liability, incur any material liability for taxes other than in the ordinary course or file a material amended tax return or claim for refund of taxes;

A-11

*With respect to DBZCO or DBZGP*

- o   make any distribution or dividend;

- o   amend its organizational documents or agree to merge with any other person and or acquire any equity or voting interest in DBZCO or DBZGP if such action would have the effect of avoiding its obligations under the transaction documents;

- o   incur indebtedness for borrowed money or guarantee any indebtedness;

- o   make loans or advances in excess of $2 million;

- o   sell, transfer, mortgage, lease, encumber or otherwise dispose of the assets being purchased by, or provided under the TSA to, the Buyer or grant encumbrances on any such assets, except for permitted encumbrances;

- o   amend any benefit or compensation plan, take any action to accelerate any rights or benefits under any benefit or compensation plan or increase the compensation, bonus or other benefits payable to any employee;

- o   enter into a lease of real property;

- o   acquire assets of any business for consideration in excess of $1 million;

- o   make capital expenditures in excess of $1 million or acquire any business;

- o   cancel or waive any claims or rights or any indebtedness; or

- o   enter into, amend or terminate any contract other than in the ordinary course; enter into arrangements with any affiliates; amend any investment advisory agreement; or amend or terminate any employment agreement.

- •   The Buyer agrees that it shall not use the performance track record of the Funds, except as required by law.

- •   DBZCO agrees to identify data that can be provided to the Buyer at the Closing in order to minimize the need for the Buyer to retrieve additional materials pursuant to the provisions in the Information Sharing Agreement. For a description of the Information Sharing Agreement, see Section 7 below.

- •   The parties will confer prior to the Closing to identify certain information and technology agreements of DBZCO that the Buyer wishes to acquire rights under or assume following the Closing and to agree in writing when such assumption or acquisition rights will occur and what rights, if any, DBZCO will have from and after such assumption or acquisition. For those contracts not assumed or acquired, the provision of rights thereunder will be governed by the TSA.

A-12

- The Buyer agrees to grant a license in favor of DBZCO to use the computer software that is being acquired by the Buyer under the APA so that DBZCO may perform its obligations under the TSA, wind-down its and certain of its affiliates' operations and comply with regulatory, tax and ongoing other legal requirements and in connection with litigation. DBZCO may retain copies of the computer software and data being acquired by the Buyer, in each case subject to the Confidentiality Agreement and other transaction documents.

- The Buyer also will grant a license in favor of Daniel Zwirn, for which he will pay $50,000, to use certain computer software and data that is being acquired by the Buyer under the APA.

- Daniel Zwirn shall enter into a letter agreement regarding the operation, ownership and disposition of certain FCC-licensed properties in which the Funds have an interest, and DBZCO shall also enter into a letter agreement with respect to such matters. The obligations of DBZCO and Daniel Zwirn under such letter agreements will be subject to the rules and regulations of the FCC and the Communications Act.

### Indemnification

After the Closing, each of DBZCO and the Buyer will indemnify and hold harmless the other party and its directors, officers, members, partners and employees and their respective affiliates from any loss arising out of (i) any inaccuracy or breach of any covenant, agreement, representation or warranty of such party contained in the APA, (ii) such party's failure to pay or perform any liability retained or assumed by such party (other than, in the case of DBZCO, the specified liabilities for which the Buyer has agreed to separately indemnify DBZCO), (iii) liabilities arising out of or relating to the ownership of the acquired assets to the extent such liabilities arise out of acts, omissions or events occurring prior to Closing in the case of DBZCO, or from and after the Closing, in the case of the Buyer, or (iv) liabilities arising out of or relating to the provision of access, information or documents by the parties from and after the Closing.

No party shall have any liability to the other party for breaches of representation and warranties until the aggregate amount of losses incurred as a result of such breach or breaches exceeds $220,000 and the liability of such party shall be limited only to amounts exceeding $220,000. The representations and warranties will survive for two years from the Closing.

### Conditions to Consummation of the APA

The obligations of the parties to consummate the transactions are subject to the satisfaction or waiver of customary conditions (some of which run in favor of only Buyer or only DBZCO) including:

- the representations and warranties of the parties shall be true and correct in all material respects if not otherwise qualified by materiality or, if qualified as to materiality, true and correct, in each case, as of the Closing Date, except that those representations and warranties which address matters only as of a particular

date need only be true and correct or true and correct in all material respects, as applicable, as of such date;

- the parties shall have performed and complied in all material respects with each of the terms, conditions, covenants, obligations, agreements and restrictions required by the APA;

- the satisfaction or waiver of all conditions to the Closing of the IMTA;

- each of the parties shall have obtained all necessary authorizations and consents;

- the absence of injunctions preventing the Closing, or pending litigation or litigation threatened by a governmental authority seeking to restrain or prohibit the Closing;

- the Buyer shall have made the payments required under the APA;

- the consummation of the transactions contemplated by the Domestic Fund Interest Assignment and Assumption Agreement;

- the ITA (described in Section 6 below) and the license in favor of Daniel Zwirn to use certain computer software and data that is being acquired by the Buyer under the APA shall have been delivered; and

- the delivery by the parties of all other required transaction documents.

### *Termination*

The APA may be terminated:

- by the mutual written consent of the parties at any time prior to the Closing Date;

- by written notice of any party to the other parties if the Closing has not occurred prior to July 31, 2009, unless a breach by the party seeking termination is the sole cause for the Closing not having occurred prior to such date; and

- by any party in the event of an earlier termination of the IMTA.

3.   **MATERIAL DIFFERENCES BETWEEN THE EXISTING IMA AND THE NEW IMA**

| Term | Existing IMA | New IMA |
|---|---|---|
| Services as Manager | DBZCO conducts operations of the Fund, including making all investment decisions, monitoring performance and compliance, negotiating agreement terms, retaining brokers and borrowing money on behalf of the Fund. | Substantially the same, except the New Manager also is authorized to take all actions necessary to manage and liquidate the Fund's portfolio.

Also, the New Manager may hire subadvisors affiliated with Zwirn Holdings LLC to the extent necessary for the New Manager to provide services in certain non-U.S. jurisdictions and carry indemnification and other insurance as the New Manager determines in its discretion to protect it and any other individual or entity entitled to indemnification by the Fund.

The New Manager may delegate to its affiliates any of its duties under the IMA, which, in its discretion, should be performed by such affiliate.

FIG agrees that it shall make available to the New Manager such personnel and other resources as reasonably necessary for the New Manager to perform its obligations under the proposed IMA. |
| Compensation | The Fund pays DBZCO a monthly management fee equal to 1/12 of 2.0% (2.0% per annum) of the sum of each investor's month-end capital account balance.  The Offshore Fund pays DBZCO, and the Domestic Funds allocate to their general partner (pursuant to the applicable limited partnership agreement) 20% of each investor's annual net profit, as of December 31 of each year, in each case subject to a high water mark. | The Fund pays the New Manager: (i) a management fee equal to 1% of any gross amounts collected by the Fund, payable monthly, and  (ii) from and after the distribution to investors in the Fund of an amount equal to the net asset value of the Fund (as determined by DBZCO in good faith and consistent with the Fund's governing document and applicable law) as of the Measurement Date, the Fund shall pay to the New Manager an incentive fee equal to 5% of all distributions to investors in the Fund in excess of such amount (gross of such incentive fee) payable monthly. |
| Expenses | Each party bears its own expenses | In addition to bearing its own expenses, the Fund also bears the expenses of the New Manager that relate to the Fund such as |

investment expenses; compensation of third-party subadvisors (to the extent permitted by the IMA); financing costs; due diligence, research and investment-related travel expenses; legal expenses; professional fees (including expenses of consultants and experts) relating to investments; accounting expenses (including the cost of accounting and trading software packages); auditing and tax preparation expenses; valuation expenses (including the cost of third-party valuation agents); administrative expenses; cost of software (including fees of third-party software developers) used by the New Manager to track and monitor investments; insurance expenses (including for director and officer liability insurance); the management fee and incentive fee; any taxes and duties payable by the Fund or its direct or indirect subsidiaries in any jurisdiction in connection with the operation of the Fund; fees and expenses of the administrator and other agents or service providers; entity-level taxes of the Fund or its direct or indirect subsidiaries, insurance premiums and other similar expenses related to the Fund; extraordinary expenses (including litigation, indemnification and contribution expenses); and all other expenses and/or liabilities incurred in connection with the operation of the Fund.  The Fund shall also bear all expenses incurred by the New Manager and its affiliates, whether incurred prior to, on or after the date of the proposed IMA, to satisfy their obligations under, or relating to the transactions contemplated by, the Transaction Documents, as such term is defined in the APA, or relating to DBZCO or its affiliates.

Within (i) 45 days of the last day of each fiscal quarter (other than a fiscal quarter ending on December 31st) and (ii) 60 days of each fiscal quarter ending December 31st, the New Manager shall cause the Chief Financial Officer of Fortress to provide a certificate that the payment obligations of the Fund and the New

Manager under the applicable expense provision in respect of such prior fiscal quarter have been determined in accordance with the New IMA, along with supporting schedules with line item detail to be agreed in good faith by the New Manager and the Advisory Board (in the case of the Domestic Funds) and the directors of the Fund (in the case of the Offshore Fund). Upon request of the Advisory Board or directors of the Fund, as applicable, the Chief Financial Officer or his designee shall confer with the Advisory Board or the directors of the Fund, as applicable, or their designated representatives concerning such certificate and accompanying materials and such other related matters as shall reasonably be requested.

Further, unlike the Existing IMA where each party bears its own expenses, the Fund is also responsible for all of the New Manager's internal expenses related to the Fund, such as internal due diligence, research and investment-related travel expenses; internal legal expenses; internal accounting expenses; internal auditing and tax preparation expenses; internal valuation expenses; organizational expenses for entities utilized by the New Manager to perform services under the IMA; the internal cost of software used by the New Manager to track and monitor investments; and the Fund's allocable share of all overhead expenses of the New Manager and its affiliates, including rent, insurance, systems and employee expenses (such as base compensation, bonuses and benefits). The Fund shall also pay the New Manager for all internal expenses and allocable share of overhead expenses incurred by the New Manager and its affiliates, whether incurred prior to, on or after the date of the proposed IMA, to satisfy their obligations under, or relating to the transactions contemplated by, the Transaction Documents, including services provided to DBZCO or its affiliates pursuant to the TSA. Notwithstanding the foregoing, the New Manager shall not allocate to the Fund the

|  |  | cost of any foregoing expense, if the New Manager, FIG or any of their affiliates has allocated or will allocate the cost of the same expense to another person. In addition, the Fund shall pay the reasonable out-of-pocket expenses of the members of the Advisory Board (as such term is defined in the LLC agreements of the Domestic Funds) incurred in connection with their activities on behalf of the Fund. |
|  |  | **Advancement of Expenses:** The proposed IMA adds a provision requiring the Fund to advance all expenses at the start of every fiscal quarter (and promptly following the date the New Manager takes over management) based on the New Manager's budget. Promptly following the end of each quarter and the termination of the proposed IMA, the Fund shall pay to the New Manager the amount, if any, by which the advance for such quarter was less than all expenses in such quarter, or the New Manager shall pay to the Fund or, at New Manager's election, offset from the advance for the succeeding quarter, the amount, if any, by which expenses in such quarter were less than the amount of the advance in respect of such quarter. |
| Standard of Care | The definition of indemnified person includes: DBZCO, its affiliates, and their respective principals, members, officers, directors, partners, employees, agents and the representatives of any of them.<br><br>DBZCO shall exercise its best judgment in rendering the services listed in the IMA and act in, or not opposed to, the best interests of the Fund. All investments, allocations and transactions effected or facilitated by DBZCO for the Fund shall be solely for the Fund's risk.<br><br>DBZCO, its affiliates and their respective principals, officers, directors, partners, employees, agents and representatives will not be liable | The definition of indemnified person includes the New Manager, its affiliates or their respective officers, directors, managing members, members, shareholders, partners, controlling persons employees, agents, consultants and legal representatives (each, a "Manager Indemnified Person") and, in connection with services rendered under the TSA, DBZCO, its affiliates or their respective officers, directors, managing members, members, shareholders, partners, controlling persons, employees, agents, consultants and legal representatives (each a "DBZ Indemnified Person"). These definitions add shareholders, controlling persons and consultants of the New Manager and its affiliates, and include the prior manager and its officers, directors, managing members, members, |

A-18

| | |
|---|---|
| for mistakes of judgment or for action or inaction reasonably believed to be in, or not opposed to, the best interests of the Fund or for (i) any act or omission performed or failed to be performed by it, or for any losses, claims, costs, damages or liabilities arising therefrom, in the absence of intentional misconduct, bad faith or gross negligence, (ii) any tax liability imposed on the Fund or any investor or (iii) any losses due to any act or omission of any brokers or third-party agents of the Fund or DBZCO (whether or not such persons are directly employed by any indemnified person) as long as such persons are selected, engaged or retained by DBZCO, its affiliates, or any of their respective principals, officers, directors, partners, employees, agents or representatives as the case may be with reasonable care. | shareholders, partners, controlling persons, employees, agents, consultants and legal representatives.<br><br>No "best judgment" standard<br><br>Manager Indemnified Persons are not liable to the Fund or to any investor in the Fund for any losses arising out of or related to any acts or omissions to act by any Manager Indemnified Person in connection with the Fund, the proposed IMA or the services under the TSA, or any investment made or held directly or indirectly by the Fund or any expense incurred in connection therewith and DBZ Indemnified Persons are not liable to the Fund or to any investor in the Fund for any losses arising out of or related to any acts or omissions to act by, any DBZ Indemnified Persons in connection with services rendered under the TSA, in each case, except to the extent any such losses are determined by final non-appealable judgment of a court of competent jurisdiction to have been attributable primarily to such indemnified person's bad faith, 'gross negligence' (as such term is interpreted under the laws of the State of Delaware, U.S.) or willful misconduct.<br><br>Where losses result from acts or omissions of any broker or agent of the fund, the Manager Indemnified Persons are not liable if the broker or agent's selection, engagement or retention did not constitute gross negligence, willful misconduct or bad faith.<br><br>An indemnified person may consult with counsel and accountants in respect of the Fund's affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel and/or accountants, provided, that the selection did not constitute gross negligence, willful misconduct or bad faith.<br><br>The Manager Indemnified Persons are not |

| | | |
|---|---|---|
| | | liable for losses arising out of or related to any investment decisions made by or on behalf of the Fund prior to the date of the proposed IMA. or any other actions by the Fund, DBZCO or any other person prior to the date of the proposed IMA (including without limitation any claim alleging a fraudulent conveyance).<br><br>The proposed IMA adds a provision that no Manager Indemnified Persons shall be liable for any act, or failure to act, by DBZCO or its affiliates or their respective officers, directors, managing members, members, shareholders, partners, controlling persons, employees, agents, consultants and legal representatives. |
| Indemnification | Indemnification for:<br>(1) any loss or expense suffered or sustained by any indemnified person by reason of their being an indemnified person _provided_ that such loss or expense resulted from a mistake of judgment or from action or inaction reasonably believed to be in, or not opposed to, the best interests of the Fund, or, in the case of loss or expense suffered as a result of the negligence, dishonesty or bad faith of any employee, broker or third-party agent of the Fund. DBZCO or the General Partner, such employee, broker or third-party agent was selected, engaged or retained by the Fund, DBZCO, the General Partner or an affiliate thereof or any principal, member, officer, director, partner, employee, agent or the representative of any of the foregoing, as the case may be. with reasonable care. and<br><br>(2) any losses, claims costs, damages or liabilities to which such indemnified person may become subject in connection with any matter arising out of, or in connection with, the Fund s business or affairs, except to the extent that any such loss. claim, cost, damage or liability results solely from the | In addition to providing indemnification for losses arising from the Fund s business or affairs, the proposed IMA also provides indemnification to Manager Indemnified Persons for losses (a) arising from any actual or alleged act or omission performed or omitted by an indemnified person in connection with any matter arising out of or in connection with the proposed IMA, (b) arising from any investment made or held by the Fund, (c) arising from any act or omission by a Manager Indemnified Person in connection with the Transaction Documents, (d) relating to DBZCO or its affiliates and (e) arising out or related to any investment decisions made by or on behalf of the Funds prior to the Closing Date and any other activities of the Fund, DBZCO or any other person prior to the Closing Date, including any claim alleging a fraudulent conveyance.<br><br>The proposed IMA also provides for DBZCO and its affiliates to be indemnified in connection with services rendered under the TSA.<br><br>In the case of indemnification for losses arising from any actual or alleged act or omission to act of any broker, agent counsel or accountant of the Fund, |

| | | |
|---|---|---|
| | intentional misconduct, bad faith or gross negligence of such indemnified person. | indemnification is available where the selection, engagement or retention of the broker, agent, counsel or accountant by the indemnified person did not constitute gross negligence, willful misconduct or bad faith on the part of such indemnified person.<br><br>Losses determined by a non-appealable final judgment of a court of competent jurisdiction to have been primarily attributable to such indemnified person's bad faith, gross negligence or willful misconduct are carved out from the above indemnification provisions. The Existing IMA did not contain language regarding a non-appealable final judgment of a court of competent jurisdiction.<br><br>The proposed IMA adds a provision that indemnifies and holds harmless the Manager Indemnified Persons for losses arising out of or related to any investment decisions made by or on behalf of the Fund prior to the date of the IMA, or any other actions by the Fund, DBZCO or any other person prior to the date of the proposed IMA (including without limitation, any claim alleging a fraudulent conveyance). |
| Advancement | The Fund shall, at the election of each indemnified person, either (i) advance to such indemnified person, or (ii) promptly reimburse such indemnified person for, all expenses (including fees and expenses of counsel) incurred in connection with investigating, preparing, pursuing or defending any threatened or pending proceeding related to, arising out of or in connection with the IMA or the Fund's business or affairs; provided that such indemnified person shall promptly repay to the Fund the amount of any such advanced or reimbursed expenses paid to it if it shall be judicially determined by judgment or order not subject to further appeal or discretionary review that such indemnified person was not entitled to | Same. |

A-21

| | | |
|---|---|---|
| | be indemnified under the terms of the IMA. | |
| Services to Other Companies or Accounts | The Fund understands that DBZCO may act as investment adviser to other managed accounts and to other partnerships or investment funds, and the Fund has no objection to DBZCO s so acting, so long as whenever the Fund and one or more other clients advised by DBZCO have available funds for investments, investments suitable and appropriate for each will be allocated approximately pro rata among the Fund and the other clients, to the extent reasonably practicable, unless DBZCO believes in good faith that another method would be more fair and equitable.<br><br>DBZCO (and affiliates) are not restricted from engaging in and devoting time and attention to other business and clients. | The proposed IMA explicitly does not (i) prevent the New Manager and its affiliates from forming additional investment funds, from entering into other investment advisory relationships or from engaging in other business activities, even if such activities may be in competition with the Fund and/or may involve substantial time and resources of the New Manager; (ii) prevent the respective officers, directors, managing members, members, shareholders, partners, controlling persons, employees or agents of the New Manager and its affiliates from becoming involved in the management of other investment funds and accounts, including those that are not managed or advised by the New Manager or one of its affiliates that may have investment objectives that overlap with the investment objective of the Fund; or (iii) prevent the respective officers, directors, managing members, members, shareholders, partners, controlling persons, employees or agents of the New Manager and is affiliates from engaging in any other lawful activity, and shall not in any way limit or restrict such persons and entities or the New Manager or any of its affiliates from buying, selling or trading any securities for its or their own accounts or for the accounts of others for which it or they may be acting; provided, however, that the New Manager must comply with its fiduciary obligations to the Fund and will engage in no activities that, in its judgment would materially impair its ability to perform of its obligations under the proposed IMA. The proposed IMA explicitly provides that the New Manager is not liable to account for any profit earned or other benefit arising from any advice given by it to any other person, company, joint venture, mutual fund or other collective investment scheme or trustee or manager thereof in relation to the acquisition holding, financing, sale or disposal of any property, assets, securities |

| | | or instruments of whatsoever nature including any property, assets, securities and instruments of a type acquired, held, financed, sold or disposed of by the Fund. |
|---|---|---|
| Brokerage Arrangements; Soft Dollars | The Fund pays its own brokerage commissions and transaction costs; DBZCO does not receive commissions generated by the Fund's trading but may benefit indirectly from payments made by the Fund. Portfolio transactions for the Fund will be allocated to brokers and dealers on the basis of a variety of factors, which may result in higher costs. The use of 'soft dollars' is expected to fall within the 'safe harbor' under Section 28(e) of the U.S. Securities Exchange Act of 1934, as amended. | Substantially similar. |
| Non-Assignability | The IMA cannot be assigned by either party without the consent of the other party. | Same; plus two caveats: (a) consent is inferred if prior written notice of the assignment is delivered to shareholders (in the case of the Offshore Fund) or the members (in the case of the Domestic Funds) and a majority-in-interest of shareholders or members as the case may be, do not object in writing within 20 days of the giving of such notice, and (b) the New Manager may assign the proposed IMA or all or part of its rights and obligations to any of its affiliates. |
| Term of Agreement | Effective until December 31, 2009 and from year to year thereafter; either party may terminate upon 90 days' prior notice to the other | The IMA shall terminate upon final liquidation of the Fund, except that it may be earlier terminated (a) by the New Manager upon 90 days' prior written notice to the Fund or (b) by the board of directors of the Offshore Fund or the managing member of the Domestic Funds upon 90 days' prior written notice to the New Manager. |
| Governing Law; Submission to Jurisdiction; Waiver of Trial by Jury | Governed by New York law. | Governed by New York law. Actions arising under the IMA will be brought in New York. The parties waive the right to a jury trial in |

A-23

| | | actions arising out of the IMA. |
|---|---|---|
| Amendment | Does not contain an amendment provision | The IMA may be amended from time to time by the Fund and the New Manager by written agreement signed by the Fund and the New Manager, _provided_ that no such amendment shall adversely affect the rights of indemnified persons under sections of the IMA relating to indemnification and term of agreement. |
| Severability | Does not contain a severability provision. | Contains a severability provision. |

## 4.   TRANSITION SERVICES AGREEMENT

*General*

    *Parties.* The TSA will be entered into contemporaneously with the Closing by DBZCO, the Buyer and the New Manager.

    *Services.*

    DBZCO has agreed to provide certain services to the Buyer and/or the New Manager to facilitate the conduct of the Business by the New Manager and the transition of the assets acquired by the Buyer under the APA, including the following: (i) IT support for and access to DBZCO's IT systems that hold certain data; (ii) assistance and cooperation with respect to the assignment, migration off of, or other transition of certain IT contracts used by DBZCO in the Business prior to Closing; (iii) access to certain data; (iv) segregation and transfer of certain data; (v) consultation regarding the integration of data and the installation of computer software and equipment acquired by the Buyer under the APA; (vi) financial and tax services, including satisfying DBZCO's financial statement and tax return obligations under the IMTA; (vii) the provision of information and analyses regarding certain investments to be managed by the New Manager; and (viii) the provision of risk management data and analyses relating to certain CDS investments to be managed by the New Manager (collectively, the " DBZCO Services").

    The New Manager has agreed to provide certain services to DBZCO, namely, (i) the provision of access to personnel as necessary to assist DBZCO and its affiliates in providing DBZCO Services and in winding down the global operations of DBZCO and its affiliates and preparing tax returns for DBZGP, DBZCO and DBZCO's affiliates; (ii) the provision of office space, office equipment furniture and supplies to employees retained as full-time employees of DBZCO or its affiliates, and other office services, including segregated storage space, mail services, voice and data communication and network connectivity; and (iii) access to the accounting journal file that records changes to the books and records of the Funds for the pre-Closing period (collectively, the "New Manager Services").

    *Limitations to Providing Services*

    DBZCO has no obligation to provide DBZCO Services if required third party vendor consents (or equivalent/alternative services) are not obtainable (including if the Buyer elects not to pay any fees imposed by such third party vendor as a condition to obtaining consent or fees with respect to obtaining equivalent/alternative services). In addition, if an employee of DBZCO that is transferred to the Buyer post-Closing ceases to be an employee of the New Manager, and such employee is not replaced by another employee of DBZCO or the New Manager, and DBZCO cannot reasonably continue to provide a DBZCO Service (or portion thereof) without access to such person, then DBZCO shall be relieved of its obligation to provide the applicable DBZCO Service or portion thereof.

    *Fees.*

    The fees payable by the Buyer to DBZCO under the TSA will be equal to the expenses, fees, and costs to DBZCO of winding down the operations of DBZCO and its affiliates during

the term of the TSA and of providing DBZCO Services (which expenses, fees, costs and other amounts are set forth in the TSA Budget).  The Buyer shall pay the amounts set forth in the TSA Budget (and any other amounts payable by Buyer as set forth below) monthly in advance, and at the end of the month shall pay any shortfall, by which the advance was less than all expenses, fees, costs and other amounts owing by Buyer for that month; provided that the aggregate amounts paid by the Buyer during the initial term of the TSA shall be not exceed by more than $500,000 the aggregate amounts set forth in the TSA Budget except as set forth below.  If any monthly advance is more than the actual expenses, fees, and costs owing by the Buyer under the TSA for such month, DBZCO shall pay to the Buyer or Buyer may offset from the next advance the amount of the overpayment to the extent such excess reflects anticipated aggregate cost reductions and not merely variances in the timing of incurrences of expenses.  In addition to the amounts set forth in the TSA Budget, the Buyer is responsible for paying the following amounts, which are excluded from the $500,000 cap: (i) any direct, out-of-pocket costs of the DBZCO required to be incurred in providing services inadvertently omitted from, or otherwise within the scope of, the initial DBZCO Services (if such amounts are not already covered in the TSA Budget), (ii) any direct, out-of-pocket costs of DBZCO required to be incurred as a result of obtaining alternative or equivalent services in the event that a required third party consent cannot be obtained, (iii) mutually agreed upon fees for DBZCO 's provision of services agreed to be provided outside of the scope of the initial DBZCO Services, and (iv) any additional amounts approved in writing by the Buyer.

No fees or expenses are payable to the Buyer or the New Manager for New Manager Services.

### *Term and Termination*

The initial term of the TSA is for a period of twelve (12) months.  The Buyer may request to extend the term of the TSA by providing written notice to DBZCO and the New Manager not later than ninety (90) days prior to the expiration of the initial term.  If the Buyer terminates any services being provided by the Seller prior to expiration of the applicable term, DBZCO must make commercially reasonable efforts to mitigate the costs attributable to such services, and the Buyer shall continue to pay any such costs, to the extent that they cannot be mitigated.

### *Indemnification*

DBZCO will indemnify the New Manager and the Buyer against losses arising out of third-party claims brought against either the New Manager or the Buyer based on the DBZCO s bad faith, gross negligence or willful misconduct.

### *Limitation of Liability*

The parties are not liable to one another for any error or omission in rendering the services under the TSA, or for any defect in the services rendered, except to the extent that any losses resulting therefrom are directly attributable to the bad faith, gross negligence, or willful misconduct of the service provider or are indemnified losses as provided above.  A service recipient's sole and exclusive remedy and the service provider's sole and exclusive liability for any breach of the TSA, and for any damages suffered or incurred in connection with the

A-26

provision of services under the ISA, shall be to seek equitable relief for the prompt and proper performance by the service provider of such services.

## 5.   SUBSCRIPTION AGREEMENT

*General*

    *Parties.* The Subscription Agreement will be entered into prior to or contemporaneously with the Closing by the Buyer, each Consenting Fund, a wholly-owned subsidiary of the TE Fund (provided that the TE Fund is a Consenting Fund) and a wholly-owned subsidiary of the Offshore Fund (such Funds and, in the case of the TE Fund and the Offshore Fund, their respective subsidiaries, collectively, the "Subscribers"). The Offshore Fund and the TE Fund, though parties to the Subscription Agreement, will not directly subscribe for membership interests in the Buyer. Each of the Offshore Fund and the TE Fund will subscribe through a wholly-owned subsidiary.

    *Purchase of Interests.* Pursuant to the Subscription Agreement, the Subscribers (a) will subscribe for membership interests in the Buyer, (b) upon the Closing, will make cash capital contributions sufficient to satisfy the Buyer's payment obligations payable on the Closing Date, which obligations are described elsewhere in this proxy statement, and (b) following the Closing, will make additional cash capital contributions sufficient to fund all financial obligations of the Buyer under the APA, the Domestic Funds Interest Assignment and Assumption Agreement, the IMTA, the TSA, the ISA and the Buyer Guaranties (described below under "Subscription Agreement – Guaranty") (collectively, the "Specified Agreements"). All such contributions will be made by Subscribers (or, in the case of the Offshore Fund and the TE Fund, the subsidiaries of such Funds that are Subscribers) in proportion to the respective net asset values of the Consenting Funds on the Measurement Date (with contributions at the Closing based on March 31, 2009 net asset values and subsequently trued-up without interest within 90 days of the Closing).

*Representations and Warranties*

    The Subscription Agreement contains customary representations and warranties made by each of the Subscribers and the Buyer, as well as:

- Representations to ensure exemption from registration under securities laws; and

- An acknowledgement that there is no provision for voluntary withdrawal from the Buyer

    In addition, each of the TE Fund and the Offshore Fund individually make customary representations and warranties with respect to the authority and ability of each of the TE Fund and the Offshore Fund to enter into the Subscription Agreement and perform its respective obligations thereunder.

*Guaranty*

    Under the Subscription Agreement, the Subscribers will guarantee, for the benefit of DBZCO, the payment when due of the Buyer's payment obligations under the Specified Agreements. The Buyer Guaranties are instruments pursuant to which the Buyer will guarantee certain compensation with respect to certain of the Retained Employees.

In addition, since the Offshore Fund and the TE Fund will not directly subscribe for membership interests in the Buyer, each of the Offshore Fund and the TE Fund will guarantee the performance and payment obligations of their respective subsidiaries that will directly subscribe for membership interests in the Buyer and any expenses incurred by DBZCO, DBZGP or the Buyer in enforcing their respective rights under such guarantees.

## 6.   INDEMNITY TRUST AGREEMENT

*General*

The Indemnity Trust Agreement (the "ITA") will be entered into upon the Closing, at which time, the Buyer will establish, and deposit $15 million into, a trust ("Trust"), pursuant to the ITA.

*Parties*

The parties to the ITA are DBZCO, the Buyer, a trustee to be designated (the "Trustee") an administrator to be designated (or any successor thereto, the "Administrator"), Daniel Zwirn, as a Participant Representative, David C. Lee, as a Participant Representative, and Lawrence Cutler, as a Participant Representative.

### *The Participants in the Trust*

The Trust will be established for the benefit of the following persons or entities (referred to, collectively, as the "Participants"): DBZCO and its Affiliates (other than any of the Funds) or any current or former principal, member, officer, director, partner, employee or agent of either of them or any representative of any of the foregoing, except that (x) any person or entity who or which, to the Administrator's actual knowledge, has commenced or threatened in writing to commence any action, suit, arbitration or other proceeding against DBZCO, any Participant Representative, or any entity that is an affiliate of DBZCO other than an action, suit, arbitration or other proceeding that is only seeking to enforce such person's or entity's contractual rights to indemnification from, and/or compensation for services provided to, such entity, and (y) any one of certain specified entities or persons  shall not be deemed to be a Participant

### *The Purpose of the Trust*

The purpose of the Trust is to indemnify and hold harmless each of the Participants and, subject to the terms of the ITA, the Trust shall indemnify and hold harmless each of the Participants, from and against any and all costs and expenses (including, without limitation, legal fees and disbursements) and indemnification obligations, in each case contingent or otherwise and known or unknown, that are sustained or incurred by the Participants by reason of, resulting from or arising out of: (A) any proceeding relating to or arising out of the conduct of the business or operations of DBZCO, D.B. Zwirn Partners, LLC or any other entities which are affiliates of DBZCO, including without limitation (i) any act or omission of any current or former principal, member, officer, director, partner, employee, agent or representative of DBZCO or of any entity that is an affiliate of DBZCO in connection with the conduct or operation of the business of any such entity, (ii) any pending or threatened investigation, action, suit, arbitration or other proceeding by any governmental authority or other person that relates to the conduct or operation of the business of DBZCO or any of its affiliates, including but not limited to the pending SEC investigation of DBZCO; and (iii) any federal or state tax audit or examination, in each case limited to legal fees and expenses, accounting fees and expenses and fees and expenses of experts and consultants; (B) without limitation on clause (A) above, any indemnification obligation of DBZCO or certain of its affiliates to any of its or their current or former principals, members, officers, directors, partners, employees, agents or representatives (excluding partners,

A-30

former partners and former employees of DBZCO as of the Closing Date with respect to (a) any fines or penalties and (b) indemnification obligations as prohibited by law or federal regulatory policy, in each case arising out of any investigation, action, suit, arbitration or other proceeding by the SEC) that relates to any matter or event that occurred, or to any proceeding by any governmental authority or other person that relates to the conduct or operation of the business of DBZCO or any of its affiliates or the conduct of such current or former principal, member, officer, director, partner, employee, agent or representative; and (C) all legal fees and expenses and accounting fees and expenses incurred by DBZCO and its affiliates in connection with the wind down of the operations of DBZCO and its affiliate. The Participants will not be entitled to recover under the ITA an aggregate amount in excess of the available funds in the Trust, and their rights to indemnification under the ITA, and to advancement of expenses related to claims for indemnification under the ITA, are subject to the procedures and limitations in the ITA. No Participants shall have a direct right to seek indemnification or advancement of expenses against the Buyer under the ITA other than by asserting claims against the Trust funds. The advancement and indemnification pursuant to the ITA will not limit or modify the rights of any person to indemnification from DBZCO, the Funds or any other person under any other contract or agreement, or the right to receive insurance proceeds.

### Claims Against the Trust and Advancement of Expenses

A Participant who believes in good faith that he has a claim for payment that is covered by the purposes of the Trust will submit the claim to the Administrator. Such Participant may also request advancement from the Trust of reasonable attorneys' fees and other costs and expenses incurred in connection with defense of any action or proceeding relating to such a claim. The Administrator will direct the Trustee to pay the Participant out of the Trust funds for claims or related advancement requests if the relevant claim qualifies as an obligation under the Trust, among other factors determinative of whether the claim should be paid by the Trust, all to be considered by the Administrator. Such other determinative factors include (i) whether the claim satisfies the guidelines provided in the ITA, (ii) the amount of pending claims relative to the availability of Trust funds, (iii) whether such claim will be satisfied by an alternative means of recovery such as insurance or other source of indemnification (other than from DBZCO, or any of its affiliates or from the Funds) or (iv) whether the Participant submitting the claim is subject to bankruptcy, insolvency or a similar event. If the Administrator determines that the claim, or some portion of it, should be paid to the Participant, then the Administrator will direct the trustee to pay it, subject to any taxes, expenses or other costs that are payable by the Trust at the time of payment.

### Resignation of the Administrator

The Administrator may not be removed. If the original administrator resigns or is no longer capable of performing his duties, then a successor designated in the ITA will be automatically appointed as the successor. If the first successor administrator does not accept such appointment or if such designated successor administrator resigns or is no longer capable of performing the Administrator's duties, then another successor Administrator will be appointed by mutual consent of the Buyer and a majority of the Participant Representatives. If such other successor Administrator has not been appointed within 60 days, then any Participant Representative or the Buyer may apply to a court of competent jurisdiction for such appointment.

A-31

*Resignation, Removal and Appointment of Participant Representative*

There will be no more than three Participant Representatives serving in such capacity at any time.  Initially, Daniel Zwirn  David Lee and Lawrence Cutler will be the Participant Representatives.  Any Participant Representative may resign at any time after the first anniversary of the Closing by giving the requisite notice, except that Daniel Zwirn may not resign as Participant Representative so long as David Lee or Lawrence Cutler is then serving as a Participant Representative or if there is no other person serving as a Participant Representative at the time of his resignation.  If at any time there are less than three Participant Representatives, then the remaining Participant Representatives may appoint an additional Participant Representative.  If at any time prior to the termination of the Trust there is no Participant Representative, then DBZCO (or, if DBZCO has been dissolved, DBZGP or its managing member) may appoint a Participant Representative.  If no Participant Representative is appointed by DBZCO (or, if DBZCO has been dissolved, DBZGP or its managing member) during the 30 day period commencing on the first date on which there is no Participant Representative, then at any time prior to the appointment of a new Participant Representative by DBZCO (or, if DBZCO has been dissolved, DBZGP or its managing member)  the Administrator may appoint a Participant Representative.

## 7.   INFORMATION SHARING AGREEMENT

*General*

The ISA will be entered into by the Buyer, the New Manager and DBZCO contemporaneously with the Closing.

DBZCO has conducted electronic screening in order to segregate certain documents, email and other materials contained on DBZCO's electronic databases, some of which may be subject to the attorney-client privilege and work-product doctrine in favor of DBZCO or attorneys or others working on their behalf. Such documents, email and other materials will not be made available to the Buyer at the Closing, but only pursuant to the procedures set forth in the ISA. Within a year after the Closing, DBZCO will deliver this material to a third-party vendor (the "Vendor"), which will maintain such information on an electronic database for the term of the ISA.

Following the Closing, the Buyer and the New Manager from time to time may require certain materials needed in connection with the Business, which materials will be contained on the electronic database maintained by the Vendor. In such event, the Buyer and the New Manager will request such materials from the Vendor and a law firm engaged by DBZCO ("Counsel") to conduct privilege reviews in response to such requests. Upon such a request from the Buyer or the New Manager, Counsel will conduct a privilege review of such requested information and based on such review will make a determination as to the privileged nature (if any) of such requested material. All non-privileged material will be promptly delivered to the Buyer and/or the New Manager. All material that is privileged in favor of the DBZCO only and is not relevant to the Business will be withheld and not disclosed to the Buyer or the New Manager. Other privileged material will be delivered to the Buyer, except where there is anticipated, current or threatened litigation to which requested material relates, in which case the ISA provides that, in order to preserve privilege, such material will be provided to the Buyer and/or the New Manager only after the parties have entered into a joint defense or common interest agreement, a form of which has been agreed to by the parties and is annexed to the ISA. Certain materials will not be made available to Buyer or New Manager.

The ISA provides that where privileged material relating to the Business that may be provided to the Buyer and the New Manager under the ISA relates to matters that are the subject of anticipated, current or threatened litigation, the parties will enter into a joint defense or common interest agreement prior to the provision of such material in order that the privileged nature of such materials may be preserved. A form of such joint defense or common interest agreement has been agreed to by the parties and is annexed to the ISA.

The term of the ISA is seven years, but may be extended as necessary if DBZCO is required by applicable law or contract to preserve any materials.

### ANNEX B

### FORTRESS DISCLOSURE

### FORTRESS VRF ADVISORS I LLC

### Annex to Proxy Statement of
### D.B. Zwirn Special Opportunities Fund, Ltd. dated May 1, 2009

*Fortress Investment Group LLC and its affiliates expressly disclaim any responsibility or liability for the accuracy, reliability or completeness of any of the information and statements provided in the Proxy Statement (except for this Annex B)*

*Each of DBZCO, the Fund, their respective affiliates and the Board expressly disclaim any responsibility or liability for the accuracy, reliability or completeness of any of the information and statements provided in this Annex B and in the New Manager Projected First-Year Operating Budget.*

The following should be read in conjunction with the Proxy Statement of D.B. Zwirn Special Opportunities Fund, Ltd. dated May 1, 2009, and includes important information you should read in connection with the Transactions.

### I.    Description of Fortress

The Funds will be managed by Fortress VRF Advisors I LLC ("New Manager"), an indirect subsidiary of Fortress Investment Group LLC ("Fortress"). Fortress is a global alternative investment and asset management firm founded in 1998 and listed on the New York Stock Exchange (NYSE: FIG). Fortress is headquartered in New York and has affiliates with offices in Chicago, Dallas, Frankfurt, London, Los Angeles, Munich, New Canaan, Rome, San Francisco, Shanghai, Sydney, Tokyo and Toronto. Fortress raises, invests and manages private equity funds and hedge funds.

Fortress has been an active investor in the credit markets through a number of its funds. In liquidating the assets of the Funds, the New Manager will draw upon Fortress's expertise in investing, managing and realizing assets that are in many cases like those held by the Funds. The Fortress Hybrid Funds ("Hybrid Funds") team, led by Peter Briger and Dean Dakolias, will be primarily responsible for managing the Funds. The team is composed of over 200 people who manage highly diversified, value-oriented investments in assets, opportunistic lending situations and securities throughout the capital structure.

Please see Fortress's website at www.fortress.com for additional information relating to Fortress and its management and businesses.

### Key Personnel

**Peter Briger** is a President and a member of the board of directors of Fortress Investment Group LLC and has been a member of the Management Committee of Fortress since March 2002. Mr. Briger is responsible for the Hybrid Funds business which includes the Fortress Credit Opportunities, Drawbridge Special Opportunities, Drawbridge Real Assets, Drawbridge Long Dated Value and Fortress Partners Funds. Prior to joining Fortress, Mr. Briger spent fifteen years at Goldman, Sachs & Co. where he was elected partner in 1996. Over the course of his career at Goldman Sachs, he was the co-head of several businesses, including Whole Loan Sales and Trading, Fixed Income Principal Investments, Asian Distressed Debt, Asian Real Estate Private Equity and the $1.5 billion Goldman Sachs Special Opportunities (Asia) Fund. In addition, he was a member of the Goldman Sachs Global Control and Compliance Committee, Goldman Sachs Asian Management Committee and Goldman Sachs Japan Executive Committee. Mr. Briger received a B.A. from Princeton University in 1986 and an M.B.A. from Wharton in 1994. Mr. Briger serves on the board of the Princeton University Investment Company.

**Richard Baxter** is a Managing Director of the Hybrid Funds, responsible for healthcare transactions. Previously, Mr. Baxter was the Chief Business Officer of Concurrent Pharmaceuticals, Inc., a platform technology company. Prior to this, he was Vice President of Marketing and Business Development at ViroPharma Incorporated. Mr. Baxter was also the head of Marketing and Business Development for PathoGenesis Corporation, which successfully launched and developed a novel, inhaled antibiotic brand that was acquired by Chiron for approximately $750 million. Mr. Baxter began his career in health care in various marketing, sales and strategic planning positions at SmithKline Beecham Pharmaceuticals. He was an analyst at Goldman, Sachs & Co. and received his A.B. from Princeton and M.B.A. from Harvard Business School.

**Andrew Berman** is a Managing Director of the Hybrid Funds, responsible for ABS and CDO trading and structuring. Mr. Berman joined Fortress in May 1998 as a Vice President concentrating in the areas of asset acquisition and structured finance. As a member of the Fortress acquisition team Mr. Berman worked on the acquisition of over $9 billion in asset receivables in the United States and Europe. Mr. Berman developed the CBO business at Fortress and was responsible for trading and structuring over $200 million of CBO Equity. Mr. Berman previously worked for Union Bank of Switzerland, and worked for an affiliate of BlackRock Financial Management, Inc. from December 1994 to May 1997. Prior to joining BlackRock, Mr. Berman spent ten years trading mortgage derivatives at Lehman Brothers and PaineWebber Inc. Mr. Berman received a B.A. in Mathematics from Macalester College.

**Doug Cardoni** is the Chief Administrative Officer of the Hybrid Funds. Mr. Cardoni heads large portfolio acquisition strategies (including government-run sales and programs) and

strategic initiatives for the Hybrid Funds. He previously ran the joint-venture platform of the Hybrid Funds and was involved in structural aspects of both deal and fund-level matters, and the development and implementation of strategic and operational initiatives. Prior to joining Fortress, Mr. Cardoni was a senior associate with the law firm of Schulte Roth & Zabel, where he worked on a variety of matters including CDO securitizations, hedge and private equity fund formations, and other general M&A and corporate matters. Mr. Cardoni received a B.S. degree from Erskine College with a major in Business Management and a minor in Mathematics and a J.D. from New York Law School, where he was an Articles Editor on the Law Review.

**David Cody** is the President of Hybrid Funds, responsible for business development, capital formation and investor relations. Mr. Cody joined Fortress in early 2002 as a Managing Director responsible for developing, launching and growing the Hybrid and Liquid Markets businesses. Just prior to joining Fortress, Mr. Cody was a principal at Banc of America Securities in the Global Markets Group responsible for hedge fund strategy and was one of the founding principals of Lydian Asset Management, a global convertible arbitrage hedge fund. Prior to that, Mr. Cody was a Vice President at Bankers Trust Company in the Global Convertible business where he established the international business in New York as well as the Asian distribution effort in Hong Kong. Mr. Cody began his career at Chemical Bank where he completed the credit analyst training program in New York. Mr. Cody received a B.A. from Colby College.

**Michael Cohn** is the Chief Compliance Officer and Deputy General Counsel of Fortress Investment Group LLC. Mr. Cohn leads a team of lawyers and compliance professionals who are responsible for various legal matters and all regulatory and compliance matters affecting Fortress and its affiliates around the world. Mr. Cohn joined Fortress in early 2004 from the law firm Fried, Frank, Harris, Shriver & Jacobson where he specialized in securities regulation and enforcement matters. On special assignment from Fried Frank, Mr. Cohn also spent a substantial amount of time working in the Goldman Sachs & Co. Sales and Trading Legal Department. Prior to Fried Frank, Mr. Cohn served as a staff attorney in the Division of Enforcement of the United States Securities and Exchange Commission. Mr. Cohn received a B.A., with honors, from the University of Florida and a J.D. from Hofstra University School of Law where he served on the editorial board of the Law Review.

**Leslee Cowen** is a Managing Director of the Hybrid Funds responsible for transaction analysis, structuring and execution with an emphasis on corporate debt and equity opportunities. Prior to joining Drawbridge, Ms. Cowen was an analyst at the Baupost Group, a value investment firm where she was involved in the acquisition of public and private distressed debt and equity securities in the U.S. and Europe, as well as the acquisition of non-performing loan portfolios in the U.S. and Europe. Prior to that, Ms. Cowen was an associate at the Argentum Group, a venture capital firm, where she was involved in several "roll-up" transactions. Between 1994 and 1996, Ms. Cowen was an analyst at The Blackstone Group in the private equity and M&A groups. Ms. Cowen received a B.S. degree from the Wharton School at the University of Pennsylvania with concentrations in finance, accounting and multinational management.

**Glenn Cummins** is the Chief Financial Officer of the Hybrid Funds. Prior to joining Fortress, Mr. Cummins was the Chief Financial Officer of Ivy Asset Management Corp. In addition, he previously worked at JP Morgan and Deloitte & Touche. Mr. Cummins, who is a Chartered Financial Analyst and a Certified Public Accountant, holds an MBA in Finance from Columbia Business School and a BBA in Accounting from Baruch College.

**Dean Dakolias** is the Co-Chief Investment Officer of the Hybrid Funds. Prior to joining Fortress, Mr. Dakolias was a Managing Director, Chief Credit Officer and co-founder of American Commercial Capital LLC and Coronado Advisors, both of which were sold to Wells Fargo & Co. in April 2001. Prior to being sold to Wells Fargo, these companies completed over $1 billion of financing and M&A advisory transactions from their inception in 1998. Mr. Dakolias was previously a director at RER Financial Group ("RER") where he was responsible for the firm's acquisition efforts as a principal and as a provider of third party due diligence and asset management; in this capacity he supervised due diligence on assets totaling more than $5 billion of book balance. Mr. Dakolias also served on credit committees for RER's own assets and managed assets for third parties (including the RTC, FDIC and institutional investors), controlling distressed business and commercial real estate assets totaling more than $2 billion. Mr. Dakolias received a B.S. in Physics from Columbia University.

**Ali Elam** is a Managing Director of the Hybrid Funds, focusing on hospitality and related fields as well as international real estate debt and equity investments. Recent transactions have included senior, mezzanine and preferred equity financing of individual hotels, hotel developments, land acquisitions as well as large portfolios in the U.S., Europe and Latin America. Mr. Elam maintains Fortress's relationships with all major hotel brands and individual owners. Prior to joining Fortress, Mr. Elam spent 8 years at Lehman Brothers in both investment banking and real estate principal investments. He also worked at Goldman Sachs in London and First Boston Corporation (now Credit Suisse) where he started his career. He holds a B.S. from Yale University and an MBA from the Wharton School Graduate Division.

**Michael Fallacara** is a Managing Director of the Hybrid Funds, responsible for all residential whole loan and residential real property acquisition activities. Prior to joining Fortress, Mr. Fallacara was a Managing Director at Credit Suisse in charge of whole loan originations. For the first four years at Credit Suisse he co-headed and built a distressed mortgage business that purchased more than $3 billion of assets. Mr. Fallacara worked on all aspects of asset management and was instrumental in Credit Suisse's acquisition of Select Portfolio Servicing, a specialist in distressed debt servicing. Prior to joining Credit Suisse, Mr. Fallacara worked for seven years as a Managing Director at Nomura Securities, where he specialized in purchasing distressed mortgage loans and other illiquid investments. Before Nomura, he worked for nine years at Citicorp in various residential and commercial real-estate businesses. Mr. Fallacara has a B.A. in Business from Rutgers University.

**Greg Finck** is a Managing Director of the Hybrid Funds, responsible for the trading and structuring of residential mortgage-backed securities. Prior to joining Fortress, Mr. Finck spent the last 16 years trading mortgages for Goldman, Sachs & Co where he was responsible for

residential mortgage securitization and secondary trading, including Prime, Alt-A, Subprime, Agency-guaranteed mortgages and Reverse mortgages. He was named a Managing Director at Goldman Sachs in 2003. Mr. Finck received a B.S.E from Princeton University in 1991.

**Robert Fraley** is a Managing Director of the Hybrid Funds, responsible for investment analysis and execution with an emphasis on corporate distressed, event-driven and deep value opportunities within and among a wide range of industries and asset classes in North America and Europe. Mr. Fraley also assists with underwriting and structuring corporate loans and asset acquisitions, particularly in the power sector. Prior to joining Fortress in 2002, Mr. Fraley was the senior analyst and Director on the distressed trading desk at Merrill Lynch & Co. In that capacity, he was responsible for evaluating distressed bonds and bank loans for investment purposes. Mr. Fraley has worked in London for both Drawbridge and Merrill, and spent one year working for Merrill in Hong Kong. Overall, he has invested in over 100 bank debt, corporate bond and equity positions, representing well over $1 billion in invested dollars. Mr. Fraley received a J.D. degree and an M.B.A. from New York University and a B.S. from the University of California at Riverside.

**Marc Furstein** is the Chief Operating Officer of the Hybrid Funds. Prior to joining Fortress, Mr. Furstein co-founded and was the Chief Operating Officer of American Commercial Capital LLC and Coronado Advisors, both of which were sold to Wells Fargo & Co. in April 2001. Prior to that, Mr. Furstein was co-manager of the opportunistic real estate loan business of Goldman Sachs where he structured, negotiated and closed over $2.5 billion of senior and mezzanine commercial loans and acquisition facilities. Before that, Mr. Furstein was involved in the acquisition of more than $2 billion of distressed business, consumer and real estate loans and had responsibility for the management of more than sixty portfolios of such assets where he designed and oversaw the implementation of an asset management system as well as managed the resolution process for over 1,000 distressed assets. Mr. Furstein was also in Goldman's Financial Institutions Group, where he focused on M&A transactions and corporate finance. Mr. Furstein received a B.A. from Columbia University and an M.B.A. from the Wharton School at the University of Pennsylvania.

**Curtis Glovier** is a Managing Director of the Hybrid Funds, responsible for origination, execution and monitoring of private equity investments. Prior to joining Fortress, Mr. Glovier served for seven years as a Managing Director and Co-Head of the Middle Market Buyout group at Perseus, LLC. Before that, he was a Managing Director of Nassau Capital, which managed approximately $2 billion on behalf of Princeton University. At both Perseus and Nassau Capital Mr. Glovier was responsible for all aspects of the direct investment process, including identifying and developing opportunities, negotiating and closing transactions and developing strategic plans and exit strategies for portfolio companies. Prior to Nassau, Mr. Glovier worked at Goldman, Sachs & Co. in the Mergers & Acquisitions, Structured Finance and Leveraged Buyout groups, and was also a management consultant at The Boston Consulting Group. He has served as a director of companies in the business services, branded consumer products, alternative energy, communications and manufacturing areas, and as Chairman of the Board of MTN. Mr. Glovier received a B.A. from Princeton University, an M.Ec. from James Cook

B-5

University in Australia, and an M.B.A. from The Wharton School at the University of Pennsylvania.

**David Goldman** is a Managing Director of the Hybrid Funds responsible for transaction tax matters, related structuring and execution. Prior to joining Fortress, Mr. Goldman was a Tax Partner in the New York Office of Mayer, Brown, Rowe & Maw LLP, where he focused on structured finance, investment fund and capital markets transactions, and served as a practice leader of that firm's Tax Transactions and Planning group. Before attending law school, Mr. Goldman was an associate in Banking and Corporate Finance at Chemical Bank. Mr. Goldman received a B.A. in Economics from the University of Pennsylvania, a J.D. from Columbia Law School and an LL.M in Taxation from New York University School of Law.

**Megan Johnson** is General Counsel to the Fortress Partners Funds. Prior to working with the Fortress Partners Funds, Ms. Johnson was Vice President and Counsel in the legal department of Fortress. Prior to joining Fortress, Ms. Johnson was a senior associate at Cleary, Gottlieb, Steen & Hamilton LLP, where her practice included corporate and financial transactions, private fund formation and investment management. Ms. Johnson received a J.D. from the Yale Law School and a B.A. from Holy Cross College.

**David Kelleher** is a Managing Director of the Hybrid Funds, responsible for debt and equity transactions in Australia and the pacific region. Mr. Kelleher is based in Sydney and joined Fortress from GE Commercial Finance, where he spent 5 years. He was most recently Managing Director of the Real Estate business in Australia and New Zealand that was investing as an owner of real estate and as a lender via structured finance products for real estate investors and developers. Previously, Mr. Kelleher was employed at Bank of Scotland for 5 years as an originator of real estate project finance loans. In these roles, he has had wide experience investing as principal and lender in all asset sectors within the Australian and New Zealand real estate markets. Mr. Kelleher has a Bachelor of Commerce from the University of New South Wales and is a qualified Chartered Accountant.

**Jonathan Klein** is a Managing Director of the Hybrid Funds, responsible for sourcing, executing and managing real estate debt and equity transactions. Prior to joining Fortress, Mr. Klein spent five years as a Principal with TriCap Holdings, LLC, a residential and commercial real estate development company. Before that, Mr. Klein was a Managing Director of a boutique real estate investment management company. Mr. Klein has structured, underwritten and negotiated more than $5 billion in transactions ranging from the acquisition of real estate, funding of various debt and equity transactions and the acquisition of distressed loan portfolios. Mr. Klein has a B.A. from the University of Hartford and a Master's degree in finance from New York University.

**Richard Levy** is the Director of Tax Compliance for the Fortress Hybrid Funds. Mr. Levy was previously the Chief Financial Officer of Alerian Capital Management LLC, an energy infrastructure focused hedge fund. Prior to his time at Alerian Capital Management LLC, he was a Vice President at J.P. Morgan Partners, the Private Equity Division of JPMorganChase. While

at J.P. Morgan Partners, Mr. Levy managed the group's tax department as well as several of its investment partnerships. Mr. Levy also spent over 8 years in public accounting at Ernst and Young LLP and Price WaterhouseCoopers LLP. Mr. Levy is a CPA and holds a M.S. in Taxation from Fordham University and a B.S. in Accounting from Rutgers University.

**Chris Linkas** is a Managing Director of the Hybrid Funds, responsible for real estate loan origination, acquisition and asset management. Prior to joining Fortress, Mr. Linkas was a vice president at Goldman Sachs where he spent 5 years originating, securitizing and syndicating in excess of $4 billion of mortgage loans. Prior to joining Goldman, Chris worked at AEW Capital Management and RER Financial Group ('RER') where he focused on real estate underwriting, due diligence, acquisition and asset management. His work at RER included due diligence on distressed assets totaling more than $4 billion of book balance for third parties including the FDIC, RTC, and various opportunity funds. Mr. Linkas received a B.A. from Bowdoin College.

**Drew McKnight** is a Managing Director of the Hybrid Funds, responsible for trading with an emphasis on corporate distressed loan and bond opportunities. Prior to joining Drawbridge, Mr. McKnight was the trader for Fir Tree Partners where he was responsible for analyzing and trading high yield and convertible bonds, bank debt, derivatives and equities for the $2.3bn value-based hedge fund. Prior to Fir Tree, Mr. McKnight worked on Goldman Sachs' distressed bank debt trading desk. Mr. McKnight graduated from the University of Virginia with a degree in Economics.

**Rick Noble** is a Managing Director of and General Counsel to the Hybrid Funds. Prior to joining Fortress, Mr. Noble was a Managing Director with American Commercial Capital LLC, a financing business, and Coronado Advisors, a registered broker-dealer. Mr. Noble co-founded both businesses in 1998, which were subsequently acquired by Wells Fargo Bank, N.A. in 2001. Prior to that, Mr. Noble was a partner and co-head of the Structured Finance Group of Battle Fowler LLP, NY. Mr. Noble received a J.D. from Fordham University School of Law, N.Y., where he served as Editor-in-Chief of the Fordham International Law Journal and a B.A. from Hamilton College, N.Y.

**Joshua Pack** is a Managing Director of the Hybrid Funds, responsible for directing the West Coast activities of the corporate loan group which includes managing loan origination, structuring and execution of senior and subordinated debt transactions and acquiring distressed and attractively priced assets. While at Drawbridge, Mr. Pack has structured, underwritten and negotiated more than $5.0 billion in transactions ranging from the acquisition of distressed loan portfolios, to structuring private ABS, to funding debt and equity transactions and acquiring real estate. Prior to joining Fortress, Mr. Pack was a Vice President with Wells Fargo & Co. in the capital markets group where he managed a team of investment professionals originating and underwriting senior loan transactions for Wells Fargo Commercial Capital. Previously, Mr. Pack was a Vice President with American Commercial Capital, an independent specialty finance company focused on corporate and real estate lending to middle market branded businesses that was subsequently acquired by Wells Fargo in 2001. Mr. Pack received a B.A. in Economics from California State University San Marcos.

**Ken Sands** is a Managing Director of the Hybrid Funds, responsible for managing the Hybrid Funds' corporate loan origination activities; he also serves as Chief Credit Officer of the corporate lending group. Prior to joining Fortress, from 1993 until 2003, Mr. Sands was an Executive Vice President of Congress Financial Corp. where he was responsible for originating and structuring loan commitments in excess of $5 billion in over 100 asset-based financings to a wide range of middle-market companies. Prior to that, Mr. Sands started his career at National Westminster Bank USA (NatWest) where he worked from 1983 until 1992, completing NatWest's formal credit training program and then working in the Leveraged Finance Group; as a Vice President in that group, he was responsible for originating and structuring cash-flow based financings in acquisition and recapitalization transactions which typically involved private equity firms and financial entrepreneurs. Mr. Sands received a B.S.B.A from Boston University in 1983 and an M.B.A. from New York University in 1992.

**David Stiepleman** is a Managing Director and the Deputy General Counsel of Fortress. At Fortress, he is the lead lawyer responsible for new business formation, which includes new fund structuring and launching businesses in new jurisdictions. Mr. Stiepleman joined Fortress in 2007 from Goldman, Sachs & Co., where he represented the Special Situations Group and the Mortgages Department. Prior to that, he was a lawyer at Cleary Gottlieb Steen & Hamilton LLP, where he represented U.S., foreign and sovereign clients in mergers and acquisitions, venture capital and other transactions. Mr. Stiepleman received a B.A. from Amherst College and a J.D. from Columbia Law School.

**Douglas Thomas** is a Managing Director of the Hybrid Funds, responsible for investment and business development activities in Europe. Earlier, he established the Hybrid Funds' private equity portfolio finance effort. Prior to joining Drawbridge, Mr. Thomas was a senior vice president at the TCW Group where he managed a series of private equity joint-ventures focused on the Greater China region and India with committed capital totaling over $1.2 billion. While at TCW, Mr. Thomas led and/or participated in over 50 portfolio investments across a diverse range of industries and led the raising of approximately $500.0 million in new fund capital. Mr. Thomas holds a B.A. in International Relations from Tufts University and a Masters of International Finance and Business from Columbia University

**Anthony Tufariello** is a Managing Director of the Hybrid Funds, responsible for all Hybrid Funds real estate debt and equity investing. Prior to joining Fortress, Mr. Tufariello spent 21 years with Morgan Stanley and held a number of senior positions at that firm, including being a member of the firm's Management Committee, a member of the Sales and Trading Operating Committee and co-chair of the Global Large Loan Credit Committee. Mr. Tufariello's most recent role encompassed managing a complex business which included client agency businesses, principal lending activities (commercial real estate, residential lending, warehouse lending and secured cash flow lending) as well as managing the trading desk across CMBS, ABS, CDO and residential products. Since 2004, he was the global head of the Securitized Products Group with a focus on U.S., Europe and Asia. Prior to that, he headed the Securitized Products Group in North America from 2001 to 2004. Prior to 2001, Mr. Tufariello co-headed the Real Estate Debt Capital Markets Group as well as being the sole head of ABS, CMBS and non agency mortgage

trading.  Mr. Tufariello received a B.A. from Villanova University and an MBA from the
Wharton School at the University of Pennsylvania.

**II.**   **Potential Conflicts of Interest and Certain Other Considerations Arising as a Result**
**of the Transactions**

*In deciding whether to vote in favor of the matters presented to you for approval, shareholders of
D.B. Zwirn Special Opportunities Fund, Ltd. (the "Offshore Fund") and limited partners of D.B.
Zwirn Special Opportunities Fund, L.P., D.B. Zwirn Asia/Pacific Special Opportunities Fund,
L.P. and D.B. Zwirn Special Opportunities Fund (TE), L.P. (collectively, to the extent such
Funds consent to be managed by the New Manager, the "Domestic Funds" and all such
shareholders and limited partners, the "Investors", each an "Investor") should carefully
consider, among other factors, the matters described below relating to the New Manager and the
Transactions, each of which could have an adverse effect on the value of Interests in the Funds.
As a result of these factors, as well as other risks inherent in the Transactions, there can be no
assurance that the Funds will be able to successfully carry out their liquidation, or that the full
value of investments in the Funds would be realized from such liquidation. As used in this
Section II, unless the context otherwise requires, the term "Funds" refers to the Offshore Fund
and the Domestic Funds.*

*Potential Conflicts of Interest*

**General.**  As the affiliate of a registered investment adviser, the New Manager intends to act in
good faith in a manner consistent with its duties to clients under applicable law.  However, the
New Manager is subject to various conflicts of interest arising from its relationships to affiliates
of Fortress.  Fortress, its affiliates and investment funds and accounts managed by Fortress and
its affiliates (collectively, but specifically excluding the Funds, "Fortress Entities") engage in a
broad spectrum of activities, including direct investment activities and investment advisory
activities, and have extensive investment activities (including principal investments by Fortress
Entities for their own account), both proprietary and on an agency basis, that are independent
from, and may from time to time conflict, overlap or compete with, the Funds' activities.  These
activities may give rise to numerous situations where interests may conflict, including (i)
investments of Fortress Entities (including proprietary investments) in entities or assets in which
the Funds are invested, (ii) the investment by certain Fortress Entities in debt issued by
collateralized loan or other financing vehicles sponsored by the Funds, (iii) the investment by the
Funds and the Fortress Entities and/or businesses in which they invest in the same loans or other
securities or assets or in different levels of the capital structure of the same issuer, or (iv) other
dealings involving the Funds, on the one hand, and Fortress Entities and/or businesses they
invest in, on the other. The particular circumstances described under the following headings
further illustrate some of the conflicts of interest that may arise.  There can be no assurance that
other conflicts of interest with the potential for adverse effects on the Funds will not arise.

The New Manager will establish an advisory board for each Domestic Fund (each, an  Advisory
Board"), composed of at least three members, that when requested will resolve certain issues

B-9

concerning conflicts of interest between Fortress Entities, on the one hand, and the Funds and managed accounts, on the other and among the Funds (including the approval of certain affiliated party transactions) and advise and counsel the New Manager on such other matters relative to the Funds as the New Manager may from time to time request. The members of the Advisory Board will be selected from time to time by the New Manager, and each member will be a representative of an Investor that is willing to have a representative sit on the Advisory Board and will not be a Fortress Entity. The members of the Advisory Board will be entitled to indemnification. The New Manager shall not be required to bring any matter before the Advisory Board. The Transactions do not contemplate the establishment at this time of an Advisory Board for the Offshore Fund. However, the Board of Directors of the Offshore Fund will be independent of Fortress and will continue to provide oversight independent of Fortress and approve or disapprove of transactions involving conflicts of interest. In doing so, the Board may engage the services of independent experts, may delegate and may take such actions as they see fit. The members of the Advisory Board or the Board may therefore have conflicts of interest.

**Allocating Opportunities Among Fortress and its Entities.** Fortress currently offers a broad range of alternative investment products, including private equity funds, hedge funds and publicly traded alternative investment vehicles. Generally, Fortress does not maintain "Walls ' among respective management teams that manage these investment vehicles. Accordingly, information may be shared across the investment and asset management teams. In general, the Funds are not expected to make new investments, but it is possible such conflicts may arise in connection with disposition, hedging or other asset management activities conducted by Fortress. In addition, Fortress Entities invest their own capital in a broad range of investments. Fortress Entities investments are similar to, and may overlap with, the investments held by the Funds and the Funds do not have rights or priority with respect to any asset management or liquidation opportunity. In addition, the economic interests of Fortress Entities in certain Fortress managed accounts and businesses in which Fortress Entities have interests, when combined with their rights to management and/or incentive fees or allocations from such Fortress managed accounts, may be significantly larger than the Management Fee and other compensation payable to the New Manager and its affiliates. Accordingly, Fortress Entities may have a substantial incentive to direct disposition or other asset management opportunities to Fortress Entities and the businesses they invest in or to otherwise make decisions that favor any of them over the Funds.

Finally, the Funds and Fortress Entities may make investments or engage in other activities that express inconsistent views with respect to similar or overlapping investments or may engage in direct transactions between the Fortress Entities and the Funds. For example, the Funds may elect to sell all or a part of an investment in an entity while Fortress Entities hold their investments in the same entity (or increase their exposure to it).

**Common Investments With Other Fortress Entities.** Additional conflicts of interest may arise as a result of the overlapping investments of Fortress Entities, on the one hand and the Funds, on the other, or among the Funds.

- **Concurrent Coinvesting.** The Funds have invested in assets also held by certain Fortress Entities. There can be no assurance that any Fund would dispose of such an investment at substantially the same price or time as any other Fund or any Fortress Entity due to many factors that may or may not be foreseeable, including capital needs and availability of capital to meet such needs, differing basis in the investment, differing financing terms applicable to different investments, time horizons applicable to the Funds and the Fortress Entities and their differing investment objectives;

- **Investing in Pre-Existing Investments.** Fortress Entities may invest in entities the Funds have invested in, which may have an effect (either positive or negative) on the market price of the Funds' investments. In such circumstances, the Funds expect to make business decisions relating to such investment (such as, for example, financing or hedging interest rate or currency risk) independently of the analogous decisions made with respect to such investment by such Fortress Entities. This may result in situations where the Funds choose not to hedge certain risks that certain Fortress Entities do hedge, or the possibility that the Funds are exposed to risks of financing (for example, possible margin calls) on an investment when certain Fortress Entities are not.

- **Existing Strategies.** The New Manager may decide to continue to pursue and employ certain asset management strategies for the Funds that were initiated by the D.B. Zwirn & Co., L.P. ("Existing Manager") in certain cases in which the New Manager would not otherwise initiate such strategies for Fortress Entities. The decision as to whether or not to pursue such strategies will be based on the condition and position of each Fund and, as such, decisions made with respect to similar situations faced by any other Fund or any Fortress Entity may vary among such Funds and/or Fortress Entities.

- **Risks and Restrictions Arising from Fortress Entity Activities.** Fortress Entities regularly acquire confidential information and may enter into confidentiality and/or "standstill agreements" when assessing investment opportunities. These activities could prevent the Funds from disposing of loans or other securities of an issuer, potentially for an extended period. Further, the Funds may be subject to regulatory or legal restrictions or constraints that may not have been applicable had Fortress Entities not also invested in the same entity (for example, the investment in a single company by any of the Funds and any Fortress Entities may be aggregated for regulatory purposes, resulting in possible public disclosure of the investment or becoming subject to Section 16 "short-swing" trading rules).

- **Investing in Different Levels of the Capital Structure.** A Fund may hold interests in an entity that are of a different class or type than the class or type of interests held by another Fund or a Fortress Entity. For example, such Fund may hold mezzanine securities and another Fund or Fortress-controlled hedge fund may hold senior securities. This would potentially result in the other Fund or such Fortress Entity being senior or junior to such Fund in the capital structure of such entity, which could mean that in a workout or other distressed scenario the other Fund or such Fortress Entity might be adverse to such Fund and might recover all or part of its investment while the Fund might not. None of the Funds or Fortress Entities will be required to take any action or withhold from taking any action to mitigate losses by such Fund in such a scenario.

B-11

**CLO Risk.** Each of D.B. Zwinn Special Opportunities Fund, L.P. ("DBZSO") and the Offshore Fund have CLO vehicles that are utilized to leverage certain investments. Fortress Investment funds and managed accounts own an indirect interest in the junior bonds issued by DBZSO's CLO, and thus are senior to DBZSO's equity in the CLO. This different ownership interest could give rise to a conflict of interest. The CLO vehicles are currently subject to a dispute between the existing manager of the CLO and MBIA Insurance Corporation, who insures certain of the CLO interests. Such dispute may continue following the Closing. Such dispute and the failure to find a new collateral manager to manage the CLOs could subject the Funds to material risk, including a risk of loss of their investments in the CLOs. In addition, approval of MBIA, Inc., S&P and Moody's may be required in order to appoint a replacement collateral manager of the CLOs, and there is no assurance that any such consent would be provided. If such consent is not obtained, the failure to approve a replacement collateral manager could be harmful to the Funds. The New Manager (or its affiliate) will seek consent to be engaged as collateral manager of the CLOs, but, there is no assurance that such consent will be obtained. Any new collateral manager, including the New Manager (or its affiliate), would be engaged pursuant to terms substantially the same as the terms in the existing collateral management agreement and would be entitled to receive management fees and certain expense reimbursement and indemnities as provided therein. If the New Manager (or its affiliate) is engaged as the new collateral manager of the CLOs, it may choose to agree to an amendment to the agreements governing the operations of the CLOs similar to those described in Part III hereof. If such amendment is adopted, the CLOs might choose to terminate the engagement of the New Manager (or its affiliate), which could adversely affect the value of the collateral of the CLOs and the value of the Funds' investments in the CLOs.

**Expenses of the New Manager.** As provided in the New IMA, the New Manager and/or its affiliates will perform operations and accounting, legal and other services for the Funds and asset management services with respect to the Funds' investments and will be reimbursed by the Funds for these services, including brokerage commissions; clearing and settlement charges; custodial fees; hedging expenses; bank service fees; interest expenses; financing costs; legal and professional fees; valuation expenses; administrative expenses; the cost of software; insurance expenses; extraordinary expenses (including litigation, indemnification and contribution expenses); and expenses incurred by the New Manager and its affiliates relating to the Transactions, whether incurred prior to, on or after the date hereof. In addition, the Funds shall pay the New Manager for all of the New Manager's internal expenses related to the Funds, such as internal legal expenses; internal accounting expenses; internal auditing and tax preparation expenses; internal valuation expenses; the internal cost of software; and overhead expenses of the New Manager and its affiliates, including rent, insurance, systems and employee expenses and such internal expenses and overhead expenses incurred by the New Manager and its affiliates relating to the Transactions, including services provided to the Existing Manager pursuant to the TSA, whether incurred prior to, on or after the date hereof. The Funds shall also bear all expenses and overhead incurred by the New Manager and its affiliates, whether incurred prior to, on or after the date hereof, to satisfy their obligations under, or relating, to the Transactions or relating to the Existing Manager or its affiliates. If the New Manager enters into a management agreement with one or more of the Managed Accounts, the New Manager will allocate in good faith expenses that are incurred in respect of both the Funds and such Managed Accounts, and will reduce, pro rata and to the extent paid by such Managed Accounts, the

expenses charged to the Funds for such allocated expenses. The New Manager may have a conflict of interest in determining the respective portions of the costs of such services that will be charged to the Funds, such Managed Accounts and other affiliates of Fortress. Further, the Fund's reimbursement obligation is not capped and the amounts of such expenses may increase substantially in the future, resulting in additional expenses to the Funds.

**Regulated Industries.** The Funds may be subject to certain restrictions with respect to investments in regulated industries, such as banking, insurance, gaming or communications. For example, there may be limits on the aggregate amount of investment by affiliated investors that may not be exceeded in certain regulated industries without the grant of a license or other regulatory or corporate consent or, if exceeded, may cause the Funds, certain Fortress Entities and/or their clients to suffer disadvantages or business restrictions. As a result of either the Transactions or future investment activities by Fortress Entities, the New Manager may be required to dispose of such investments at a time, and under circumstances, which may not be optimal for the Funds, or restrict the type of governance rights it exercises in connection with its investments in regulated industries. Certain restrictions may limit the ability to transfer and may require continuing cooperation and involvement or control of the Existing Manager or its affiliates.

**Time and Attention of the Investment Committee and Fortress Investment Professionals.** The Fortress professionals, including former employees of the Existing Manager, will devote such time and attention to the conduct of the Funds' business as such business shall reasonably require. However, there can be no assurance, for example, that such professionals will devote any minimum number of hours each week to the affairs of the Funds or that they will continue to be employed by Fortress. In the event that Fortress personnel cease to be actively involved with the Funds, Investors will be required to rely on the ability of Fortress to identify and retain other professionals to conduct the Funds' business.

**Legal and Accounting.** Skadden, Arps, Slate, Meagher & Flom LLP and other internal and external counsel (each, "Counsel") represent the New Manager and its affiliates from time-to-time in a variety of matters. Conyers Dill & Pearman ("Conyers") represents the New Manager as to Cayman Islands law only. Counsel and Conyers do not represent any or all of the Investors in connection with the Funds. Counsel represents the New Manager and its affiliates, including with respect to the New Manager's role in relation to the Funds. Furthermore, in the event a conflict of interest or dispute arises between the New Manager and any Fund or any Investor, it will be accepted that Counsel is counsel to the New Manager and not counsel to the Funds or any Investor, notwithstanding the fact that, in certain cases, Counsel's fees are paid through or by the Funds (and therefore in effect by the Investors). Certain attorneys and accountants may have conflicts that limit or prohibit providing services after the Closing which could require the Funds or the New Manager to engage other professionals to provide such services which may result in increased costs and delays.

*Other Considerations*

**Reliance on Fortress Professionals.** The success of the Funds is substantially dependent on the senior investment professionals of Fortress, including members of the Investment Committee. Should one or more of these individuals become incapacitated or in some other way cease to perform duties for the New Manager on behalf of the Funds the Funds' performance could be materially adversely affected through a diminished capacity to structure the Funds' investments and to execute the Funds' business plans. Neither the Funds nor the New Manager currently intend to maintain key man insurance with respect to any of such persons.

**Reliance on Former D.B. Zwirn Personnel.** The success of the Funds may be dependent on the ability of the New Manager to attract and retain certain senior professionals of the Existing Manager. Certain of these professionals will continue to be employed by the Existing Manager immediately following the Closing and for a period thereafter, and will provide services to the New Manager pursuant to the TSA (see Annex A). Should these individuals determine not to accept employment with the New Manager or, having accepted such employment, become incapacitated or in some other way cease to perform duties for the New Manager on behalf of the Funds, the Funds' performance could be materially adversely affected through a diminished capacity to obtain relevant information concerning the Funds' investments, to structure the Funds' investments and to execute the Funds' business plans. There is no assurance that any other person or entity will not solicit any or all employees providing services to the Funds. For the employees that accept employment with the New Manager, the New Manager intends to take certain steps designed to mitigate the foregoing risk, although there can be no assurance that such steps will be effective. In addition, Daniel Zwirn has entered into a non-solicit agreement effective as of the Closing for a period of ninety days.

**Access to Information.** The Existing Manager will retain in its possession certain files and records pertaining to the Funds and investments held by the Funds. Such files and records will be made available to the New Manager only after (a) a specific request by the New Manager, (b) a review of such files and records by the Existing Manager and/or its counsel for the purpose of removing any information as to which it may assert a privilege and, in certain circumstances, (c) entering into a common interest or common defense agreement between the Existing Manager and the New Manager, the purpose of which would be to preserve Existing Manager's privilege which may be asserted with respect to such files and records to be delivered to the New Manager. The process of obtaining such files and records will depend on the ability of the New Manager to determine whether certain information is available for transfer and to properly frame any requests for such information. The New Manager's ability to properly request such files and information may depend, to a certain extent, on its ability to attract and retain the services of personnel of the Existing Manager. (See "Reliance on Former D.B. Zwirn Personnel"). Furthermore, the delivery to the New Manager of such files and information may be subject to delay as a result of the processes described above and may result in increased costs to the Funds. Any inability of the New Manager to obtain such files and records, or any delay in obtaining such files and records, could have an adverse impact on the ability of the New Manager to manage the Funds and their investments, and could result in losses to the Investors.

**Loss of High Water Mark.** As a result of the Transactions, the high water mark applicable to investors in each Fund will no longer apply, as management and incentive fees payable to the New Manager will be calculated on a different basis than such fees were calculated for payment or allocation to the Existing Manager. The new method of the calculation of fees, as expressly set forth in the IMA, may be more or less favorable to investors in the Funds (see Annex A).

**Compliance Matters.** The New Manager will be responsible for monitoring and complying with applicable compliance and regulatory matters for the Fund including, without limitation, requirements applicable to FIG as a registered investment adviser with the SEC under the Investment Advisers Act of 1940, as amended, and the rules and regulations thereunder. Such requirements may be more onerous than those that applied to the Existing Manager and may result in expense that is reimbursable by the Funds.

**Potential Bankruptcy of Existing Manager.** Should the prevailing economic conditions or its own financial difficulties worsen, it is possible that the Existing Manager may enter into bankruptcy in the near future. Any bankruptcy or similar business disruption experienced by the Existing Manager could hamper the ability of the New Manager to obtain information and/or services from the Existing Manager pursuant to the TSA and the ISA, which are necessary to efficiently manage the Funds. The failure to obtain such information and/or services could adversely impact the performance of the Funds.

**Audited Financial Statements.** Audited financial statements for certain of the Funds have not been completed for 2008. Pursuant to the IMTA, the Existing Manager is responsible for preparing such statements, along with unaudited statements of net asset value of each of the Funds for each of the months from January 1, 2009 through the Closing Date, although there can be no assurance that such statements will be completed. The ability of the New Manager to prepare financial statements will depend on completion of financial statements for the prior years and, at least for some period of time, on the cooperation of the Existing Manager, access to employees of the Existing Manager and access to information held by the Existing Manager (see Annex A). As described above, there is no assurance that the New Manager will have sufficient and timely access to the employees and information of the Existing Manager. In addition, there is no assurance that the factors which have resulted in delays in preparing the Funds  audited financial statements for 2007 and 2008 will not continue, and will not affect the preparation of future financial information.

In addition, the preparation of financial statements for periods after 2008 will depend, at least in part, on the preparation of audited financial statements for 2008. If the Existing Manager is not able to complete the audited financial statements for the Funds for 2008, the New Manager may not be able to deliver audited financial statements for any subsequent period in a timely manner.

**General Economic and Capital Market Conditions.** Investors should realize that distributions may not be made by the Funds due to general economic conditions, illiquidity of portfolio investments, constraints imposed by financing arrangements, contractual prohibitions or other reasons mentioned below. Business risks may be more significant in issuers that are embarking on a build-up or operating a turnaround strategy. General fluctuations in the market prices of

assets or securities may adversely affect the value of investments held by the Funds and/or the ability of the Funds to dispose of investments at attractive valuations.

**Limited Cash Available to the Funds.** The Funds now have, and following the Transactions will continue to have, limited available cash resources. The lack of available cash may cause the Funds to be unable to make distributions to investors in the short term and beyond. The Funds may also be unable to meet certain expenses such as indemnification obligations or reimbursement of the New Manager for the compensation of employees and other expenses associated with the management of the Funds. Any inability to meet such expenses could adversely impact the management and performance of the Funds.

**Limited Due Diligence.** During the process of pursuing and negotiating the Transactions, Fortress has had limited opportunity to review relevant files, documents, agreements and personnel that are required to conduct effective and exhaustive due diligence, including transition issues and change of control. As a result there may be issues which belatedly come to the attention of Fortress and/or the New Manager and which may have an adverse effect on the performance of the Funds.

**Transition Issues; Permits.** Certain transition issues may arise in connection with the transfer of management of the Funds from the Existing Manager to the New Manager. For example the New Manager may not have permits necessary to manage the Funds in certain non-U.S. jurisdictions, and will need to make interim arrangements until such permits can be obtained. Such arrangements may include entering into sub-advisory or similar agreements with certain affiliates of the Existing Manager which may subject the Funds to continued influence of the Existing Manager and/or its creditors in such jurisdictions for as long as such agreements persist. Additionally, the failure to make such interim arrangements, or obtain such permits, could have an adverse impact on the Funds. Other unforeseen regulatory difficulties may also arise in connection with the transition leading to increased costs to the Funds and/or a reduction in the New Manager's ability to efficiently manage the Funds, in either case leading to an adverse effect on the performance of the Funds.

**Defaults; Change of Control.** Certain agreements entered into by the Funds are currently in default and the Transactions may trigger additional defaults. If the New Manager is unable to cure or delay enforcement of defaults, the assets of the Funds to which such defaults relate may decline in value or be forfeited. Certain agreements of the Existing Manager or the Funds, including agreements governing certain investments held by the Funds, provide that, or a key man event, a change in control or sale of substantially all the assets of the Existing Manager, or a change in control of the Funds or a change in the Fund's manager, such agreement could terminate or the other party thereto will have the right to terminate such agreement. The termination of agreements of the Existing Manager or the Funds could be adverse to the Funds, resulting in a material reduction in value of the investments held by the Funds.

**Limited Recourse to Existing Manager.** The Existing Manager will have limited available cash and few other assets. As a result, in the event that the Funds or the New Manager were to

bring a successful claim against the Existing Manager that was not subject to indemnification by the Funds, it is unlikely that the Existing Manager would be able to satisfy any resulting monetary judgment.

**Expenses for Transition Services, Winding Down of Existing Manager.** Pursuant to the TSA, the Buyer has agreed to pay the Existing Manager for the expense of providing certain services on behalf of the Funds. The amount to be paid for such services is set forth in a budget, which may be modified from time to time. In the event that Existing Manager is unable to provide such services due to *force majeure*, or New Manager determines that certain of such services are no longer required, the obligation to pay for such services will continue, subject to any mitigation by Existing Manager. Additionally, in order to assist in the winding down of the Existing Manager, the Existing Manager will be permitted to utilize the services of ex-employees of the Existing Manager who are retained by the New Manager at the expense of the Funds subject to certain limitations.

**Successor Liability; Fraudulent Conveyance.** The Buyer is purchasing certain assets transferred from the Existing Manager. It is possible that certain creditors of the Existing Manager may seek to satisfy claims against the Existing Manager by characterizing the Buyer or the New Manager as a successor-in-interest to the Existing Manager or asserting other claims relating to the assets transferred from the Existing Manager. There can be no assurance that such a claim would not be brought and that it would not result in material adverse consequences for the Buyer, the New Manager or the Funds. In addition, if it is determined that, at the time of the Transactions, the Existing Manager is insolvent and the sale of its assets to the Buyer is for less than fair value, then the creditors of the Existing Manager could seek to set aside such sale of the assets as a "fraudulent conveyance" which could have an adverse impact on the Buyer and the Funds.

**Dissolution Rights.** As a condition to the obligations of the Fortress affiliates to complete the Transactions, each Domestic Fund will be converted from a limited partnership into a limited liability company. The limited liability company agreements will require certain changes from the existing limited partnership agreements of the Domestic Funds. One such change would permit the members of any Domestic Fund to vote to dissolve such Fund. If one Domestic Fund were to dissolve without the other Funds dissolving at the same time, there could be an adverse effect on the Funds that did not elect to dissolve at the same time.

**New Manager as a Subsidiary of a Public Company.** The New Manager is an affiliate of Fortress, a public company. As a public company, Fortress is subject to the risk of investigation or litigation by regulators or its public shareholders arising from an array of possible claims, including shareholder dissatisfaction with the performance of its businesses or its share price, allegations of misconduct by its officers and directors or claims that it has inappropriately dealt with conflicts of interest or investment allocations. As Fortress is the indirect parent of the New Manager, any such investigations into or claims brought against Fortress could divert time, attention and resources away from the New Manager and the Funds. Additionally, as a public company, Fortress is subject to a number of reporting and regulatory regimes to which the Funds

and the New Manager are not subject, including the U.S. Sarbanes-Oxley Act of 2002 and the reporting provisions of U.S. Securities Exchange Act of 1934. Compliance with such laws similarly requires the time, attention and resources of Fortress and its executive officers that might otherwise be devoted to the Funds, which diversion may result in an adverse effect on the Funds.

**Independent Board Control of Offshore Fund**. The Offshore Fund is, and will continue to be, controlled by an independent Board of Directors. The ability of the New Manager to efficiently manage the Offshore Fund will be subject to the oversight and management of the Board. To the extent there is value in the coordination of action among all the Funds, the inability of the New Manager to control the Board of the Offshore Fund may adversely impact all Funds.

**No Duties Owed Prior to Closing**. Neither the New Manager nor Fortress shall owe any duties to the Funds prior to the Closing.

**Delayed Tax Reporting**. The New Manager anticipates that tax returns and Schedules K-1 for prior years will continue to be delayed. As a result, and in general, the New Manager will be unable to provide final Schedules K-1 to the Investors in the Domestic Funds for any given fiscal year until significantly after April 15 of the following year. The New Manager will endeavor to provide Investors in the Domestic Funds with estimates of the taxable income or loss allocated to their investment in such Funds on or before such date, but final Schedules K-1 may not be available until after completion of the Domestic Funds' annual audits. Domestic Fund Investors will be required to obtain extensions of the filing date for their income tax returns at the Federal state and local levels.

**Hedging Transactions**. The Funds may from time to time purchase or sell various financial instruments including forwards, swaps or options on currencies, securities and indices when seeking to mitigate risk associated with its investments; however, it is generally impossible to fully hedge an investment given the uncertainty as to the amount and timing of projected cash flows and investment returns, if any, on the Funds' investments. Conversely, there will be times in which the Funds believe that it is not advisable to enter into hedging transactions and instead elect to remain unhedged against particular types of risks that in other cases the Funds hedge against; accordingly, the Funds may be exposed to fluctuations in currencies and other market conditions specific to the underlying asset.

**Valuation of Investments**. A significant proportion of the securities or assets and liabilities that the Funds own or are exposed to are not actively traded. In the absence of market comparisons and consistent with the Funds' valuation policy, the New Manager may resort to pricing methodologies different from those utilized by the Existing Manager including, for example, models based on assumptions regarding expected trends, historical trends following market conditions believed to be comparable to the then current market conditions and other factors believed at the time to be likely to influence the potential resale price of an investment. The Funds' valuation policy permits the New Manager discretion in selecting and applying pricing

B-18

methodologies, which may be different from those used by the Existing Manager. In addition, current economic and market conditions have led to the consolidation of many third party pricing sources, which will make it more difficult for the Funds to accurately price certain of their securities and assets and may make it more difficult to obtain prices from multiple sources in respect of any one investment. The inability to accurately price the Funds' assets and securities may result in adverse consequences to the Funds.

**FAS 157 and Other Changes in Accounting Rules.** The Funds' assets and liabilities are valued in accordance with the valuation policies set forth in the agreements governing the operation of the Funds (the "Fund Agreements"). However, for purposes of preparing the Funds' annual audited financial statements, which are prepared in accordance with GAAP, certain of the Funds assets and liabilities may be valued in a manner that, while consistent with GAAP, is different from the manner in which such assets are valued pursuant to the Fund Agreements.

Specifically, for purposes of GAAP-compliant financial reporting, a Fund is required to follow a specific framework for measuring the fair value of its assets and liabilities, and is required to provide certain additional disclosures regarding the use of fair value measurements in its audited financial statements. Many of these requirements are set forth in Statement on Financial Accounting Standards No. 157, "Fair Value Measurements" ("FAS 157"), which defines and establishes a framework for measuring fair value under GAAP and expands financial statement disclosure requirements relating to fair value measurements. FAS 157 was issued by the Financial Accounting Standards Board ("FASB") in September 2006 and applies to all GAAP-compliant financial statements issued for fiscal years beginning after November 15, 2007. Other valuation-related requirements are contained in other provisions of GAAP, and other related FASB Statements and guidance. Additional FASB Statements and guidance, and additional provisions of GAAP, that may be adopted in the future may also impose additional, or different, specific requirements as to the valuation of assets and liabilities for purposes of GAAP-compliant financial reporting.

The New Manager will review the application of FAS 157, and of other relevant FASB Statements and guidance, to the valuation of the Funds' assets and liabilities. In particular, the New Manager will analyze the impact of the FAS 157 requirement that the fair value of an asset reflect any restrictions on sale, transfer or redemption applicable to the asset, which may result in the imposition of a discount when determining the fair values of assets that are subject to such restrictions.

As a result of this analysis, the New Manager may determine in certain instances to value a particular asset at a different value for financial reporting purposes than the value of that same asset as determined under the Fund Agreements. For example, the General Partner may determine that FAS 157 may require the Funds, for purposes of GAAP-compliant financial reporting, to value their investments at values that are at a discount to the values that are determined pursuant to the Fund Agreements.

B-19

Accordingly, to the extent that GAAP would require any of a Funds assets or liabilities to be valued in a manner that differs from the valuation policies set forth in its Fund Agreements, such assets or liabilities will be valued (x) in accordance with GAAP, solely for purposes of preparing the Funds' GAAP-compliant annual audited financial statements, and (y) in accordance with the valuation policies set forth in the Fund Agreements (without regard to any GAAP requirements relating to the determination of fair value), for all other purposes.

Generally, FAS 157 and other accounting rules applicable to investment funds and various assets they invest in are evolving. Such changes may adversely affect a Fund. For example, the evolution of rules governing the determination of the fair market value of assets to the extent such rules become more stringent would tend to increase the cost and/or reduce the availability of third-party determinations of fair market value. This may in turn increase the costs associated with selling assets or affect their liquidity due to inability to obtain a third-party determination of fair market value.

## III.  Summary of Consent to Amend the Fund LLC Agreements

*General*.  The New MM will irrevocably consent, subject to the terms set forth below and notwithstanding anything to the contrary set forth in each Fund LLC Agreement, to amend such Fund LLC Agreement to allow the members of such Domestic Fund collectively having more than 50% of the aggregate ownership percentages (based on relative capital account balances) of such members (other than a member that is a related party or employee of the New MM or employee of such related party (collectively, 'Excluded Members')) to vote to dissolve such Domestic Fund at a meeting duly called for such purposes. This amendment to the Fund LLC Agreement is not yet effective, but will become effective with respect to a Domestic Fund upon approval by such Domestic Fund's members, as described below.

The key provisions of this amendment, and the means by which the amendment may be adopted and put into effect are summarized below.

*Adoption of Amendment*. The New MM's consent will be effective as of the Closing Date, and the other members of each Domestic Fund may adopt, and exercise their rights under, this amendment through the affirmative vote of members having more than 50% of the ownership percentages of such Domestic Funds members (other than Excluded Members) at a meeting duly called for such purposes (which may also be the same meeting at which the vote to dissolve such Domestic Fund is held) which is held at any time on or after the Closing Date.

*Meeting of Members*.  To be duly held, the meeting discussed above must be requested in writing by members of a Domestic Fund having more than 25% of the ownership percentages of such Domestic Fund (other than Excluded Members) (a "25% Members Request"). A 25% Members Request must state whether the purpose of the meeting is (i) solely to approve this amendment to the Fund LLC Agreement, (ii) both to approve the amendments

B-20

and to vote to dissolve such Domestic Fund ('Dissolution Vote') or (iii) at any time following a meeting at which such amendments have been approved, to hold a Dissolution Vote. At any such meeting, a quorum will require attendance in person or by proxy of members of such Domestic Fund having more than 50% of the ownership percentages of such Domestic Fund's members (other than Excluded Members). Meetings that do not have a proper quorum will be cancelled and no votes will be held. The dissolution of a Domestic Fund by its members may only be voted upon at a meeting properly called in accordance with this Summary of Terms.

*Assistance with Calling of Meeting.*   The New MM will assist members of a Domestic Fund (other than Excluded Members) in obtaining a 25% Member Request with respect to such Domestic Fund as follows:   Any member of such Domestic Fund (other than an Excluded Member) may send the New MM a written request, which must state that such member is seeking to hold a meeting solely for the purposes described above.   If the New MM receives any such requests during any fiscal quarter, and to the extent that such requests are made by members of such Domestic Fund (other than Excluded Members) having more than 5% of the ownership percentages of all of such Domestic Fund's members (other than Excluded Members) (a '5% Members Request'), then the New MM will use commercially reasonable efforts to send to all other members of such Domestic Fund (other than Excluded Members) a request to hold such a meeting, subject to the New MM's right to impose reasonable conditions upon such request including, without limitation, the requirement that any responses to such request be returned to the New MM within a specified period of time (which shall not be less than 30 days). The New MM will then tabulate the members' responses to that request to determine whether a 25% Member Request has been obtained.

*Timing Considerations.*   (1)  The New MM will select a record date for the meeting that is no later than 15 days following a 25% Members Request.

(2) The meeting will be held within 60 days following the record date.

(3) Within 15 days following an affirmative vote to dissolve such Domestic Fund (such date the 'Liquidation Commencement Date'), the New MM shall commence the orderly liquidation of such Domestic Fund in accordance with the provisions of such Fund's LLC Agreement and as further described below under 'Prompt Liquidation.'

*Prompt Liquidation.*   In addition to the requirements under each Fund LLC Agreement and under applicable law to effectuate an orderly liquidation of such Domestic Fund, following an affirmative vote of such Domestic Fund's members to dissolve such Domestic Fund, the New MM shall use commercially reasonable efforts to effect a liquidation of such Domestic Fund's assets in an orderly manner in accordance with the provisions of such Fund LLC Agreement, provided that if such liquidation is not substantially completed within the Liquidation Period (as defined below) with respect to such Domestic Fund, then members of such Domestic Fund having more than 50% of the ownership percentages of such Domestic Fund's members (other than Excluded Members) shall be entitled to replace the New MM with

B-21

respect to such Domestic Fund, provided such replacement managing member (x) is (or is affiliated with) an entity that has at least $5 billion of assets under management and has been in the financial services industry or in the business of managing private equity investments for at least 5 years and (y) has agreed to purchase any interests (other than any right of the New MM or any Excluded Member to receive an incentive allocation, carried interest or other incentive or performance based fee or allocation, which shall be retained by such persons) that the New MM and any Excluded Member wishes to sell, at the fair value of such interests on the date of any vote to replace the New MM, as such fair value is determined by a nationally recognized independent valuation agent selected by the New MM (whose fees will be borne by such Domestic Fund), as adjusted for contributions and distributions in respect of such interests between the date of the vote and date of the replacement.

"Liquidation Period" with respect to the Domestic Fund means the period commencing on the Liquidation Commencement Date of such Domestic Fund and ending one year thereafter.

*Amendment.* After the Closing Date, notwithstanding anything herein or in any Fund LLC Agreement to the contrary, the New MM, in its sole discretion, may revoke, amend or waive any of the provisions set forth in this Part III or the amendment described herein with respect to any Domestic Fund, so long as such revocation, amendment or waiver does not adversely affect the right of any members to vote to dissolve such Domestic Fund. If the New MM makes any such revocation, amendment or waiver, it will give notice thereof to the members of such Domestic Fund as part of the next regularly scheduled report provided to such members following such revocation, amendment or waiver.

**The foregoing list of considerations does not purport to be a complete enumeration or explanation of the risks relating to the New Manager or otherwise involved in the Transactions. Investors should read this entire Proxy Statement and consult with their own advisors before deciding to vote in favor of the Transactions.**

**ANNEX C**

**FORM OF NEW IMA**

**(See attached)**

C-1

ANNEX C
FORM OF NEW IMA

D.B. Zwirn [Asia/Pacific] Special Opportunities Fund [(IE)], [LLC] [Ltd.]

MANAGEMENT AGREEMENT

As of          , 2009

Fortress VRF Advisors I LLC
1345 Avenue of the Americas, 46th Floor
New York, New York 10105

Dear Sirs:

This Management Agreement (this 'Agreement'), dated as of          , 2009, is among D.B. Zwirn [Asia/Pacific] Special Opportunities Fund [(IE)], [LLC] [Ltd ], [a Delaware limited liability company] [Cayman Islands exempted company] (the 'Fund"), and [Name of Manager], a Delaware limited liability company (the 'Manager"), and provides for investment advisory services to be provided by the Manager to the Fund.

The Fund is in the process of winding down, and desires to avail itself of the advice and assistance of the Manager and to have the Manager perform various investment management services on its behalf in connection with such winding down.

The Manager is willing to perform such services under the terms and conditions as set forth herein

The Manager has received a copy of the Fund's [certificate of formation and operating agreement] [memorandum and articles of association] dated _____, as amended from time to time, (the "Operative Document") as in effect as of the date of this Agreement

In consideration of the mutual promises and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is agreed among the parties hereto as follows:

1.      Investment Description; Appointment; FIG Agreement

(a)      The Fund desired to employ its capital by investing and reinvesting in securities and other instruments and investments as specified in the offering memorandum of the Fund and now desires that the Manager perform all services incident to the wind-down of the Fund's portfolio. Copies of the offering memorandum have been previously submitted to the Manager. The Fund desires to employ and hereby appoints the Manager as its agent and attorney-in-fact to act as investment adviser. The Manager is authorized as attorney-in-fact of the Fund to take all such actions (including, without limitation, the execution of any documents or other instruments) on behalf of the Fund that it deems, in its sole discretion, necessary or

C-2

appropriate to perform its obligations under this Agreement. The Manager accepts the appointment by its executing this Agreement

(b)  FIG LLC ("FIG") agrees that it shall make available to the Manager such personnel and other resources as shall be reasonably necessary for the Manager to perform its obligations hereunder and, in the event that the Manager is unable for any reason to provide services in accordance with the terms of this Agreement, at the request of the Fund, FIG shall (at its election) provide or cause an entity controlling, controlled by or under common control with (an "Affiliate") FIG to provide such services pursuant to a new investment management agreement substantially identical to this Agreement.

2.  Services as Manager

(a)  Subject to the policies and control of the [Board] [Managing Member], the Manager shall conduct all operations of the Fund, and is authorized and empowered to take all actions to implement the purposes of managing and liquidating the global investment portfolio of the Fund and perform all acts necessary or advisable or incidental thereto. The Manager shall, among other things (i) make all investment decisions for the Fund in connection with the management and wind down of the Fund's portfolio, which may include the ability to make protective advances and hedge positions, (ii) monitor the performance of the Fund, (iii) monitor compliance of the Fund with all regulatory requirements applicable to its operations, (iv) negotiate the terms of all agreements to be entered into on behalf of the Fund, (v) retain brokers and borrow money on behalf of the Fund, (vi) oversee the distribution, in cash or in-kind, of proceeds or assets of the Fund, (vii) advise the Fund regarding the timing and amounts of distributions of cash and other assets to the investors in the Fund, (viii) hire agents and service providers, including accountants, attorneys and administrators, to provide services to the Fund as the Manager deems advisable, (ix) hire subadvisors Affiliated with Zwirn Holdings, LLC, but only to the extent necessary, in the reasonable judgment of the Manager, for the Manager to provide services required hereunder in certain non-U.S. jurisdictions (together with the parties set forth in clause (viii), the "Consultants"), (x) take any and all action that is permitted under the laws of [the state of Delaware] [the Cayman Islands] and which is customary or the Manager believes is related to the business of the Fund, (xi) bring or defend, pay, collect, compromise, settle, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Fund, (xii) deposit, withdraw, invest, pay, retain and distribute each of the Fund's funds in a manner consistent with the objectives of the Fund and the Operative Document, and (xiii) carry such indemnification and other insurance as the Manager determines in its discretion to protect it and any other individual or entity entitled to indemnification by any of the Fund. The Manager may delegate to its Affiliates any of its duties hereunder which, in its discretion, should be performed by such Affiliate.

(b)  The Manager further agrees (i) to furnish the Fund with whatever statistical information the Fund may reasonably request with respect to its portfolio and (ii) to keep the Fund informed of developments materially affecting its portfolio and provide the Fund, from time to time, with any information that the Manager believes may be appropriate or relevant to the Fund's operations.

C-3

(c)     The value of the Fund's assets subsequent to the date on which the Manager takes over management of the Fund shall be determined in good faith in accordance with the Operative Document, in consultation with the Manager and such determination shall be binding and conclusive on the parties to this Agreement.

(d)     The Fund shall cause VRF I Assets LLC ("Buyer") to make available to the Manager (i) all of the assets and services acquired by Buyer pursuant to the Asset Purchase Agreement (the "APA") dated as of May ___, 2009 by and between Buyer and D.B. Zwirn & Co., L.P. ("DBZ") and (ii) all of the assets and services acquired by Buyer pursuant to the Transition Services Agreement (the "TSA") dated as of _____, 2009 by and among the Manager, Buyer, DBZ and the other parties thereto.

(e)     [Notwithstanding the foregoing, the Manager shall not have the right to exercise any voting rights with respect to the interests of the Fund in Bankhaus Zwirn Pte., Ltd., or otherwise exercise control of Bankhaus Zwirn GmbH & Co. KG, unless and until the Manager and the [Managing Member] [Board of Directors] of the Fund agree otherwise.]*

3.     <u>Compensation</u>

(a)     In consideration for the services rendered pursuant to this Agreement, the Fund shall pay the Manager (i) a management fee (the "Management Fee") equal to 1% of any gross amounts collected by the Fund, payable monthly and (ii) from and after the distribution to investors in the Fund of an amount equal to the net asset value of the Fund as of [month-end], 2009 (as determined by the prior manager of the Fund in good faith and consistent with the Operative Document and applicable law), the Fund shall pay to the Manager an incentive fee (the "Incentive Fee") equal to 5% of all distributions to investors (gross of such Incentive Fee) in the Fund in excess of such amount, payable monthly.

(b)     To the extent that expenses to be borne by the Fund pursuant to Section 5 herein are paid by the Manager or its Affiliates, the Fund shall reimburse such parties for such expenses.

(c)     Fees or other compensation paid by the Fund to any third-party subadvisors, to the extent permitted by Section 2(a)(ix), brokers or other agents engaged by the Manager on behalf of the Fund shall not offset any fees or reimbursements to the Manager.

(d)     The Fund shall pay all Incentive Fees and Management Fees as provided in this Section 3, but in no event later than 12 months following the end of the year in which the Manager ceases to provide services hereunder.

4.     <u>Status of the Manager</u>

The Manager shall for all purposes be an independent contractor of the Fund, and nothing herein shall be construed as making the Fund a partner of, or co-venturer with the Manager or any of its Affiliates or clients. The Manager shall have no authority to act for, represent, bind or obligate the Fund except as specifically provided herein.

---

\*    Applicable only to D.B. Zwirn Special Opportunities Fund, LP and D.B Zwirn Special Opportunities Fund, Ltd

5.    Expenses of the Fund

    (a)    The Fund shall bear all expenses of the Fund and the Manager related to the Fund such as investment expenses (i.e., expenses that the Manager reasonably determines to be related to the management and disposition of the Fund's assets, such as brokerage commissions, expenses relating to short sales, clearing and settlement charges, custodial fees, hedging expenses, bank service fees, interest expenses, expenses related to the formation and maintenance of any vehicles, formed to effect or facilitate the acquisition of any investment and to provide financing for investment and expenses relating to proposed investments that are not consummated); compensation of third-party subadvisors, to the extent permitted by Section 2(a)(ix); financing costs; due diligence, research and investment-related travel expenses; legal expenses; professional fees (including expenses of Consultants and experts) relating to investments; accounting expenses (including the cost of accounting and trading software packages); auditing and tax preparation expenses; valuation expenses (including the cost of third-party valuation agents); administrative expenses; cost of software (including fees of third-party software developers) used by the Manager to track and monitor investments; insurance expenses (including for director and officer liability insurance); the Management Fee and Incentive Fee; any taxes and duties payable by the Fund or its direct or indirect subsidiaries in any jurisdiction in connection with the operation of the Fund; fees and expenses of the administrator, if any, and other agents or service providers; entity-level taxes of the Fund or its direct or indirect subsidiaries, insurance premiums and other similar expenses related to the Fund; extraordinary expenses (including litigation, indemnification and contribution expenses); and all other expenses and/or liabilities incurred in connection with the operation of the Fund. The Fund shall also bear all expenses incurred by the Manager and its Affiliates, whether incurred prior to, on or after the date hereof, to satisfy their obligations under, or relating to the transactions contemplated by, the Transaction Documents, as such term is defined in the APA  or relating to DBZ or its Affiliates.

    (b)    The Fund shall pay the Manager for all of the Manager's internal expenses related to the Fund, such as internal due diligence, research and investment-related travel expenses; internal legal expenses; internal accounting expenses; internal auditing and tax preparation expenses; internal valuation expenses; organizational expenses for entities utilized by the Manager to perform services hereunder; the internal cost of software used by the Manager to track and monitor investments; and the Fund's allocable share of all overhead expenses of the Manager and its Affiliates, including rent, insurance, systems and employee expenses (such as base compensation, bonuses and benefits). The Fund shall also pay the Manager for all internal expenses and allocable share of overhead expenses incurred by the Manager and its Affiliates, whether incurred prior to, on or after the date hereof, to satisfy their obligations under, or relating to the transactions contemplated by, the Transaction Documents, including services provided to DBZ or its Affiliates pursuant to the TSA. Notwithstanding the foregoing, the Manager shall not allocate to the Fund the cost of any foregoing expense if the Manager, FIG or any of their Affiliates has allocated or will allocate the cost of the same expense to another Person.  In addition, the Fund shall pay the reasonable out-of-pocket expenses of the members of the Advisory Board incurred in connection with their activities on behalf of the Fund.

    (c)    At the start of every fiscal quarter (and promptly following the date on which the Manager takes over management of the Fund) the Fund shall advance to the Manager

C-5

the amount of all expenses payable under Section 5(a) and 5(b) ('Expenses') for such quarter, based on the budget prepared by the Manager for such quarter. Promptly following (i) the end of each quarter and (ii) the termination of this Agreement, (x) the Fund shall pay to the Manager the amount, if any, by which the advance for such quarter was less than all Expenses in such quarter, or (y) the Manager shall pay to the Fund or, at Manager's election, offset from the advance for the succeeding quarter the amount, if any, by which Expenses in such quarter were less than the amount of the advance in respect of such quarter. Within (i) 45 days of the last day of each fiscal quarter (other than a fiscal quarter ending on December 31st) and (ii) 60 days of each fiscal quarter ending December 31st, the Manager shall cause the Chief Financial Officer of Fortress Investment Group LLC to provide a certificate that the payment obligations of the Fund and the Manager under this Section 5(c) in respect of such prior fiscal quarter have been determined in accordance with this Agreement, along with supporting schedules with line item detail to be agreed in good faith by the Manager and the [Advisory Board][directors of the Fund]. Upon request of the [Advisory Board][directors of the Fund], the Chief Financial Officer or his designee shall confer with the [Advisory Board][directors of the Fund] or their designated representatives concerning such certificate and accompanying materials and such other related matters as shall reasonably be requested.

6.   Standard of Care

None of (i) the Manager, its Affiliates or their respective officers, directors managing members, members, shareholders, partners, controlling persons, employees, agents, Consultants and legal representatives (each, a "Manager Indemnified Person") or (ii) only to the extent of clause (w)(ii) below, DBZ, its Affiliates or their respective officers, directors managing members, members, shareholders, partners, controlling persons, employees, agents, Consultants and legal representatives, in each case in connection with its services under the TSA (each, a "DBZ Indemnified Person" and, together with the Manager Indemnified Persons, the 'Indemnified Persons") shall be liable to the Fund or to any investor in the Fund for any loss, cost, expense, claim, judgment, damages, award, settlement, government investigation or proceeding, fine, penalty, accrued interest, fee and related expense (including attorneys' fees and expenses) (collectively, "Losses") (w) arising out of or related to any acts or omissions to act (i) by a Manager Indemnified Person in connection with the Fund or this Agreement or the services under the TSA, or any investment made or held directly or indirectly by the Fund or any expense incurred in connection therewith, or (ii) by a DBZ Indemnified Person in connection with services rendered under the TSA except, in each case, to the extent any such Losses are determined by final non-appealable judgment of a court of competent jurisdiction to have been attributable primarily to such Indemnified Person's bad faith, "gross negligence" (as such term is interpreted under the laws of the State of Delaware, U.S.) or wilful misconduct ("Disabling Conduct"), (x) due to any acts or omissions to act of any broker or agent of the Fund, provided, that such broker's or agent's selection, engagement or retention by an Indemnified Person did not constitute Disabling Conduct or (y) arising out of or related to any investment decisions made by or on behalf of the Fund prior to the date hereof, or any other actions by the Fund, the prior investment manager of the Fund or any other Person prior to the date hereof (including, without limitation, any claim alleging a fraudulent conveyance). An Indemnified Person may consult with counsel and accountants in respect of the Fund's affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel and/or accountants provided, that their selection did not constitute Disabling Conduct.

C-6

Notwithstanding any other provision of this Agreement or any provision of law or equity to the contrary, whenever in this Agreement a Person is permitted or required to make a decision (i) in its "discretion" or under a similar grant of authority or latitude, such Person, to the fullest extent permitted by applicable law, shall be entitled to act in its "sole and absolute" discretion to consider only such interests and factors as it desires and may consider its own interests and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Fund, the [Managing Member] [Board of Directors] or the investors in the Fund (or any of them) or (ii) in its "good faith" or under another express standard, such Person shall act under such express standard and shall not be subject to any other or different standards.

Notwithstanding any other provision of this Agreement to the contrary, none of the Manager, its Affiliates, nor their respective officers, directors, managing members, members, shareholders, partners, controlling persons, employees, agents, Consultants and legal representatives shall be liable for any act, or failure to act by DBZ or its Affiliates or their respective officers, directors, managing members, members, shareholders, partners, controlling persons, employees, agents, Consultants and legal representatives.

7.  Indemnification

(a)  The Fund shall, to the fullest extent permitted by applicable law, indemnify and hold harmless each Manager Indemnified Person and, with respect to clause (x)(ii) only, each DBZ Indemnified Person against any Losses sustained by such Indemnified Person (x) arising from any actual or alleged act or omission performed or omitted by it (i) in connection with any matter arising out of or in connection with this Agreement or the Fund's business or affairs or any investment made or held by the Fund, and for any Losses due to any actual or alleged act or omission to act of any broker, agent, counsel or accountant of the Fund (provided, that the selection, engagement or retention of such broker, agent, counsel or accountant by the Indemnified Person did not constitute Disabling Conduct on the part of such Indemnified Person), and arising from any actual or alleged act or omission performed or omitted by it in connection with the Transaction Documents or relating to DBZ or its Affiliates, and (ii) in connection with services under the TSA, except, in each case, for any such Losses determined by a non-appealable final judgment of a court of competent jurisdiction to have been primarily attributable to such Indemnified Person's Disabling Conduct or (y) arising out of or related to any investment decisions made by or on behalf of the Fund prior to the date hereof, or any other actions by the Fund, the prior investment manager of the Fund or any other Person prior to the date hereof (including, without limitation, any claim alleging a fraudulent conveyance). The Fund shall, at the election of each Indemnified Person, either (i) advance to such Indemnified Person or (ii) promptly reimburse such Manager Indemnified Person for, all expenses (including fees and expenses of counsel) incurred in connection with investigating, preparing, pursuing or defending any threatened or pending proceeding related to, arising out of or in connection with this Agreement or the Fund's business or affairs and, with respect to the DBZ Indemnified Persons, their services under the TSA; provided, that such Indemnified Person shall promptly repay to the Fund the amount of any such advanced or reimbursed expenses paid to it if it shall be judicially determined by judgment or order not subject to further appeal or discretionary review that such Indemnified Person was not entitled to be indemnified under the terms of this Agreement.

(b)     Notwithstanding any of the foregoing to the contrary, the provisions of this Section 7 shall not be construed so as to provide for the exculpation or indemnification of an Indemnified Person with respect to any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), to the extent (but only to the extent) that such liability may not be waived ·modified or limited under applicable law (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons acting in good faith), but will be construed so as to effectuate the provisions of this Section 7 to the fullest extent permitted by law.

(c)     The rights accruing to any Indemnified Person under these provisions (i) shall not be deemed to be exclusive of, and shall not be limited by, any other right to which such Indemnified Person may be entitled under any agreement (including the governing documents of such Indemnified Person and insurance policies), as a matter of law, or otherwise, both as to action in such Indemnified Person's official capacity and to action in another capacity; provided such Indemnified Person does not recover more than the full amount of any Loss; (ii) shall continue as to such Indemnified Person who has ceased to have an official capacity for acts or omissions during such official capacity or otherwise when acting at the request of the Fund; and (iii) shall inure to the benefit of the heirs, devisees, executors, legal representatives, trustees or other successors and administrators of such Indemnified Person.

(d)     The rights accruing to Indemnified Person shall survive the dissolution, liquidation and termination of the Fund and shall survive the termination of such Indemnified Person in any capacity relating to the Manager and the termination of this Agreement.

8.     Service to Other Companies or Accounts

Nothing in this Agreement shall (i) prevent the Manager and its Affiliates from forming additional investment funds, from entering into other investment advisory relationships or from engaging in other business activities, even if such activities may be in competition with the Fund and/or may involve substantial time and resources of the Manager; (ii) prevent the respective officers, directors, managing members, members, shareholders, partners, controlling persons, employees or agents of the Manager and its Affiliates from becoming involved in the management of other investment funds and accounts, including those that are not managed or advised by the Manager or one of its Affiliates that may have investment objectives that overlap with the investment objective of the Fund; or (iii) prevent the respective officers, directors, managing members, members, shareholders, partners, controlling persons, employees or agents of the Manager and its Affiliates from engaging in any other lawful activity, and shall not in any way limit or restrict such persons and entities or the Manager or any of its Affiliates from buying, selling or trading any securities for its or their own accounts or for the accounts of others for which it or they may be acting; provided, however, that the Manager shall comply with its fiduciary obligations to the Fund and will engage in no activities that, in its judgment, would materially impair its ability to perform of its obligations under this Agreement.

Nothing in this Agreement shall render the Manager liable to account for any profit earned or other benefit arising from any advice given by the Manager to any other person, company, joint venture, mutual fund or other collective investment scheme or trustee or manager thereof in relation to the acquisition, holding financing, sale or disposal of any property, assets,

securities or instruments of whatsoever nature including any property, assets, securities and instruments of a type acquired, held, financed, sold or disposed of by the Fund.

9.    Brokerage Arrangements; Soft Dollars

The Fund pays its own brokerage commissions and other transaction costs. Neither the Manager nor any of its Affiliates will receive any commissions generated by the Fund's trading. The Manager and its Affiliates may benefit indirectly from payments made by the Fund (including payments by way of "soft dollars") as described below.

The Manager is authorized to allocate portfolio transactions for the Fund, including financings, to such brokers and dealers as may, in the reasonable judgment of the Manager, implement the policy of the Fund to obtain the best net results based on a number of factors, including price, transaction costs, ability to effect transactions, facilities, reliability and financial responsibility, access to company management, access to deal flow and precedent transaction, ability to provide financing commitments, the brokers' and dealers' provision or payment of the costs of research and other services or property that are of benefit to the Fund, the Manager and other factors that the Manager deems appropriate to consider under the circumstances. The Manager is not obligated to solicit competitive bids or to seek the lowest available commission cost. Accordingly, the commissions and other transaction costs (which may include dealer markups or markdowns) charged to the Fund by brokers or dealers in the foregoing circumstances may be higher than those charged by other brokers or dealers that may not offer such products or services.

The use of "soft dollars," if any, generated by the Fund through agency and certain riskless principal transactions for research, brokerage or research-related products and services is expected to fall within the "safe harbor" for the use of soft dollars provided under Section 28(e) of the United States Securities Exchange Act of 1934, as amended. Where a product or service obtained with soft dollars provides both research and non-research assistance to the Manager, the Manager will make a reasonable allocation of the cost which may be paid for with soft dollars.

Under Section 28(e), research obtained with soft dollars generated by the Fund may be used by the Manager or its Affiliates to benefit accounts other than the Fund. Conversely, the research information provided to the Manager by brokers through which other clients of the Manager or its Affiliates effect securities transactions may be used by the Manager or its Affiliates in providing services to the Fund.

10.   Outside Services

When deemed necessary for the proper performance of its duties hereunder, the Manager may seek legal, tax, financial, accounting, administrative or other advice, as well as employ services from third parties on behalf of the Manager.

11.   Non-Assignability; Persons Benefiting

This Agreement may not be assigned by either party without consent of the other party; provided however, that consent shall be inferred if prior written notice of such assignment

C-9

is delivered to the [Shareholders] [Ordinary Members] of the Fund and a majority-in-interest of [Shareholders] [Ordinary Members] of the Fund do not object in writing delivered to the Manager within 20 days of the giving of such notice; provided, further, that the Manager may assign this Agreement or all or part of its rights and obligations hereunder to any of its Affiliates that would serve pursuant thereto as investment manager to the Fund.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their successors and permitted assigns.  Nothing in this Agreement is intended or shall be construed to confer upon any person other than the parties and their respective successors and permitted assigns any right, remedy or claim under or by reason of this Agreement or any part hereof, except, with respect to Indemnified Persons, Sections 6, 7, 12 and 13 and this Section 11.

12.  Term of Agreement

This Agreement shall terminate upon final liquidation of the Fund, except that it may be earlier terminated (a) by the Manager upon 90 days' prior written notice to the Fund or (b) [by the Board] [by the Managing Member] upon 90 days' prior written notice to the Manager.  Notwithstanding anything herein to the contrary, the termination of this Agreement shall not extinguish any obligations of the Fund pertaining to services rendered by the Manager prior to the effective date of such termination, including Sections 3, 5, 6 and 7.

13.  Amendment

This Agreement may be amended from time to time by the Fund and the Manager by written agreement signed by each of the Fund and the Manager; provided that no such amendment shall adversely affect the rights of Indemnified Persons under Sections 6, 7, 11 and 12 or this Section 13.

14.  Notices

Except as otherwise specifically provided in this Agreement, any notice, demand, consent or other communication sent pursuant to this Agreement shall be in writing and shall be delivered (a) in person, (b) by facsimile, (c) by e-mail or similar electronic means, (d) by overnight courier or (e) by first-class mail.  Notices, demands, consents and other communications mailed in accordance with the foregoing clause (e) shall be deemed to have been given and made three (3) Business Days following the date so mailed, provided that, any notice to the Manager shall be effective only if and when received by the Manager.  Notices, demands, consents and other communications given in accordance with the foregoing clauses (a) through (d) shall be deemed to have been given when delivered, which in the case of notices under (c) shall mean when accessible via such web-based interface.  Any notice, demand, consent or other communication made or given in connection with this Agreement shall be given as follows:

<u>If to the Manager</u>:

> Fortress VRF Advisors I LLC
> 1345 Avenue of the Americas
> New York, NY 10105
> Attn:
> Fax:
> Tel:
> E-mail:

<u>If to the Fund</u>:

> [                    ]
> Attn:
> Fax:
> Tel:
> E-mail:

15.    <u>Counterparts</u>

This Agreement may be executed in counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

16.    <u>Severability</u>

If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement, or the application of such provision in jurisdictions or to Persons or circumstances other than those to which it is held invalid, illegal or unenforceable shall not be affected thereby.

17    <u>Governing Law; Submission to Jurisdiction; Waiver of Trial by Jury</u>

(a)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE PRINCIPLES OF CONFLICT OF LAWS THEREOF).

(b)    Each party to this Agreement irrevocably consents and agrees, with respect to any legal action or proceeding arising under this Agreement and any action for enforcement of any judgment in respect thereof, that (i) any such action or proceeding must be brought in the state Supreme Court of New York County or the United States federal courts for the Southern District of New York and (ii) by execution and delivery of this Agreement, each party hereby submits to and accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of the aforesaid courts and appellate courts from any appeal thereof. Each party to this Agreement hereby irrevocably waives any objection that it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to above and

hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum. Nothing in this Section 17 shall be deemed to constitute a submission to jurisdiction, consent or waiver with respect to any matter not specifically referred to herein

(c)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT OF TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY MATTER ARISING HEREUNDER, AND ALSO WAIVES ANY RIGHT TO CLAIM RECOVERY OF ANY PUNITIVE, CONSEQUENTIAL AND SPECIAL DAMAGES IN CONNECTION WITH ANY DISPUTE HEREUNDER, EXCEPT TO THE EXTENT CLAIMED BY A THIRD PARTY AND INDEMNIFIABLE PURSUANT TO SECTION 7 HEREOF.

If the foregoing is in accordance with your understanding, kindly indicate your acceptance of this Agreement, dated as of the date first written above, by signing and returning the enclosed copy of this Agreement.

Very truly yours.

D.B. Zwirn [Asia/Pacific] Special Opportunities Fund [IE] [LLC] [Ltd.]

By:

By:

By: _____
Name:
Title:

Accepted:

FORTRESS VRF ADVISORS I LLC

By:

By:

By:_____
Name:
Title:

FIG LLC
(only as to Section 1(b))

By:_____
Name:
Title:

C-13

**ANNEX D**

**MEMORANDUM, DATED OCTOBER 20, 2008,
FROM DBZCO TO THE SHAREHOLDERS**

(see attached)

# D.B. Zwirn & Co., L.P.

### SHAREHOLDER ACTION REQUIRED

October 20, 2008

To the Shareholders of
D.B. Zwirn Special Opportunities Fund, Ltd. (the "Fund")

Since announcing the orderly dissolution of the Fund in February 2008, D.B. Zwirn & Co., L.P. ("DBZCO," "we" or "us") has reduced its expenses through an array of measures, including reductions in headcount in functional areas across the firm—particularly investment staff—as well as the global reduction of office and overhead expenses. Throughout this period, however, we have retained key personnel and resources that we believe are required to maximize the value of the Fund's investments and effectively manage and liquidate a highly diverse portfolio of discrete assets in North America, South America, Europe and Asia. In particular, as we have stated in our 2008 investor commentaries, we believe that it is critically important to maintain key asset management, accounting, operations, legal and compliance and other essential mid- and back-office personnel to ensure the effective execution of the wind-down process.

As assets under management decline and capital is distributed to investors, the DBZCO infrastructure required to effectively execute the wind down and to maximize value will necessarily decline at a relatively slower pace. As a result, management fees will decline more rapidly than DBZCO's expenses. While current management fees are expected to be sufficient to cover the expenses incurred by DBZCO through the end of 2008, we anticipate a shortfall in 2009.

We have explored several options to mitigate the imbalance between future revenue and the continuing expense of managing the global dissolution of the Fund's assets. We have had numerous conversations with shareholders regarding these options, including the possibility of a revised fee structure. We have determined, however, that at present there is another mechanism that will not require us to request the consent of shareholders to revise the current fee structure. We propose that DBZCO be paid the management and incentive fees already earned by DBZCO in 2004 to supplement the Fund's current management fee. The fees earned in 2004 were deferred until 2015 and are currently an expense payable that has been indexed to the return of the Fund. This proposal will avail DBZCO of approximately $19.5 million before taxes based on amounts as of August 31, 2008. Of the $19.5 million, roughly $12.6 million would normally be paid to Daniel B. Zwirn. Mr. Zwirn will be foregoing the amounts otherwise due to him from the deferred fees (other than tax distributions) to support DBZCO's operations in carrying out the dissolution process for the benefit of investors. It is our hope that the acceleration of the 2004 deferred fees, along with other actions, will allow DBZCO to cover its revenue/expense shortfall and that we can avoid seeking payment by the Fund of any portion of such expenses. In the absence of additional revenue and/or the accelerated receipt of the 2004 deferred fees, DBZCO

will not be in a position in 2009 to meet its obligations to its employees, vendors and leaseholders.

The Fee Deferral Agreement between DBZCO and the Fund, dated as of December 29, 2005, as amended (the "Fee Deferral Agreement") states that the approval of a majority of the shareholders (excluding DBZCO-affiliated shareholders) is required for the Fund to amend the Fee Deferral Agreement to accelerate the distribution of deferred fees. We are therefore seeking the consent of the majority of the shareholders (excluding DBZCO-affiliated shareholders) to accelerate the distribution of the 2004 deferred fees pursuant to the Fee Deferral Agreement. Upon receiving the requisite consent, we intend to elect that distributions of 90% of the 2004 deferred fees will be paid from the Fund to DBZCO within 30 days of the end of the current fiscal year. The remaining balance from the deferral account will be paid to DBZCO in 2009 upon completion of the 2008 audited financial statements for the Fund, but no later than December 31, 2009.

The deferred fees will be used to pay DBZCO's ongoing expenses. DBZCO will not make any partnership distributions to its partners or its former partners, from the deferred fees or from other sources of revenue until the wind-down process of the Fund is complete and all sums due to shareholders of the Fund (in their capacity as shareholders and creditors) have been paid, other than necessary tax distributions and/or as required by law (including pursuant to a court or arbitrator's order). A binding agreement to this effect in a form satisfactory to the independent members of the Board of Directors of the Fund (the "Independent Directors") will be entered into with the Fund. DBZCO will seek to enter into an employment agreement with its remaining working partner, Mr. Zwirn. The terms of any employment agreement, including compensation, will reflect the fair market value of Mr. Zwirn's contribution to the wind down process as determined by DBZCO, in consultation with Alan Johnson, an independent compensation consultant retained by DBZCO.

We believe that permitting DBZCO to obtain the deferred fees to pay its expenses will be beneficial to the Fund and will not impact the ongoing dissolution process. Please review this letter carefully with your legal and tax advisers.

If you have any questions about this consent, we encourage you to call Elise Hubsher, who can be reached by telephone at (646) 720-9343 or by email at elise.hubsher@dbzco.com.

We appreciate your continued support and, as always, welcome your questions and comments.

**To evidence your consent to amend the Fee Deferral Agreement to accelerate distribution of the 2004 deferred fees, please complete, sign and return the attached Consent Form (Appendix A) no later than November 10, 2008 to:**

> D.B. Zwirn Special Opportunities Fund, Ltd.
> c/o GlobeOp Financial Services (Cayman) Limited
> 45 Market Street, Suite 3205, 2nd floor
> Gardenia Court, Camana Bay
> Grand Cayman KY1-9003

Cayman Islands
Attention: Investor Relations: Joe Cosoleto and Adam Weisberg
Via Fax: (345) 946-7652
Via Email: Investors@GlobeOp.com

with a separate copy to:

D.B. Zwirn & Co., L.P.
Via Fax: (646) 720-9226
Via Email: investor.relations@dbzco.com

If the original form is deposited at the offices of GlobeOp Financial Services (Cayman) Limited,
please also send a copy of the form by facsimile or email to GlobeOp Financial Services
(Cayman) Limited.

Very truly yours,

D.B. Zwirn & Co., L.P.

By:
Name: DANIEL B. ZWIRN
Title: MANAGING PARTNER

3

ANNEX E

MEMORANDUM, DATED MARCH 26, 2007,
FROM DBZCO TO INVESTORS

(see attached)

D-2

# D.B. ZWIRN & CO., L.P.

# MEMORANDUM

To:      Investors

From:    D.B. Zwirn & Co., L.P.

Date:    March 26  2007

Re:      Completion of Independent Review

As we previously informed you, following the departure of our former Chief Financial Officer last October, we commenced an extensive Independent Review of the firm's accounting operations which was conducted by independent outside legal counsel and forensic auditors. We are very pleased to report that this Independent Review, which was based on more than forty interviews with current and former employees of the firm and the review of more than one million pages of documents, has just concluded

The Independent Review has uncovered additional instances of inappropriate conduct by our former CFO and by several individuals who reported to him. In sum, there were a number of improper transfers among the Funds (collectively defined as the Onshore Fund, the Offshore Fund, and the TE Fund) and managed accounts and certain operational expenses were overcharged by the Management Company (D.B. Zwirn & Co., L.P.) to the Funds and a managed account. Investors have been fully reimbursed with interest for the amounts at issue.

We remain committed to complete transparency with our investors. We self-discovered improprieties, self-reported our initial findings to our Investors and clients and to the SEC. We voluntarily initiated an exhaustive Independent Review which has cost the Management Company--not the Funds or managed accounts--over $20 million in professional fees to date. Throughout the period of the Independent Review, we have continued to make attractive investments and to generate consistent risk-adjusted returns for our investors and clients. February 2007 marked our 53rd consecutive month of positive net returns to our Funds.

Although the cumulative impact to our Funds' investment performance is not quantitatively material, the conduct identified by the Independent Review is completely unacceptable to us and deeply embarrassing. It is clear from the Independent Review that the firm's substantial growth over a relatively short time, coupled with our sharp focus on generating returns for our investors, helped to cause us to outgrow our support infrastructure. Accordingly, over the past eighteen months, we have strengthened our mid- and back-office operations, adding senior professionals and supporting staff in a variety of roles and implemented far more rigorous policies, procedures, controls and safeguards to help ensure that these issues will not reoccur in the future.

2

In the following pages, we describe these efforts in detail along with the process and findings of the Independent Review.

When we learned of the first of these issues last year, we immediately brought in our principal outside counsel, Schulte Roth & Zabel LLP ("Schulte Roth"), to investigate. Following Schulte Roth's review of these issues, our former Chief Financial Officer separated from the firm. Shortly thereafter, additional issues were identified. We retained Gibson Dunn & Crutcher LLP ("Gibson Dunn") to conduct an independent review of these issues, and Gibson Dunn retained Deloitte & Touche ("Deloitte") to assist them in the process. We also retained Fried, Frank, Harris, Shriver & Jacobson LLP ("Fried Frank") to serve as our principal SEC counsel, and voluntarily informed the SEC of each of the issues we had uncovered and the actions the firm was taking to address them. Based on the findings of the Independent Review, the firm has made remediation on all of the issues for which it had not previously done so. On March 20, 2007, Gibson Dunn and Deloitte presented the findings of the Independent Review to the SEC.

Gibson Dunn's Independent Review confirmed the findings of Schulte Roth with respect to the issues initially identified. Gibson Dunn and Deloitte also independently reviewed additional issues and reported the following findings. With respect to each of the issues, Gibson Dunn found that our former Chief Financial Officer directed the payments or transfers or was otherwise aware of the issues, but found no evidence that any current members of senior management were aware of these issues.

- Gibson Dunn's Independent Review provided additional details about accounting operations issues disclosed to investors in October. In February and March 2006, $3.5 million in expenses were shifted between D.B. Zwirn Special Opportunities Fund, L.P. (the "Onshore Fund") and D.B. Zwirn Special Opportunities Fund, Ltd. (the "Offshore Fund") and reversed in April and May 2006. The Independent Review concluded that the evidence now suggests this was done to reduce the gap between the monthly performances of the two Funds.

With respect to issues not previously known, the Independent Review reported the following:

- During the process of investigating the inter-fund transfers the firm had previously identified in October, Deloitte discovered numerous additional inter-fund transfers. Gibson Dunn found that the Offshore Fund and a managed account frequently made advances to the Onshore Fund, D.B. Zwirn Special Opportunities Fund (T.E.), L.P. (the "TE Fund"), and other managed accounts, and those advances were used to fund investments. These inter-fund transfers were not properly accounted for and documented. They have now been documented as demand notes with interest paid to the respective Funds and managed accounts by the Funds and managed accounts that had received the benefit of the use of such capital. The impact to the Funds' NAVs and historical investment performance are incorporated in the table on page 5. We are working with our advisors to determine the final due to/due from affiliates balances. The amounts which are due from the Onshore Fund to the Offshore Fund and a managed account are in excess of $100 million. We do not believe

3

the final determination of the due to/due from affiliates balances will have any further meaningful impact on NAVs.

- Money from the Onshore Fund was used to cover capital calls for an investment partnership held personally by three senior professionals associated with the firm. Upon discovering the issue, the Management Company repaid the Onshore Fund $117,606 plus interest. Gibson Dunn found that there was confusion with respect to payment of the capital calls, in part because the Onshore Fund had made discretionary investments in individual transactions involving a predecessor to this investment partnership. Gibson Dunn found no evidence that the three individuals had any knowledge that the former CFO and his staff used Fund assets to cover the capital calls.

- The Management Company obtained a number of letters of credit for the benefit of the Funds, using the Funds' capital for collateral. Due to an administrative mistake, however, the Management Company did not return all of the Funds' assets in a timely fashion following expiration of the letters of credit. The Management Company has now repaid the $1.6 million of the Funds' capital plus interest

- Between January 2004 and September 2006, the Management Company overcharged the Funds and a managed account for certain operational expenses. The firm identified this issue, referred it to Gibson Dunn for investigation and suspended expense reimbursements from the Funds and a managed account pending the completion of the Independent Review. The suspended reimbursements owed to the Management Company by the Funds and the managed account as of March 19, 2007 totaled over $11 million. Deloitte analyzed approximately 14,000 expense items on an item-by-item basis to determine if they were properly charged and concluded that approximately $12.2 million was overpaid by the Funds. That amount was repaid by the Management Company with interest to the Funds and the managed account on March 19, 2007. Deloitte based its review on expense guidelines developed in consultation with Schulte Roth and Gibson Dunn. The governing documents of the Funds and managed accounts provide for certain categories of expenses to be chargeable to the Funds. Gibson Dunn found that the firm did not have consistent guidelines and training with respect to which expenses are chargeable to the Funds and managed accounts, and that the misallocation of expenses was due in part to confusion created by amendments to provisions of the Funds' governing documents regarding the categories of expenses chargeable to the Funds.

- In August 2006, interests in three investments were assigned from the Onshore Fund to the Offshore Fund "as of" a prior date, which would have reduced the gap between the performance of the funds for July 2006 by $2.1 million.

- The Independent Review concluded that a former employee who reported to the former CFO mistakenly failed to include an incentive fee of approximately $3.6 million in calculating NAV for the Offshore Fund in August 2005. This error was reversed out by the employee over the subsequent three months. Deloitte determined that the Offshore Fund investors benefited with no material impact to NAV.

4

Finally, the firm identified a question as to the appropriate valuation of a legacy investment portfolio of high-yield bonds, and referred the issue to Gibson Dunn and Deloitte for investigation. Gibson Dunn found that the portfolio manager, who left the firm in September 2005, did not follow a systematic pricing methodology based on third-party broker quotes. The portfolio was almost entirely wound down during 2006. Deloitte found that by retroactively applying an established pricing methodology in general use during the relevant time period, the portfolio may have been marginally overvalued. Applying a "highest bid, lowest offer" pricing methodology, Deloitte found an average discrepancy of $4.3 million or 0.67 percent of the legacy investment portfolio for a period starting in March 2004 and ending in October 2006. Deloitte also found that this discrepancy largely disappears when average bond spreads are considered. Nevertheless, despite the fact that Gibson Dunn and Deloitte found no conclusive evidence that the portfolio was overvalued, we decided to pay an amount equal to the management fees that were earned on the discrepancy between the price at which the portfolio was valued and what the portfolio would have been valued using the "highest bid, lowest offer" methodology plus interest on the over-accrued management fees and early incentive fees. This amounted to a total of $818,398 to six funds and managed accounts, based on their respective holdings of the positions. None of the current and former employees interviewed for the Independent Review could identify any other issue with respect to valuation of investments at the firm. Deloitte viewed our currently described pricing process and methodology as consistent with observed industry practices

In the course of its inquiry, the Independent Review identified an agreed-upon loan from a managed account to the Onshore Fund that had not been repaid. Upon discovery it was documented and repaid on a timely basis at a previously agreed rate of return.

Deloitte quantified the accumulated impact of the issues set forth above, including the remediation, on the Funds' net returns. For the period of more than three years from January 1, 2004 through February 28, 2007 (including interest from March 1 to March 19, 2007), Deloitte found the following[1]:

- For the Offshore Fund (LTD), the cumulative net return is increased 72 basis points, from 37.70% to 38.42%.

- For the Onshore Fund (LP), the cumulative net return is reduced 21 basis points, from 59.67% to 59.46%.

- For the TE Fund (TE), the cumulative net return is reduced 114 basis points from 29.99% to 28.85%

5

| Fund | January 1, 2004 - February 28, 2007 | | | Change in Returns by Year | | |
|------|------|------|------|------|------|------|
| | Cumulative Change to Assets ($ in millions) | Incremental Change to Cumulative Return | Adjusted Cumulative Net Return | 2004 | 2005 | 2006 |
| LTD | $9.1 | 0.72 % | 38.42 % | 0.11 % | 0.49 % | 0.11 % |
| LP | ($1.8) | (0.21) % | 59.46 % | 0.29 % | (0.59) % | 0.09 % |
| LE | ($1.8) | (1.14) % | 28.85 % | (0.52) % | (0.22) % | (0.32) % |

The firm and its auditors and advisers are analyzing any potential accounting or tax implications of the issues discussed in this communication. In its March 20, 2007, meeting with the SEC, Gibson Dunn and Deloitte presented the findings of their Independent Review. At that meeting, the SEC informed our counsel that, as expected, they had obtained a formal order of investigation with respect to the firm. We will continue to work in full cooperation with the SEC.

Consistent with our objective of achieving the highest institutional standards in the alternative investment arena and both in advance of, and in response to, the issues that precipitated the Independent Review, the firm has devoted significant resources to strengthen our global infrastructure of operational controls, compliance safeguards and management oversight procedures. These initiatives include the following:

- Strengthening of mechanisms for the valuation of liquid and illiquid investments;
- Implementation of new authorized signatory policies and procedures;
- Additional staff resources and requirements in support of the firm's expense policies;
- Introduction of new compliance policies and procedures;
- Appointment of a new Vice Chairman for governance and compliance;
- Recruitment of senior professionals in essential accounting/operational roles across the firm.

*Valuation*

We believe the previously noted issue concerning the historical valuation of liquid bonds in a legacy investment portfolio represents an isolated instance. The possible over-valuation of those bonds is by a margin of less than 1%. We nonetheless aim to make our valuation practices as rigorous as possible. We have therefore modified our methodology and strengthened controls to ensure the consistent and fair valuation of all investments. We no longer allow business analysts, traders, or portfolio managers to make final pricing decisions for their own portfolios. Instead, the authority to value investments is exercised only by the pricing and valuation committees whose conclusions are final.

*Liquid Investments*

To ensure the accurate pricing of liquid investments, we have established a Pricing Committee which is comprised of the firm's President, COO/CCO, CFO, Global Director of

6

Operations, Deputy Chief Compliance Officer and the Director of Risk Management. The Committee obtains pricing information from independent, third-party liquid asset pricing sources. For difficult to price securities, including those for which brokers' bid/ask quotes must be solicited, the firm currently uses a system of average bid for long positions and average offer for short positions, an even more conservative method than that used by Deloitte in retroactively valuing the legacy high-yield portfolio.

### Illiquid Investments

We have established a Valuation Committee for our illiquid investments, which include corporate private loans, real estate private loans, commercial and industrial assets, consumer assets, private equity investments, and other investments. The Committee is comprised of the COO/CCO, CFO, Global Director of Asset Management and the head of restructuring for Asset Management. The Committee makes decisions by consensus and independent of the investment professionals responsible for the transactions in question.

Approximately 95% of illiquid assets worth over $1 million and held over 90 days are valued by recognized, independent, third-party valuation firms. These firms generally submit written reports which provide a financial analysis of the asset and an opinion as to the reasonableness of the Committee's determination of the asset's fair market value/carrying value.

Materials and data provided by us to third-party valuation firms include loan agreements and related amendments and waivers; monthly financial statements and annual external audits for our portfolio companies; presentations by investment banks; and company investment memoranda. We provide valuation firms direct access to our portfolio companies.

### Authorized Signatory Policy

The firm's Authorized Signatory Policy requires the following:

- All new illiquid investment transactions must be reviewed and approved by the Managing Partner, President or COO/CCO, the investment professional, the legal department, the compliance department, the relevant Asset Manager, and the tax department.
- Transactions in excess of $5 million require approval from two of the three following individuals: the Managing Partner, President or COO/CCO.
- Non-investment related checks and wire transfers must be signed by the Managing Partner, President or COO/CCO. Sums greater than $250,000 require approval from at least two of them.

### Updated Expense Policies

The firm recently implemented Updated Expense Guidelines. In addition, we implemented the following measures:

- Training sessions for all administrative staff to clarify the procedures and requirements associated with the updated guidelines;
- Hiring of additional professionals to implement the updated guidelines;

7

- More detailed information required to facilitate the review of expenses under the provisions of the updated guidelines.

As provided in the fund documents, the Management Company is entitled to a Loan Servicing Fee with respect to certain eligible loans. The firm had previously failed to assess this fee, while at the same time overcharging certain directly incurred expenses with respect to servicing other assets. The Management Company has repaid those overcharges with interest and as of October 2006 is applying the Loan Servicing Fee, equivalent to 40 basis points to eligible loans.

*Senior Professional Recruitment*

Our people are the foundation of our success and we continually seek to recruit the most capable professionals to serve in key functional areas of the firm's global infrastructure. We have described for you in previous letters the large number of highly-experienced, senior professionals who have joined in the past eighteen months. We continue to seek the best available talent as we strive to build the world class platform that will allow us to scale our uniquely proprietary investment sourcing and servicing infrastructure. We are very pleased with recent talented additions to our team, including a Fund Controller, Product Controller, Entity Controller, and an OTC Operations Manager.

*Whistleblower Policy*

According to revised and updated employee guidelines, any report of potentially wrongful conduct is protected by a non-retaliation policy. Reports may be made directly but confidentially, or reports may be made anonymously. The firm has established ethics e-mail inboxes and physical mailboxes to facilitate the confidential or anonymous submission to senior management of employee concerns or complaints.

*Vice Chairman Appointment*

The Honorable Warren B. Rudman, former United States Senator from New Hampshire, has been appointed Vice Chairman of the firm's International Advisory Board with a mandate to advise us on best practices for governance and compliance and provide counsel to senior management on critical commercial and strategic issues. Senator Rudman is currently Of Counsel at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, where he focuses on corporate investigations, providing independent assessments of business practices, governance and other initiatives for major international corporations and financial institutions.

A former Attorney General of New Hampshire (1970-1976), Senator Rudman served two terms in the U.S. Senate (1981-1993) and was one of the chief sponsors of the Gramm-Rudman-Hollings Balanced Budget and Emergency Deficit Control Act of 1985. He also served on the Senate Ethics Committee (1985-1993) as Chairman and Vice Chairman, where he presided over numerous investigations and was active in drafting ethics legislation. In 1986, he was appointed Vice-Chairman of the Senate Select Committee investigating the Iran-Contra affair.

8

Following his retirement from public office in 1993, Senator Rudman was appointed by President Clinton to serve as Chairman of the President's Foreign Intelligence Advisory Board, where he directed the independent review of foreign intelligence matters from 1993 to 2001. He is currently a member of the Board of Directors of Boston Scientific and an independent director of several funds of the Dreyfus Corporation. He has previously served on the boards of Raytheon, Allied Waste, the American Stock Exchange and Chubb Corporation.

*Conclusion*

We are gratified to report that despite the time and resources devoted to the Independent Review, our investment performance remains strong and stable. We would like to thank our investors for their patience during the months of work encompassed in the Independent Review. We have sought to produce the most rigorous and transparent inquiry possible to bring these issues to closure and to improve our institutional infrastructure. We are dedicated to ensuring that we never encounter these issues again. With the conclusion of this self-initiated inquiry, we believe we are well along in the pursuit of this goal. We look forward to discussing any aspect of this communication and will welcome your questions and comments.

---

[1] *This document is being provided on a confidential basis by D.B. Zwirne & Co., L.P. ("DBZ & Co.") solely for the information of those persons to whom it is transmitted. This data is proprietary information of DBZ & Co. and may not be reproduced or otherwise disseminated in whole or in part without DBZ & Co.'s prior written consent.*

*Performance data provided by Deloitte & Touche to the firm has been included specifically to demonstrate the cumulative impact of the issues on each of the fund's returns. This data has been estimated, is unaudited and may be adjusted upon further review and analysis. Although DBZ & Co. reasonably believes this information to be reliable, it is not responsible for errors or omissions made by Deloitte & Touche to the firm in its calculation. Performance is an unaudited rate of return based on the market value of each fund as of February 28, 2007. Performance includes capital contributions and withdrawals, as applicable, is net of fees and expenses and includes the reinvestment of earnings. The returns are calculated net of management fees of 1.5% from inception through June 2004, as applicable, and 2% thereafter, and an incentive allocation/incentive fee of 20%. The fund's market value has been determined in accordance with the valuation methodology set forth in the fund's offering memorandum. It should be noted that the fund's investments have generally been valued using fair valuation as determined by the general partner, investment manager or third party sources, as applicable.*

*Past performance is no guarantee of future returns.*

*No person in any jurisdiction may treat this document as constituting either an offer to sell or a solicitation of an offer to buy any interest in any fund. A prospective investor must rely solely on the terms of, and disclosure of information in, such fund's final offering memorandum and related documents, which constitute the only basis on which subscriptions may be made.*

*The funds are high-risk investment vehicles that are available only to qualified individuals or entities that are willing to assume above average risk and limited liquidity. An investment in any of the funds is speculative and involves a high degree of risk. The terms and risk factors of each fund are set out in its Confidential Memorandum which is available to qualified prospective investors upon request.*

## APPENDIX A

### NOTICE OF EXTRAORDINARY GENERAL MEETING

### D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, LTD. (the "Company")

**NOTICE IS HEREBY GIVEN** that an Extraordinary General Meeting (the "**EGM**") of the Company will be held on May 26, 2009 at Maples and Calder, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands at 10:00 a.m. to consider and, if thought fit, pass the following resolution as an ordinary resolution (the "**Ordinary Resolution**"):

THAT:

1. the Company and/or a wholly-owned subsidiary thereof engage in the transactions as provided in the Subscription Agreement and the Buyer LLC Agreement as described in the Proxy Statement;

2. the Company engage in the Transactions (to the extent of and as contemplated by the Proxy Statement) and pay, upon the consummation of the Transactions, any unpaid management fees due to DBZCO for the time periods prior to the Closing; and

3. the Company terminate the Existing IMA and enter into the New IMA.

Capitalized terms used, but not defined, herein have the meanings ascribed to them in the Proxy Statement, dated as of the date hereof.

BY ORDER OF THE BOARD

*[signature]*     GARY LINFORD
                  DIRECTOR.

For and on behalf of
D.B. Zwirn Special Opportunities Fund, Ltd.

Registered Office: Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman KY1-1104, Cayman Islands

Dated the fifth day of May 2009

*A form of proxy has been included with this Notice.

$R2-1099#243/6

**NOTES:**

1.  A shareholder entitled to attend and vote at the above EGM is entitled to appoint one or more proxies to attend and vote in his/her stead. A proxy need not be a shareholder of the Company.

2.  A form of proxy for use at the EGM is enclosed. Whether or not you propose to attend the EGM in person, you are strongly advised to complete and sign the enclosed form of proxy in accordance with the instructions printed on it and then send it to, or deposit it (together with any power of attorney or other authority under which it is signed or a notarially certified copy of that power or authority) at the offices of GlobeOp Financial Services (Cayman) Limited, 45 Market Street, Suite 3205 2nd floor, Gardenia Court, Camana Bay, Grand Cayman KY1-9003, Cayman Islands or send it by facsimile to (345) 946-7652 or by email to Investors@GlobeOp.com (together with any power of attorney or other authority under which it is signed or a notarially certified copy of that power or authority), in each case marked for the attention of Investor Relations: Adam Weisberg and in each case with a separate copy to D.B. Zwirn & Co., L.P. by facsimile to (646) 720-9226 or email to investor.relations@dbzco.com by 10:00 a.m. (New York time) on May 22, 2009. If the original form is deposited at the offices of GlobeOp Financial Services (Cayman) Limited, please also send a copy of the form by facsimile or email to GlobeOp Financial Services (Cayman) Limited. Returning the completed form of proxy will not preclude you from attending the EGM and voting in person if you so wish. Anyone wishing to represent a corporate entity at the EGM in person must ensure that the duly completed proxy form is either returned to Company in accordance with the instructions herein contained or bring the original duly completed proxy form to the meeting as evidence of his authority to do so.

3.  If two or more persons are jointly regarded as holders of a share, the vote of the senior person who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of other joint holders. For this purpose seniority shall be determined by the order in which the names stand on the Company's register of shareholders in respect of the relevant shares.

4.  The quorum for the EGM is one or more shareholders present in person or by proxy representing at least fifty one percent (51%) of the voting rights attached to the issued and outstanding shares in the Company entitled to vote on the resolutions to be considered at the EGM.

**D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, LTD.**

(the "Company")

**FORM OF PROXY FOR MEMBERS**

I/We _____     _____

Please Print Name(s)

of _____     _____

Please Print Address(es)

being (a) shareholder(s) of the Company with _____ shares respectively hereby appoint

_____ of _____

or failing him/her

_____ of _____

or failing him/her the duly appointed Chairman of the EGM (as defined below) as my/our proxy to vote for me/us and on my/our behalf at the Extraordinary General Meeting of the Company (the "**EGM**") to be held on the 26th day of May 2009 at 10 a.m. at Maples and Calder, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands and at any adjournment of the EGM.  My proxy is instructed to vote on the resolution in respect of the matters specified in the Notice of the EGM as indicated below:

| Resolution | For | Against |
|---|---|---|
| The Ordinary Resolution (as defined in the Notice of the EGM) | | |

Please tick to indicate your voting preference.  If you do not complete this section, your proxy will vote or abstain at his/her discretion, as he/she will on any other business that may be raised at the EGM.

Dated: ____ day of _____ 2009

Signed:  _____

Name:  _____

**NOTES**

A proxy need not be a shareholder of the Company. Please insert the name of the person(s) of your own choice that you wish to be appointed proxy in the space provided, failing which the Chairman of the EGM will be appointed as your proxy.

1. If this form is returned without an indication as to how the proxy shall vote, the proxy will exercise his/her discretion as to whether he/she votes and if so how.

2. This form of proxy is for use by shareholders only. If the appointor is a corporate entity this form of proxy must either be under its seal or under the hand of some officer or attorney duly authorised for that purpose.

3. To be valid, this form must be completed and sent to or deposited (together with any power of attorney or other authority under which it is signed or a notarially certified copy of that power or authority) at the offices of GlobeOp Financial Services (Cayman) Limited, 45 Market Street, Suite 3205, 2nd floor, Gardenia Court, Camana Bay, Grand Cayman KY1-9003, Cayman Islands or send it by facsimile to (345) 946-7652 or by email to Investors@GlobeOp.com (together with any power of attorney or other authority under which it is signed or a notarially certified copy of that power or authority), in each case marked for the attention of Investor Relations: Adam Weisberg and in each case with a separate copy to D.B. Zwirn & Co., L.P. by facsimile to (646) 720-9226 or email to investor.relations@dbzco.com not later than 10:00 a.m. (New York time) on May 22, 2009 in accordance with the Articles of Association of the Company. If the original form is deposited at the offices of GlobeOp Financial Services (Cayman) Limited, please also send a copy of the form by facsimile or email to GlobeOp Financial Services (Cayman) Limited.

4. Any alterations made to this form must be initialled by you.

5. The completion and return of this form will not prevent you from attending the EGM and voting in person should you so wish.

6. In the case of joint holders:

   6.1   the senior should sign the form, but the names of all other joint holders should be stated on the form;

   6.2   the vote of the senior who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders.

7. For these purposes, seniority is determined by the order in which your names stand in the Company's register of shareholders in respect of the relevant shares.

8. A proxy may vote on a show of hands or on a poll.

## APPENDIX B

### DOMESTIC CONSENT MATTERS

The limited partners of each Domestic Fund will be asked to approve the following resolution with respect to such Domestic Fund:

**THAT:**

1. notwithstanding any provision of the Domestic Fund's limited partner agreement to the contrary, DBZGP be authorized to assign its limited partner interest in the Domestic Fund to the Buyer and to admit the Buyer as a limited partner of the Fund;.

2. the Domestic Fund be converted from a Delaware limited partnership into a Delaware limited liability company and, thereafter, be governed by a limited liability company agreement in the form provided to the limited partners;

3. the Domestic Fund and/or a wholly-owned subsidiary thereof engage in the transactions as provided in the Subscription Agreement and the Buyer LLC Agreement as described in the Proxy Statement;

4. the Domestic Fund engage in the Transactions (to the extent of and as contemplated by the Proxy Statement) and pay, upon the consummation of the Transactions, any unpaid management fees due to DBZCO for the time periods prior to the Closing; and

5. the Domestic Fund terminate the Existing IMA and enter into the New IMA.

Capitalized terms used but not defined, herein have the meanings ascribed to them in the Proxy Statement.